UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case No. 21-20408-CIV-MARTINEZ-BECERRA**

KENNETH CAREY
and STEVE ANYADIKE,

      Plaintiffs,

v.

JONATHAN KIRK, *et al.*

      Defendants.

_____/

**DEFENDANTS JONATHAN KIRK AND BILLION DOLLAR BABY
ENTERTAINMENT, LLC'S MOTION FOR SUMMARY JUDGMENT AGAINST
PLAINTIFFS KENNETH CAREY AND STEVE ANYADIKE**

Pursuant to Fed. R. Civ. P. 56 and Local Rules 7.1 and 56.1, Defendants Jonathan Kirk ("Kirk") and Billion Dollar Baby Entertainment, LLC ("BDBE") (collectively, the "BDBE Defendants") respectfully move for summary judgment against Plaintiffs Kenneth Carey ("Carey") and Steve Anyadike ("Anyadike").

The BDBE Defendants have filed separately their Statement of Material Facts ("SOMF") pursuant to Local Rule 56.1, and all parties' Joint Statement of Undisputed Facts ("Joint Fact Statement") pursuant to this Court's Trial Order dated February 17, 2021.

## I. Summary

BDBE moves for summary judgment against both Plaintiffs on all eight counts of the Amended Complaint. Kirk moves for *partial* summary judgment against both Plaintiffs on all counts except Counts I (breach of contract brought by Anyadike only), II (assault), and III (battery.) Therefore, the only claims where genuine issues of material fact remain for trial are Count I by Anyadike against Kirk, and Counts II and III by both Plaintiffs against Kirk.

## II. Background

Carey filed this action on February 1, 2020 in Miami-Dade County, Florida Circuit Court. Defendant Khalik Caldwell removed it to this Court on January 29, 2021 based on diversity of

citizenship.  (ECF No. 1).[1]

On June 19, 2020, Kirk filed a two-count counterclaim against Carey for common law invasion of privacy and unauthorized publication of name or likeness. (ECF No. 17-71).  Carey filed an answer on July 8, 2020 denying liability.  (ECF No. 17-72).

On November 19, 2021, Plaintiffs filed their Amended Complaint.  (ECF No. 121).  The gist of the Amended Complaint is that Kirk breached a "Performance Agreement" dated January 2, 2020[2] between Anyadike and Kirk pursuant to which Kirk agreed to make a walk-through at a Broward County, Florida event on certain conditions.  The Amended Complaint also alleges an alleged assault and battery on Plaintiffs by Kirk and non-parties on the day of the planned event.

The Amended Complaint contains eight counts against four defendants:

**Count I** – Breach of Contract by both Plaintiffs against Kirk;

**Count II** – Intentional Assault by both Plaintiffs against Kirk, BDBE, Universal Music Group, Inc. ("UMG"), and Interscope Records ("Interscope");

**Count III** – Intentional Battery by both Plaintiffs against Kirk, BDBE, UMG, and Interscope;

**Count IV** – Promissory Estoppel by both Plaintiffs against Kirk and BDBE;

**Count V** – Civil Conspiracy by both Plaintiffs against Kirk, BDBE, UMG, and Interscope;

**Count VI** – Defamation *Per Se* and *Per Quod* by both Plaintiffs against Kirk, BDBE, UMG, and Interscope;

**Count VII** – Intentional Infliction of Emotional Distress by both Plaintiffs against Kirk, BDBE, UMG, and Interscope; and

**Count VIII** – Civil Theft by both Plaintiffs against Kirk, BDBE, UMG, and Interscope.[3]

The BDBE Defendants are named in all eight counts, except only Kirk (not BDBE) is named in Count I.

---

[1]  On July 22, 2021,  the Court granted Caldwell's motion to compel arbitration and to stay this action (ECF No. 62).

[2]  The Agreement is dated January 2, 2019, but the parties agree that it intended to state January 2, <u>2020</u>.

[3]  Counts II, III, V, VII, and VIII also name as defendants four "co-conspirators," who are unnamed.

On December 3, 2021, the BDBE Defendants filed a motion to dismiss the Amended Complaint. (ECF No. 127).

### III. <u>Facts</u>

Carey and Anyadike are promoters of performances by musicians, focusing on rappers. (Carey dep. at 9; Anyadike dep. at 23).   In mid-December 2019, Carey contacted BDBE's then-employee, Kinsza Virgil ("Virgil"), to inquire whether Khalik Caldwell, a musician, would be interested in performing at a Broward County venue on January 2, 2020.  (Carey dep. at. 54-55).  Virgil, on behalf of BDBE, then prepared a contract between BDBE and Cary, which the parties executed.  (ECF. No. 14-1).  Under that contract, Caldwell agreed to perform on certain conditions at Café Iguana in Pembroke Pines, Florida on January 2, 2020.

In late December, Carey then contacted Virgil to inquire whether Kirk, also a musician who is known as "DaBaby," would be interested in promoting the Caldwell event, since Caldwell was an artist signed to Kirk's label.  (Carey dep. at 65). Virgil conveyed that Kirk was not interested in being involved with the event. (Carey dep. at 79). On or around January 1, 2020, when it became clear that tickets for the Caldwell show were not selling well, Anyadike resumed attempts to get Kirk to promote the show. (Anyadike dep. at 101, 111). Anyadike contacted Kirk on January 2, 2020 via calls and text messages and offered $20,000 for Kirk to "get on this event." (Anyadike dep. at 112).  Virgil, on behalf of Kirk, prepared a "Performance Agreement" dated January 2, 2020, which was executed by Anyadike.  (Anyadike dep. at 112; Virgil Decl. at Ex. A).  Although Kirk did not sign the Performance Agreement, he does not dispute that he agreed to its terms.  Under the Performance Agreement, Kirk agreed to make a social media post, social media drop[4] and walk-through at the Café Iguana event in exchange for $20,000.

On the scheduled day of the event, Anyadike met Kirk at the Novotel Hotel in Miami to collect his fee and record the social media drop. (Anyadike dep. at 123-130).  At the hotel, Anyadike met separately with an investor (whose name Anyadike did not know), who provided $20,000 in cash to Anyadike. (*Id*. at 123-130). Anyadike or Carey then handed that entire amount to Kirk in front of the hotel. (*Id*. at 129).

Anyadike informed Kirk that the social media drop would need to be postponed, because Anyadike and his investors were considering a change of venue to a Miami strip club. (Anyadike

---

[4]  The social media drop was going to be Kirk's recording of a video to be run on his Instagram account promoting the Café Iguana event.

dep. at 130-131).  At that point, an altercation ensued between Anyadike and Kirk.  Anyadike testified that Kirk struck him with a closed fist to the side of the head.  (Anyadike dep. at 146).[5] Anyadike then ran into the hotel lobby.  *Id*.

Carey contends that Kirk then struck him. (Carey dep. at 127-128).  Carey claims that during the altercation, Kirk or others pulled his pants down and poured apple juice on him, and took $80, his iPhone 6, and various credit cards. (Carey dep. at 131, 149).[6]  Carey testified that he never saw whether Kirk returned the $20,000 to the investor who provided the funds to pay Kirk.  (Carey dep. at 135).[7]

Anyadike testified that he was in the hotel lobby when Carey said he was hit, and thus did not witness that altercation. (Anyadike dep. at 147).  Anyadike testified no money or property was taken from him.  (Anyadike dep. at 148).  Anyadike also testified he did not know whether the $20,000 was returned by Kirk to the investor.  (*Id.* at 141).

Carey and Anyadike did not receive any treatment for any physical or emotional injuries claimed in this case.  (Carey dep at 163; Anyadike dep. at 149-150).

Carey and Anyadike testified that, after the incident, the BDBE Defendants defamed them. Specifically, they testified that Kirk wrote songs that *indirectly* referred to them in a disparaging way – they admit that their names were never used.  (Carey dep. at 212; Anyadike dep. at 173).[8]

Carey and Anyadike claimed that Kirk conspired with UMG to promote violence as a

---

[5]  Kirk testified that he struck Anyadike with an open hand.   (Kirk Decl. at ¶ 5).

[6]  Kirk testified that he never hit Carey, took any of his property, or even encountered him, as he had never met or spoken to him.  (Kirk Decl. at ¶¶ 6, 7).

[7]  As set forth in the BDBE Defendants' separately filed SOMF, Kirk testified that he returned the $20,000 on the spot to the investor who provided Anyadike with the funds, because the investor told Kirk that the funds were for a different event the following month, in February, over Super Bowl weekend. Kirk explained that he commanded a higher fee for that weekend. (Kirk Decl. at ¶ 4) and thus was unwilling to accept the $20,000.  The investor accepted the return of the funds.  *Id.*  Kirk testified that Anyadike misrepresented to him that the funds were payment for the Café Iguana event.

[8]  Kirk and BDBE deny that they ever published any defamatory statement about either Plaintiff.

marketing strategy to increase sales.   (Carey dep. at 236; Anyadike dep. at 172).[9] Carey's understanding of this marketing strategy is that Kirk "markets himself as a gangster, so, you know, him and his crew, they market themselves as, you know, like that's what they do.  You get close to DaBaby.  You could be a woman.  You could be a 79 year old man.  He's going to assault you because that's what sells records for him."  (Carey dep. at 235). Carey also testified that Universal and Interscope's involvement in this strategy is that "they don't have anything to stop it." *Id.* Carey further testified that his allegation that "DaBaby, Universal and Interscope accomplished their goal of creating a show that boosted their notoriety and ratings" (Am. Compl. at ¶ 29) is his "opinion" based on "social media and what [he] read online" (Carey dep. at 213, 237), and that he has no first-hand knowledge to support it. He claimed that "I don't think Universal does anything to deter Mr. Kirk's behavior. I think they applaud him for his behavior because it keeps him in the headlines and it keeps him making money." (Carey dep. at 226).

Anyadike similarly testified at his deposition that his allegation of a conspiracy and marketing plan was based on Universal/Interscope's failure to act. He testified "I have not seen their [Universal/Interscope] marketing scheme, but I have seen their ability to not do anything about it." (Anyadike dep. at 172).

 Anyadike also testified that he believes BDBE is "under [I]nterscope, which is under UMG." *Id.* at 174-175. He believes that "DaBaby, and he is part of Billion Dollar Baby Entertainment, which is part of – which is signing Interscope." *Id.* at 175. He further elaborated by example that "[t]hat's like me having an agreement with LeBron James and thinking that the Lakers don't have a say so in the situation or the NBA."

## IV.  <u>Legal Standard</u>

Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986) (emphasis in original).

---

[9]  The BDBE Defendants deny this allegation.

At the summary judgment stage, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).   "Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to 'come forward with specific facts showing there is a genuine issue for trial.'" *Torres v. Wal-mart Stores East, L.P.*,  2021WL 3634632, at *4 (S.D. Fla. Aug. 17, 2021) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).

At the summary judgment stage, "[a]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant.   An inference based on speculation and conjecture is not reasonable."  *Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988).   "Conclusory allegations and speculation are insufficient to create a genuine issue of material fact."  *Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018).   "[T]o survive a motion for summary judgment, the non-movant must do more than rely on bald speculation and conclusory allegations."  *Hernandez v. Palm Beach Cty. Bd. of Cty. Comm'rs*, No. 20-80075, 2021 WL 4459405, at *7 (S.D. Fla. Sept. 29, 2021); *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("[S]peculation does not create a genuine issue of fact; instead, it creates a *false* issue, the demolition of which is a primary goal of summary judgment.") (emphasis added).

## V.  Discussion

### A.   Kirk is Entitled to Summary Judgment on Count I Against Carey

The BDBE Defendants are entitled to summary judgment on Count I (Breach of Contract) against plaintiff Carey because the sued-upon contract is indisputably between Anyadike and Kirk only.  Therefore, Carey has no basis to assert as claim for breach of contract.

"Under Florida law, a plaintiff who is neither a party to nor a third-party beneficiary of a contract may not sue for breach of that contract, even if the plaintiff receives some incidental or consequential benefit from the contract."  *Sun Commodities, Inc. v. C.H. Robinson Worldwide, Inc.*, 2012 WL 602616, at *2 (S.D. Fla. Feb. 23, 2012).   "The intention of the contracting parties, gleaned from the contract itself is determinative. It is not enough that the services ... ultimately rendered accrue to the [third party]."  *Networkip, LLC v. Spread Enters., Inc.*, 922 So. 2d 355, 358 (Fla. 3d DCA 2006) (quoting *City of Tampa v. Thorton–Tomasetti, P.C.*, 646 So. 2d 279, 282–83 (Fla. 2nd DCA 1994)).  *See also Greenacre Props., Inc. v. Rao*, 933 So. 2d 19, 23 (Fla.

2d DCA 2006) (As a general rule, a person who is not a party to a contract cannot sue for a breach of the contract even if the person receives some incidental benefit from the contract.").

Here, the first two lines of the Performance Agreement expressly states that it is between Kirk and Anyadike only, and contains signature lines only for them.  There is no reference to Carey in that agreement.  Thus, Carey has no claim for a breach of a contract to which he is not a party.

Therefore, Kirk is entitled to summary judgment on this claim brought by Carey.  Kirk does not seek summary judgment under this count against Anyadike.

### B.       BDBE is Entitled to Summary Judgment on Counts  II and III

BDBE is entitled to summary judgment on Count II  ("Intentional Assault") and Count III  ("Intentional Battery") because the Amended Complaint fails to plead – and the record is devoid of any evidence – that BDBE was vicariously liable for the alleged intentional tort of its agent. Kirk does not seek summary judgment under this count.

"The general rule is that an employer cannot be held liable for the tortious or criminal acts of an employee, unless they were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer."  *Nazareth v. Herndon Ambulance Serv., Inc*., 467 So.2d 1076, 1078 (Fla. 5th DCA 1985).  "The question of whether an employee is acting within the course and scope of employment, where the facts are not in dispute, is that of law.  *Goss v. Human Servs. Assoc., Inc*., 79 So. 3d 127, 132 (Fla. 5th DCA 2012 (emphasis added).

In *Brown v. Zaveri*, 164 F. Supp. 2d 1354, 1361 (S.D. Fla. 2001), the alleged victim of an assault sued the attacker's employer.  On a motion to dismiss, the court rejected plaintiffs' claim that the employer was liable, holding that "[w]hen "an assault is purely personal to the servant, having no real connection with the master's business, the doctrine of respondeat superior is inapplicable to fasten liability upon the master." (quoting *Ayers v. Wal-Mart Stores,* 941 F. Supp. 1163, 1169 (M.D. Fla. 1996)). *See also Reillo v. Alternate Heath USA*, 2020 WL 6701625, at *5 (S.D. Fla. Nov. 13, 2020) (to hold an employer vicariously liable for the acts of its employee, a plaintiff must prove that the tortious conduct was 1) "of the the kind he was employed to perform,' " 2) occurred " 'substantially within the time and space limits authorized or required by the work to be performed,' " and 3) was " 'activated at least in part by a purpose to serve the master.' " (*quoting Fields v. Devereux Found., Inc*., 244 So. 3d 1193, 1196 (Fla. 2d DCA 2018)).

Here, the evidence establishes that Kirk was not acting within the scope of his capacity as owner of BDBE.  *See* Kirk Decl. at ¶ 10 (attesting that it was not within the scope of his authority to commit any intentional misconduct).  Further, to the extent Plaintiffs contend that the physical confrontation was related to the show scheduled for later that day, Kirk was an individual signator to the Performance Agreement; his company BDBE was not a party.  Thus, as a matter of contract law, Kirk was not acting in the capacity as owner of BDBE in that transaction.

Therefore, BDBE is entitled to summary judgment on both Plaintiffs' assault and battery claims.  Kirk does not seek summary judgment under these two claims.

### C.     The BDBE Defendants are Entitled to Summary Judgment on Count IV

No promissory estoppel claim exists by Anyadike against Kirk as a matter of law.  There is no dispute that a written agreement exists between Anyadike and Kirk.  A copy of that Performance Agreement is attached to the Amended Complaint as Exhibit 7.  Kirk admits that he entered into that agreement (which is attached to Virgil Decl. at Ex. A).  Therefore, promissory estoppel is not a viable claim, even in the alternative.  *See Concierge Servs., Inc. v. Flagler Holdings VI Beta Inc.*, No 21-20746, 2021 WL 3934225, at *4 (S.D. Fla. May 27, 2021) ("The doctrine of promissory estoppel is unavailable where the promise sought to be enforced is governed by a written contract between the parties.") (quoting *Am. Color Graphics, Inc. v. Brooks Pharmacy, Inc.*, No. 805CV1512T27TBM, 2006 WL 539543, at *4 (M.D. Fla. Mar. 6, 2006)).

Summary judgment is proper as to Carey's Promissory Estoppel claim as well.  First, Carey acknowledges that the written Performance Agreement between Anyadike and Kirk memorialized the arrangement whereby Kirk would appear at Café Iguana.  (Carey dep. at 99-102).  As noted above, Carey was not a party to that Performance Agreement.

 Second, Carey cannot prove the elements of a Promissory Estoppel claim. "The elements required to establish promissory estoppel liability under Florida law are: (1) a promise made by the promisor; (2) 'which the promisor should reasonably expect to induce action or forbearance on the part of the promisee,' (3) that in fact induced such action or forbearance, and that (4) 'injustice can be avoided only by enforcement of the promise.' " *White Holding Co., Ltd. Liab. Co. v. Martin Marietta Materials, Inc.*, 423 F. App'x. 943, 947 (11th Cir. 2011) (citing *W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 924 (Fla. 1989)) (quoting Restatement

(Second) of Contracts § 90 (1979)).

"Ultimately, the promise must be 'definite' and of a 'substantial nature,' the evidence 'clear and convincing,' *W.R. Grace & Co.*, 547 So. 2d at 920, and the reliance 'reasonable,' *Romo v. Amedex Ins. Co.*, 930 So. 2d 643, 650 (Fla. 3rd DCA 2006)." *GVB M.D. v. Aetna Health Inc.*, 2019 WL 6130825, at *9 (S.D. Fla. Nov. 19, 2019).

There is no record evidence that the BDBE Defendants ever made any type of promise to Carey.  In fact, the evidence is to the contrary.  (Kirk Decl. at ¶¶ 6, 9, 12; Virgil Decl. at ¶ 12. Carey does not allege in his Amended Complaint that Kirk or BDBE made any oral promise to him. That is fatal to Carey's promissory estoppel claim.  *See Levine v. United of Omaha Life. Insur. Co.*, 2019 WL 7841799, at *4 (S.D. Fla. Aug. 8, 2019) ("Plaintiff has not alleged that Defendant made a promise; Plaintiff has merely alleged that Defendant made a misstatement.").

### D.   The BDBE Defendants are Entitled to Summary Judgment on Count V

The BDBE Defendants are entitled to summary judgment on Count V, for civil conspiracy, because: 1) as a matter of law, Kirk cannot conspire with his company, BDBE, or its employees; 2) no evidence exists that the BDBE conspired with Universal or Interscope – or any person or entity – to harm Plaintiffs.

"The elements for civil conspiracy require (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) performance of an overt act in pursuit of the conspiracy; and (4) damage to the plaintiff because of the conspiratorial acts." *Bluegreen Vacations Unlimited, Inc. v. Montgomery Law Firm, LLC*, 2020 WL 12182222 (S.D. Fla.  Nov. 30, 2020). "Under Florida law, a civil conspiracy must have as its object the commission of an underlying tort." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281 (11th Cir. 2009).  The Amended Complaint alleges, in conclusory fashion, a conspiracy to commit assault, battery, defamation, and intentional infliction of emotional distress.  (Am. Compl. at ¶ 89).

Plaintiffs' core conspiracy allegation is contained in paragraph 90 of the Amended Complaint, which states:

> DaBaby [Kirk], BDBE, Identified Coconspirators/Agents of BDBE, Universal and Interscope conspired and have implemented a Marketing Plan and Scheme/Show that includes attacking and hurting innocent people, mostly African American, for the purposes of gaining news coverage and notoriety for their financial

gain and they have gained incredible amounts of influence and power from their illegal, criminal scheme.[10]

The record contains absolutely no evidence of this alleged conspiracy. Instead, Plaintiffs relied on pure speculation, conjecture, and their "opinions."

Carey testified as follows:

**Q:** "Is it your allegation that Jonathan Kirk conspired with Billion Dollar Baby Entertainment?

**A:** Yeah. I mean, that's my opinion. I mean, I think DaBaby does things for clout. I mean, I give you -- I mean, I been doing this a long time, so, I mean, DaBaby is signed to Interscope. 50 Cent was signed to Interscope. DaBaby is the like the new 50 Cent. Controversy sells.

**Q:** But I'm narrowing it down to Billion Dollar Baby and to BDB?

**A:** Oh, yeah, BDB.

**Q:** So your take is that Mr. Kirk, Jonathan Kirk conspired with BDB, correct?

**A:** I mean, I think he do. Yeah. I think he does whatever he can to keep himself in the limelight. Keep him in the social media light.

(Carey dep. at 213-214). Carey also testified:

**Q:** So anything that you are saying now in terms of this marketing plan is just your opinion based on whatever you['re] reading online in social media, et cetera, right?

**A:** Correct.

(Carey dep. at 237).

Anyadike testified as follows:

**Q:** … You tell me what exists that shows there's a grand marketing scheme, as referenced, about violence through Jon Kirk – Jonathan Kirk, that you've seen between Interscope, Universal, and Mr. Kirk. What have you seen?

[Plaintiffs' counsel]: Objection to form.

**Q:** Other than the three deals that you've done?

---

[10]  This allegation also appears in paragraphs 54, 64, and 122.

**A:**  The lack of -- the lack of censoring music; the lack of taking down music; the okay with pushing forward music, and their making money off of this. So because they don't do anything, they don't take action, that is a marketing  scheme in itself. If you do not do anything, you are allowing it. And you -- and by allowing you it, you are making money off of it and you are marketing this -- this is -- this is generating money for your company.

(Anyadike dep. at 179).

Plaintiffs are unable to point to any evidence in this record – none exists -- supporting their contention that Kirk, BDBE, and Universal "have conspired and have implemented a Marketing Plan and Scheme/Show that includes attacking and hurting innocent people, mostly African American, for the purposes of gaining news coverage and notoriety for their financial gain …" *See Bonner v. Radius Global Solutions*, 2021 WL 3169134, at *3 (S.D. Fla. July 27, 2021) ("[Plaintiff's]  account of events hinges on speculation as to the relationship between the three Defendants and the timing of their … efforts.  Of course, speculation alone without any evidence fails to satisfy the first element of a civil conspiracy: an agreement between the entities.").

The evidence is uncontroverted that BDBE and Kirk never agreed with each other or anyone else to engage in physical altercations with Plaintiffs or to commit violent acts against Plaintiffs (or anyone else) as a promoting and marketing strategy. (Kirk Decl. at ¶ 11; Virgil Decl. at ¶ 10).

Plaintiffs' conspiracy claim fails for the independent reason: under the intracorporate conspiracy doctrine, "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001).  In addition, "[j]ust as it is not legally possible for an individual to conspire with himself, it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself." *Merchant One, Inc. v. TLO, Inc.*, No. 19-cv-23719, 2020 WL 248608, at *9 (S.D. Fla. Jan. 16, 2020) (quoting *McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036* (11th Cir. 2000)).

Here, the Amended Complaint alleges a conspiracy among: i) Defendant Kirk; ii) the company he owns, Defendant BDBE; iii) "Identified cocospirators [sic]/Agents of BDBE"; and iv) Defendants Universal and Interscope, who Plaintiffs allege (inaccurately) are Kirk's principals. (ECF No. 121 at ¶ 90).  *See* Am. Compl. at  ¶ 56) ("All of the parties are <u>agents</u> as

part of a large chain to goes from Universal to Interscope to BDBE to DaBaby to Coconspirators") (emphasis added).

The evidence establishes that BDBE is solely owned by Kirk.  (Kirk Decl. at ¶ 3).  The Amended Complaint alleges that the four co-conspirators are employees of Kirk and BDBE. (*See* ¶¶ 6-9).  However, as a matter of law Kirk could not conspire with BDBE or its employees.

Therefore, the BDBE Defendants are entitled to summary judgment on the civil conspiracy claim.

### E.   The BDBE Defendants are Entitled to Summary Judgment on Count VI

The BDBE Defendants are entitled to summary judgment on Count VII (Defamation) because Plaintiffs are unable to identify any alleged defamatory statements that reference them by name, and in any event none of the statements constitute defamation under Florida law. Further, Plaintiffs cannot prove an essential element of their defamation *per quod* claim – special damages.

To state a claim for defamation, a plaintiff must allege that "(1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused injury to the plaintiff." *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015).

"In a *per se* action, the statements are 'so obviously defamatory' and 'damaging to reputation' that the injurious nature of the statement is apparent from the words in the statement itself[.]" *Paulson v. Cosm. Dermatology, Inc.*, No. 17-cv-20094, 2017 WL 2484197, at *3 (S.D. Fla. June 8, 2017).  In determining whether a publication is defamatory *per se*, "consideration is given only to the 'four corners' of the publication …"  *Paulson*, 2017 WL 2484197, at *3. Defamation *per se* must be "actionable on its face" and does not "require[ ] additional explanation of the words used to show that they have a defamatory meaning or that the person defamed is the plaintiff."  *Mac Isaac v. Twitter, Inc.,* 2021 WL 3860654, at * 4 (S.D. Fla. Aug. 30, 2021) *(quoting Thompson v. Orange Lake Country Club, Inc.*, 224 F. Supp. 2d 1368, 1377 (M.D. Fla. 2002)).  "When context is considered and 'extrinsic facts and innuendo are needed to prove the defamatory nature of the words,' the statements are not defamatory *per se.*"  *Paulson, supra*.

By contrast, defamation *per quod* "requires an additional explanation of, or an interpretation of innuendo suggested by the words used to demonstrate the defamatory meaning

or that the Plaintiff is the subject of the statement[,]" *Scobie v. Taylor*, No. 13-60457-CIV, 2013 WL 3776270, at *2 (S.D. Fla. July 17, 2013).

Plaintiffs' Amended Complaint identifies four areas of alleged defamation. Paragraphs 104-106 allege plaintiffs were defamed by a Miami-Dade County Police report, attached as exhibit 35 to the Amended Complaint. Paragraph 108 alleges the song "Life is Good", released February 15, 2020, defamed Plaintiffs through the lyrics "I can't entertain all that flodgin… I got fools try to sue up the boss… I got dudes trying to sue down in Florida." Next, Plaintiffs allege in paragraph 111 that the song "Talk About It", released April 17, 2020, defamed Plaintiffs through the lyrics "Court Days for the New Year… 20 on a lawyer, twenty seven thousand for a jet I never boarded…. A rich nigga can't rob a broke nigga and you know that, lock a nigga up in South Florida like Kodak, quarter million dollars in my motha fucking tote bag, think I like to fight til a nigga get a toe tag." Finally, Plaintiffs allege in paragraphs 115-116 that they were defamed by a post on Kirk's Instagram account, date unknown, which reads: "Don't allow yourself to be misled by janky promoters and lazy ass grown men itching for the opportunity to file a lawsuit that they won't win".

Here, Plaintiffs cannot satisfy the required proof under either defamation theory. Plaintiffs admitted that they cannot identify one publication where they are referenced by name. Instead, Plaintiffs rely on pure speculation.  (Anyadike dep. at 195, Carey dep. at 212).  Under Florida law, if a person alleging defamation is not named in the defamatory publication, "the communication as a whole [must] contain[ ] sufficient facts or references from which the injured person may be determined by the persons receiving the communication." *Mas Isaac*, supra, at *4 (quoting *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973)).

"In a per se action, consideration is given only to the 'four corners' of the publication and the language used should be interpreted as the 'common mind' would normally understand it.  … In a per se action, the statements are 'so obviously defamatory' and 'damaging to reputation' that the injurious nature of the statement is apparent from the words in the statement itself and the court consequently takes notice of that fact." *Paulson*, supra, at *3.

In *Morrison v. Univ. of Miami*,  2016 WL 3128604, at *7 (S.D. Fla. March 21, 2016), the court rejected  plaintiff's argument that she was defamed where she admitted that her name was never used in the alleged defamatory email, but insisted that her dispute with the defendant was "well-known to [Defendants' audience] since it had been well publicized in the media …"  *See*

*also Mas Isaac, supra* (holding that "based on the four corners of the [published statement], the Court cannot conclude that an individual reading the [published statements] would be able to identify them with Plaintiff").

*Murray v. Pronto Installations, Inc*., 2020 WL 6728812, at *1 (M.D. Fla. Nov. 16, 2020), demonstrates why Plaintiffs' defamation per se claims fail. There, a terminated employee posted social media posts about his former employer's owner and president. The first one identified the plaintiff by name and stated:

> It's funny to me how [expletive] like Chris Irvin think he can mentally and physically abuse people and think he's going to get away with it. Lie to you, steal from you. The whole nine then there is a problem when he's confronted about it and told that there are legal ramifications behind his actions regardless of how he feels. It's all good though. The lawyers agree with me and he was too dumb to listen to the warning. Oh and btw this [expletive] is the reason for my heart attack. He then hid the workers compensation from me claiming that worker's compensation doesn't pay for heart attacks meanwhile I got hurt on the job and it was caused by his actions because he thinks everything is a game. Well, we will see how much of a game it is.

The court held, on a motion to dismiss, that the post did not constitute defamation per se. It noted that the social media post could only rise to the level of libel *per se* "***if, when considered alone and without innuendo***, it (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or [4] tends to injure one in his trade or profession." *Id*. at *2 (quoting *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015) (emphasis in original). The court found that "the statements, when analyzed as the common mind would understand them and considered alone and without innuendo, do not rise to the level of libel *per se*." *Id*. at *3. It noted that only the first post mentioned the plaintiff's name and "the Court cannot determine with certainty that the statements in the second and third posts are even about [plaintiff]." *Id*. As to the first post, the court held that it did not: i) accuse plaintiff of an infamous crime or a felony; ii) subject him to hatred, ridicule, or contempt; and iii) tend to injure his trade or profession. *Id*. at *5-6. "It is for the Court to decide, as a **matter of law**, whether the complained of words are actionable expressions of fact or nonactionable expressions of rhetorical hyperbole." Id. at *4 (quoting *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379 (S.D. Fla. 2006)) (emphasis added).

The court in *Murray* held: "Due to the informal nature of social media pages, like

Facebook, "reasonable readers of most Facebook pages do not understand [posts] to be conveying factual information," and this must be taken into consideration by a court when analyzing the "context" of the statement." *Id*. at *5. "When the context of Murray's statements is taken into consideration, it becomes clear to this Court the statements were used on an informal social media platform in a loose, figurative sense as rhetoric or hyperbole—Murray was venting out of frustration on his personal Facebook page for being wrongfully terminated without notice." *Id*.

The court also held: "The Court has examined the context of [plaintiff's] statements and found that they were made in a loose, figurative sense as rhetoric or hyperbole out of frustration for being wrongfully terminated without notice. Nothing in [plaintiff's] statements directly accuses Irvin of physical or mental abuse, lying, stealing, or workers' compensation fraud." *Id*. at *6.

Here, Plaintiffs point to no statements that reference them by name. It is undisputed that Kirk never published their names. Instead, Plaintiffs rely on an undated social media post on Instagram that refers generically to "janky" promoters who file lawsuits they will not win. "Janky" is not a word in Webster's Dictionary – it is a slang word defined in the online Urban Dictionary as: "inferior quality; held in low social regard; old and dilapidated; refers almost exclusively to inanimate material objects, not to people." It similarly appears in The Oxford Dictionary of Modern Slang (2 ed.). As *Murray* illustrates, the Instagram post upon which Plaintiffs rely is not defamation *per se* as matter of law. Posting that a person is destined to lose a lawsuit is not defamatory. Plaintiffs also erroneously contend that the statement "I can't entertain all that flodgin …" is defamatory (again, without identifying any specific person). In *Murray*, the court agreed with the reasoning of another court that found a post that accused a specific person as being "great at lying" to be non-defamatory as a matter of law, because the comments were "rhetorical hyperbole and opinion." *Murray*, supra, at * 6 (quoting *Couloute v. Ryncarz*, 2012 WL 541089 (S.D. N.Y. Feb. 17, 2012)). Finally, Plaintiffs' reliance on the police report is meritless – the statements made in that report were attributed to *Plaintiffs*, not Kirk. (Ex. 35 to Am. Compl.).

Turning to Plaintiffs' claim for defamation *per quod*, Plaintiffs have offered no evidence that any of Kirk's social media posts or songs would be recognized by readers as referencing Plaintiffs *indirectly*. *See* Anyadike dep. at 198-199 ("This is – this is public – the public has

access to this, you can definitely connect the dots ….");  (Carey dep. at  212).

Even if Plaintiffs could point to a published statement that constituted defamation *per quod*, their claims fail because they cannot prove an element of the claim -- special damages.  In *Daniels v. HSN, Inc.,* 2020 WL 533927, at *5-6 (M.D. Fla. Feb. 3, 2020), the court granted summary judgment on defamation *per quod* claim based on plaintiffs' failure to prove special damages.  The court noted that "the chief characteristic of special damages is a *realized* or *liquidated* loss." (emphasis in original). However, plaintiff did not claim he "actually spent" money to "repair his reputation." Here, similarly, Plaintiffs never took the position that they expended any funds to counter any alleged defamatory statements, and they have not produced a single document reflecting any such expenditures.

In addition, BDBE (separate and apart from Kirk) cannot be liable for defamation because there is no evidence it had any role in the publications on which Plaintiffs base their claim.  The central premise of Plaintiffs' claim is that BDBE is Kirk's record label and publisher. (Carey dep. at 230; Anyadike dep. at 174-175, 215, 243).  Plaintiffs are incorrect. The evidence is incontrovertible that BDBE is neither Kirk's label nor publisher – a different record label is. *See* Kirk Decl. at ¶ 13. BDBE is a single-member company formed by Kirk for administrative purposes and for signing new artists found by Kirk. The "Billion Dollar Baby" name is trademarked.

Furthermore, Plaintiffs can point to no evidence demonstrating the Kirk was acting within the scope of his role as owner of BDBE when he made the allegedly defamatory statements. In *Happy Tax Franchising,, LLC. v. JL Hill Grp.*, 2021 WL 3811041, at *6 (S.D. Fla. June 7, 2021), Report and Recommendation *affirmed and adopted,* ECF No. 118, the court noted that "a corporation may be liable for its employees' slanderous comments" (quoting *Ohrn v. JP Morgan Chase & Co.*, No. 13-80136-CIV, 2014 WL 3809181, at *7 (S.D. Fla. Aug. 1, 2014) – if certain facts are shown.  In determining a corporation's liability for an employee's statements, courts consider: "(a) whether the person who uttered the slanderous words was an authorized agent of the corporation; (b) if so, whether he or she was acting *within the scope of her employment* when making the slanderous statements; and (c) whether the language charged was used in the *actual performance of her duties* touching the matter in question." *Id*. (emphasis added).  In *Happy Tax Franchising*, the court rejected, on a motion to dismiss, a plaintiff's attempt to attribute statements by an individual defendant to corporate defendants on the basis

that they acted in concert with one another.  The court concluded that "Plaintiffs' conclusory allegations that all Defendants were acting individually and in concert fails to provide any facts to demonstrate that the defamatory statements published by [two individual defendants] were made while acting within the scope of their duties as sole proprietors of their respective companies, and whether the language charged was used in the actual performance of their duties." *Id*.

Therefore, the BDBE Defendants are entitled to summary judgment on the defamation claim.

### F.      The BDBE Defendants are Entitled to Summary Judgment on Count VII

The BDBE Defendants are entitled to summary judgment on Count VII (Intentional Infliction of Emotional Distress) because: i) as a matter of law, the conduct alleged does not rise to the level required under Florida law to satisfy any of that tort's elements; and ii) BDBE is not vicariously liable for the alleged intentional torts of its agents.

The record is devoid of the high threshold of evidence required to support this claim.

To prove a claim under Florida law for intentional infliction of emotional distress, a plaintiff must demonstrate "(1) intentional or reckless conduct (2) that is outrageous in that it is beyond all bounds of decency and utterly intolerable in a civilized community (3) and that causes the victim emotional distress (4) that is severe." *Hammer v. Sorensen*, 824 F. App'x 689, 694 (11th Cir. 2020) (quoting *Kim v. Jung Hyun Chang*, 249 So. 3d 1300, 1305 (Fla. 2d DCA 2018)).

"What constitutes 'outrageous' conduct is a **question of law** for the court to resolve—not a question of fact for a jury." *Noah v. Assor*, 379 F.Supp.3d 1284, 1299 (S.D. Fla. 2019) (emphasis added).  "While there is no exhaustive or concrete list of what constitutes 'outrageous conduct,' Florida common law has evolved an extremely high standard." *Casado v. Miami-Dade Cty.*, 340 F.Supp.3d 1320, 1332 (S.D. Fla. 2018). "[C]ourts uphold claims of intentional infliction of emotional distress only in 'extremely rare circumstances.'" *Id*. (quoting *Triana v. Diaz*, 12-21309-CIV-KING, 2014 WL 5319800, at *7 (S.D. Fla. Oct. 16, 2014)).

Recently, in *Brown v. Bellinger*, 843 F. App'x 183, 188-89 (11th Cir. 2021), the Eleventh circuit affirmed the granting of summary judgment on an IIED claim based on plaintiff's failure to prove severe emotional distress. "[S]evere emotional distress means emotional distress of such a substantial quality or enduring quality[ ] that no reasonable person in a civilized society should be expected to endure it." *Id*. (quoting *Kim,* 249 So. 3d at 1305).  The Court rejected plaintiff's

reliance on his testimony that he saw a psychiatrist every six months for depression and anger control and to renew his anti-depressant medication, finding it did not satisfy the high standard imposed by Florida law.  The Court, quoting *Kim*, noted: "[C]ourts that have tackled this issue have recognized that a high standard for determining what kind of emotional distress is remediable in a claim for intentional infliction is necessary to prevent the tort from becoming a venue for litigation over every emotional injury." *Kim,* 249 So. 3d at 1305.

To prove the "outrageousness" element, "it is not enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort*." Hammer,* 824 F. App'x at 694 (quoting *Williams v. City of Minneola*, 575 So. 2d 683, 691 (Fla. 5th DCA 1991)).

Here, Plaintiffs cannot satisfy any of the elements of an intentional infliction of emotional distress claim.  Cast in their most favorable light, Plaintiffs' claims boil down to garden variety battery claims, with no serious injuries even alleged.  Anyadike testified he was struck once, and the thrust of Carey's claim is that he was embarrassed by having his pants pulled down, his shirt ripped, and apple juice poured on him. (Anyadike dep. at 144; Carey dep. at 149).  Neither Plaintiff sought medical treatment for their injuries – physical or emotional -- at any time. Simply put, under Florida law Plaintiffs have not come close to proving any of the elements of an intentional infliction of emotional distress claim. Plaintiffs cannot satisfy the "outrageousness" element as a matter of law.  Plaintiffs also cannot establish the severity element of this claim: as the court held in *Kim*, "the objective question is whether the emotional distress the plaintiff suffered was so intense or so long-lasting that no reasonable person should be expected to endure it." *Kim*, 249 So.3d at 1306.

Independently, for the same reasons BDBE cannot be held liable for the Kirk's alleged assault and battery, it cannot be liable for Kirk's alleged intentional infliction of emotional distress.  *See Nazareth, supra; Goss, supra; Zaveri, supra.*

Therefore, the BDBE Defendants are entitled to summary judgment on the IIED claim.

## G.    The BDBE Defendants are Entitled to Summary Judgment on Count VIII

A plaintiff alleging civil theft must prove a violation of Florida's criminal theft statute. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009).  Civil theft requires proof

that a defendant "(1) knowingly (2) obtained or used, or endeavored to obtain or use, [Plaintiff's] property with (3) 'felonious intent' (4) either temporarily or permanently to (a) deprive [Plaintiff] of its right to or a benefit from the property or (b) appropriate the property to [Defendant's] own use or to the use of any person not entitled to the property." *Amparo v. Classica Cruise Operator, Ltd., Inc*., 2021 WL 4989915, at *5 (S.D. Fla. Oct. 26, 2021) (quoting *Mazer*).  A plaintiff must establish all of these elements by <u>clear and convincing</u> evidence to defeat summary judgment.  *Tulepan v. Roberts*, 2015 WL 2355541, at *10 (S.D. Fla. Jan. 16, 2015).

Anyadike failed to comply with Florida Statute 772.11, which provides, in relevant part, that "[b]efore filing an action for damages under this section, the person claiming injury must make a written demand for $200 or the treble damage amount of the person liable for damages under this section." *See Korman v. Iglesias*, 736 F. Supp. 261, 267 (S.D. Fla. 1990) ("[B]efore an action for civil theft is filed the plaintiff must make written demand for payment upon the defendant, and allow 30 days for payment.").

The Amended Complaint's civil theft claim is brought by both Plaintiffs, but only Carey attached a statutory pre-suit demand.  The civil theft demand letter from Plaintiffs' counsel expressly states that it was sent on behalf of Carey only  *See* Ex. 37 to Am. Compl.  (ECF No. 121-1, at p. 42).  In that letter, only Carey claims that cash and personal items were taken from him – not Anyadike.  *See also* Am. Compl. at  ¶¶ 6, 7, and 11.[11]

Therefore, it is undisputed Anyadike did not comply with the pre-suit statutory demand requirement.  Nor did he comply with that requirement at any time during the pendency of this suit.  Plaintiffs' counsel recently represented to this Court that Anyadike did not a civil theft demand letter. *See* Plaintiffs' Response [ECF. No. 146] to the BDBE Defendants' Motion to Dismiss, at p. 3).

Furthermore, Anyadike admitted at his deposition that no personal property was taken from him by the BDBE Defendants.  (Anyadike dep. at 148).   To the extent they claim that the $20,000 fee paid to Kirk was not returned, both Carey and Anyadike testified that they were not sure whether Kirk returned the $20,000 to one of the investors.  (Anyadike dep. at 141; Carey dep. at 135).

---

[11] Count VIII has misnumbered paragraphs.  After paragraph number 127, Count VIII starts at paragraph "1".

Both Plaintiffs' civil theft claims fail on the merits for an independent reason. Plaintiffs claim that the BDBE Defendants had a contractual obligation to return $20,000 that they paid to Kirk. However, courts prohibit civil theft claims where the right to funds is governed by a contract. *See Longhi v. AMG Financial Group, Inc*., 2020 WL 7481167 at *3 (S.D. Fla. Jan. 24, 2020), Report and Recommendation adopted at ECF No. 32 ("Plaintiff cannot recover for conversion or civil theft because there was already a contractual relationship between the parties. There is no allegation, for example, that the conversion or civil theft is independent from [Defendant's] failure to comply with the contractual agreement."). *See also Barrakuda, Ltd*. v. *Zazaby Jewels, Inc*., 2020 WL 7493097 (S.D. Fla. Sept. 24, 2020) (dismissing civil theft claim under independent tort doctrine where that claim was "ultimately based on the same underlying conduct giving rise to its breach of contract claim. Such conduct includes the failure to perform under the initial agreement …").

In *Amparo v. Classica Cruise Operator, Ltd., Inc*., 2021 WL 4989915, at *5 (S.D. Fla. Oct. 26, 2021), the court granted defendant summary judgment on a civil theft claim analogous to this case. It held:

> Further, even if criminal intent were somehow alleged, it would be impossible for a reasonable jury to award damages related to this claim *because no evidence has been provided as to the value of the items*. While Plaintiff Amparo claims that a Rolex watch worth $7,000.00 was stolen along with $5,000.00 in cash, he was unable to produce a receipt for the watch, an ATM receipt or bank statement indicating that he had withdrawn such an amount of cash, or even remember the store where he purchased his jewelry. Similarly, while Plaintiff Fuentes testified that $700.00 was taken from her wallet, and jewelry appraised at $800.00 was also taken, *no evidence outside of Plaintiffs' testimony has been presented to validate that these items were stolen, appraised at such values, or even that they existed*. (Emphasis added).

Similarly, here, Carey has not presented any evidence of the value of his phone or credit cards. Nor does he claim the credit cards were used by the BDBE Defendants. Also, Carey asserts in his Civil Theft count that his phone had an estimated value of $100,000 since it was "his personal computer, work produce [sic], work lifeline and intellectual property." (Am. Compl. at ¶ 9, p. 22). He offers no evidence supporting that assertion as to value, and thus the civil theft claim cannot succeed. *See Amparo, supra.*

Finally, BDBE cannot be held liable for the alleged civil theft by Kirk because Plaintiffs

have failed to plead, let alone prove, that BDBE is derivatively liable for Kirk's alleged misconduct.  This law is addressed in the next section of this Motion.

Therefore, the BDBE Defendants are entitled to summary judgment on the civil theft claim.

### H.  The BDBE Defendants Are Entitled to Summary Judgment Under Counts II, III, IV, VI, VII, and VIII on the Ground that Plaintiffs Have Not Plead Separate Claims for Vicarious Liability

All of Plaintiffs' claims against BDBD, with the exception of Count V for civil conspiracy, seek to hold BDBE vicariously liable for the actions of Kirk.  (*See* Am. Compl. at ¶¶ 26-28; 56; Carey dep. at  214, 244;  Anyadike dep. at 174-176, 246).

Plaintiffs fail to even plead vicarious liability claims against BDBE as required by numerous opinions in this district.  *See Jacobs v. Mid-Continent Cas. Co*., 2021 WL 4077956, at *5 (S.D. Fla. Sept. 8, 2021)   ("[U]nder Florida law, a plaintiff cannot sustain a vicarious-liability claim unless she pleads it explicitly *in a separate coun*t of her complaint.") (emphasis in original).  *See also Amerisure Insur. Co. v. Seneca Speciality Insur. Co*., 2020 WL 3317035, at *5 (S.D. Fla. 2020) ( "Florida law is clear: 'to pursue a vicarious liability claim, the claimant must specifically plead it as a separate cause of action.'") (citation omitted).

Here, Plaintiffs have not pled their derivative claims against BDBE as separate causes of action in separate counts, nor have they alleged the elements of derivative liability or pointed to any evidence supporting that theory.

Summary judgment is appropriate where a plaintiff fails to allege vicarious liability in the complaint and the conduct alleged in the complaint was not the defendant's, but rather its agents. *Schaffer v. A.O. Smith Harvestore Prods., Inc*., 74 F.3d 722, 731 (6th Cir. 1996) (granting summary judgment for defendant based on plaintiff's failure to allege a theory of vicarious liability linking defendant to the acts alleged in the complaint).  A plaintiff is precluded from making a claim of vicarious liability for the first time in its response to defendant's motion for summary judgment.  *Computer Aid, Inc. v. Hewlett–Packard Co*., 56 F. Supp. 2d 526, 537–38 (E.D. Pa.1999) (granting defendant's motion for summary judgment for plaintiff's failure to plead vicarious liability, and holding that plaintiff may not go beyond the scope of its pleadings in responding to defendant's summary judgment).

Therefore, all counts except count V for civil conspiracy should all be dismissed against

BDBE on the independent ground that Plaintiffs have failed to plead – much less proven --
vicarious liability against it.

## VI.  Conclusion

For the above reasons, BDBE respectfully requests that the Court enter summary
judgment in its favor on all counts of the Amended Complaint and dismiss those claims with
prejudice, and award all other relief that is appropriate.

Kirk respectfully requests that the Court enter summary judgment in his favor on Counts
I (as to the claim brought by Carey only), IV, V, VI, VII, and VIII of the Amended Complaint
and dismiss those claims with prejudice, and award all other relief that is appropriate.

Therefore, in sum, the only claims where genuine issues of material fact remain for trial
are Count I by Anyadike against Kirk, and Counts II and III by both Plaintiffs against Kirk.

## **Request for Hearing**

Pursuant to Local Rule 7.1(b)(2), counsel for the BDBE Defendants respectfully request
that the Court set oral argument on this Motion.  Undersigned counsel believes that oral
argument will facilitate the Court's resolution of the Motion and allow counsel to address any
questions the Court may have.  We estimate that 30 minutes would suffice.

Respectfully Submitted,

THE FINDLING LAW FIRM
*Counsel for Defendant Jonathan Kirk*
One Securities Centre
3490 Piedmont Road, Suite 600
Atlanta, Georgia 30305
Telephone: (404) 460-4500
Fax:  (404) 460-4501
drew@findlinglawfirm.com
zack@findlinglawfirm.com

*/s/ Drew Findling*
DREW FINDLING, admitted *pro hac vice*

*/s/ Zack Kelehear*
ZACK KELEHEAR, admitted *pro hac vice*

and

GRAYROBINSON, P.A.
*Counsel for Defendants Jonathan Kirk,*
*Billion Dollar Baby Entertainment LLC and*
*Khalik Caldwell*
333 S.E. Second Avenue
Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Fax: (305) 416-6887
Brian.bieber@gray-robinson.com
Scott.cagan@gray-robinson.com

By: */s/ Scott L. Cagan*       
SCOTT L. CAGAN
Fla. Bar No.: 822681

*/s/ Brian H. Bieber*       
BRIAN H. BIEBER
Fla. Bar No.: 8140

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Scott L. Cagan

## **SERVICE LIST**

Jonathan May, Esq.
The Lions' Den, Attorneys at Law
1395 Brickell Avenue
Suite 900
Miami, FL 33131
jonmay@lionsdenjustice.com
*Attorney for Plaintiff Kenneth Carey and Steve Anyadike*


Kevin Markow, Esq.
Evan Benjamin Berger, Esq.
BECKER & POLIAKOFF, P.A.
1 East Broward Boulevard
Suite 1800
Fort Lauderdale, FL 33301
KMarkow@beckerlawyers.com (*primary*)
EBerger@bplegal.com  (*primary*)
Dgoldman@beckerlawyers.com  (*primary*)
Nsantiago@beckerlawyers.com  (*secondary*)
SSegall@beckerlawyers.com  (*secondary*)
*Attorney for Defendants Universal Music*
*Group, Inc. and Interscope Records*


/814953/2#46184424 v1