UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number: 21-20408-CIV-MARTINEZ-BECERRA**

KENNETH CAREY, *et al.*,

      Plaintiffs,

v.

JONATHAN KIRK, *et al.*,

      Defendant.

_____/

## <u>OMNIBUS ORDER</u>

Before the Court are Defendants Jonathan Kirk ("Kirk") and Billion Dollar Baby Entertainment, LLC' s ("BDBE") Motion to Dismiss, (ECF No. 127), and Motion for Summary Judgment ("Defendants' Motion"), (ECF No. 151); Plaintiffs' Motions for Summary Judgment against Kirk and BDBE ("Plaintiffs' Motion"), (ECF Nos. 157, 159); and various other pending, related motions addressed herein. After careful consideration, the Plaintiffs' Motion and Defendants' Motion are **GRANTED in part and DENIED in part.**

### I.      INTRODUCTION

Sometimes being a Rockstar, or simply acting like one, has consequences. Plaintiffs' case arises out of a physical altercation between Defendant Jonathan Kirk, a/k/a DaBaby, and Plaintiffs Kenneth Carey and Steve Anyadike. BDBE, with no apparent direct involvement, was caught in the middle of the fight.

The incident giving rise to this lawsuit can best be described as a Big Business deal gone wrong. Kirk entered into a written agreement with Anyadike to make a "social media drop" and event walkthrough at a show scheduled to take place on January 2, 2020, at a nightclub in

Pembroke Pines, Florida. In exchange, Anyadike agreed to pay Kirk a $20,000 engagement fee. What actually happened on January 2, 2020 is in much dispute. But one thing is clear: Kirk hit Anyadike. His reasons for doing so, however, are hotly contested by the parties. Premised on this background, Plaintiffs filed suit against Kirk and BDBE. Plaintiffs' briefing is far from clear, and combing through the Amended Complaint required nothing short of herculean efforts. Despite being confusingly drafted, Plaintiffs' Amended Complaint can be understood to raise a total of thirty claims against Defendants.

After careful consideration of Plaintiffs' claims, the parties' arguments, and the pertinent portions of the record, the Court finds that the only claims that survive summary judgment are Anyadike's claim against Kirk for breach of contract (Count I), and Carey's claims against Kirk for assault (Count II) and battery (Count III). Further, because the Court finds Kirk liable for assault (Count II) and battery (Count III) as to Anyadike, this claim also proceeds to trial for a determination of Anyadike's damages.

## II.    BACKGROUND

Plaintiffs Carey and Anyadike are music event planners/promoters focusing on booking rappers for shows. (Defs.' Statement of Material Facts ("SOMF") ¶ 1, ECF No. 152); *see* Defs.' Mot. at 3). BDBE is an entity solely owned by Kirk used for signing new artists discovered by Kirk. (Defs.' SOMF ¶ 3; Defs.' Mot. at 16). Defendant Jonathan Kirk is a rapper professionally known as DaBaby ("Kirk" or "DaBaby"). (Defs.' SOMF ¶ 3). Khalik Caldwell is a rapper known as Stunna 4 Vegas.[1]

Carey and BDBE entered into a performance agreement for Caldwell to perform on January

---

[1] Caldwell was originally named as a defendant in this action. (*See* ECF No. 1-3). The Court granted Caldwell's motion to compel arbitration, (*see* ECF No. 62), and Plaintiffs later dropped their claims against Caldwell in the Amended Complaint, (*see* ECF No. 191).

2, 2020 at Café Iguana, a venue located in Pembroke, Pines, Florida. (Defs.' SOMF ¶ 7). To promote this event, Anyadike and Kirk entered into a performance agreement ("Performance Agreement") wherein Kirk agreed to make a "social media post, social media drop, and venue walkthrough" at the January 2 event in exchange for a $20,000 engagement fee. (Defs.' SOMF ¶ 11; *see* Performance Agreement, ECF No. 152-1). The social media drop consisted of Kirk's recording of a video to be run on his Instagram account promoting the Café Iguana event. (Defs.' Mot. at 3 n.4). Although Kirk did not sign the Performance Agreement, he does not dispute that he agreed to its terms. (*Id.* at 3).

The parties dispute the events that took place on January 2, 2020 (the "Incident"), but the Court summarizes their positions as best it can. It is undisputed on the afternoon of January 2, 2020, Anyadike met Kirk at the Novotel hotel in Miami to collect his fee pursuant to the Performance Agreement. (Defs.' SOMF ¶ 15). The parties met outside the hotel. (*See* ECF No. 177).[2] According to Kirk, prior to him receiving the money, he saw another individual, who he later came to know as Antonio Soto, hand Anyadike the money. (Kirk Decl. ¶ 4, ECF No. 153-2; Kirk Dep. at 210:20–21, ECF No. 191-1). Kirk explains that Soto informed him he was told the money was being paid to Kirk as a down payment for an event during the Super Bowl weekend in February, 2020, rather than for his appearance at Café Iguana that same night. (*Id.*). Kirk states that after learning this, he handed the $20,000 back to Soto, who accepted the funds. (*Id.*). There

---

[2] Plaintiffs submitted twenty-one videos in support of their response to Defendants' Motion. The majority of these videos are unauthenticated videos containing hearsay purportedly obtained from YouTube and tabloid website named TMZ. In addition, several videos relate to events completely unrelated to the case at hand and the Incident between the parties. Accordingly, the only video the Court will consider is the surveillance video from the Novotel hotel because, (1) its authenticity is not in dispute, and (2) it is a soundless video that does not qualify as hearsay. *See United States v. Clotaire*, 963 F.3d 1288, 1295 (11th Cir. 2020) ("Surveillance cameras are not witnesses, and surveillance photos are not statements.").

is no dispute that, at some point, Kirk struck Anyadike, (Defs.' SOMF ¶ 18), but the parties dispute why he did so. Kirk maintains he hit Anyadike with an open hand after learning that Anyadike lied to him and attempted to "involve [him] in this scheme to defraud Mr. Soto[.]" (*Id.* ¶ 5). As to Carey, Kirk purports to have never met or spoken to Carey before. (*Id.* ¶ 6).

Plaintiffs give more color to the story. They claim to have met with Soto at Novotel prior to meeting with Kirk, and that Soto gave the money to Carey. (Carey Dep. at 123:15–20; Anyadike Dep. at 128:1–8).[3] Then, at approximately 4:00 p.m. that day, Plaintiffs met with Kirk at Novotel to pay him the $20,000. (*See* Anyadike Dep. at 127:7–12; 130:10–11, 131:18). Anyadike contends that either he or Carey handed the money to Kirk. (*Id.* at 129:23–25). After handing Kirk the money, Anyadike maintains there was a "mix-up" with the video drop[.]" (*Id.* at 130:14–25). Because the show was "doing bad" and they were having difficulties getting people to attend, he, along with Carey and other promoters, decided to change the location from Café Iguana to a venue in Miami, Florida. (*Id.* at 134:1–10). This was purportedly communicated to Kirk when he was collecting the money, and Anayadike asked Kirk to come back to record the video drop. (*See id.* at 139:22–140:1). At that point, Kirk became frustrated and hit Anyadike with a closed fist. (*Id.* at 140:8–9; 144:6–15). After being punched, Anaydike ran into the hotel. (*Id.* at 140:10–15). Anyadike testified that he does not recall whether Kirk gave the money back to Soto and he does not recall any comments being made about the Super Bowl weekend. (*Id.* at 141:2–24). Anyadike explained that he was hit in the head "pretty hard" and does not recall a lot about what happened. (*Id.* 141:25–142:3).

After Kirk hit Anyadike, Carey contends that Kirk and the individuals accompanying him

---

[3] When referencing parties' depositions, the Court cites to the page numbers in the transcript.

hit him, pulled his pants down, ripped his shirt, and poured apple juice on him. (Carey Dep. at 127:22–128:2, 149:4–5). Kirk then took Carey's iPhone 6, the $80 Carey had on him, his credit cards, and other "stuff that was in [his] pocket." (*Id.* at 149:16–150:2). Carey claims that his phone contained the phone numbers of all the celebrities he worked with. (*Id.*).

Unlike Anyadike's position, however, Carey explained during his deposition that Kirk hit him and Anyadike after demanding $10,000 more than what the Performance Agreement called for. (Carey Dep. at 151:24–152:8). Carey also reported to the police officers that the fight ensued because Kirk demanded more money. (ECF No. 121-1 at 37–38). Notably, Anyadike's statement to the police corroborated Carey's statement. (*Id.* at 38). In any event, the Stunna 4 Vegas show scheduled for January 2, 2020 never took place. (*See* Anyadike Dep. at 139:5).

Less than a week after the Incident, on January 7, 2020, Carey, through his counsel, sent a demand letter to Kirk pursuant to Section 90.408 of the Florida Statutes. (ECF No. 121-1 at 42–48). On February 1, 2020, Carey initiated this action in state court against five defendants. (ECF No. 1-3). On January 29, 2022, the case was removed from state court based on diversity jurisdiction. (ECF No. 1). The only remaining defendants in this case are Kirk and BDBE, as all others have been either voluntarily dismissed or dismissed by the Court for lack of personal jurisdiction. (*See* ECF No. 121; ECF No. 272).

The operative Amended Complaint, (ECF No. 121), contains the following counts:

- **Count I** – Breach of Contract by both Plaintiffs against Kirk;
- **Count II** – Intentional Assault by both Plaintiffs against Kirk and BDBE,
- **Count III** – Intentional Battery by both Plaintiffs against Kirk and BDBE,
- **Count IV** – Promissory Estoppel by both Plaintiffs against Kirk and BDBE;
- **Count V** – Civil Conspiracy by both Plaintiffs against Kirk and BDBE,

- **Count VI** – Defamation Per Se and Per Quod by both Plaintiffs against Kirk and BDBE,

- **Count VII** – Intentional Infliction of Emotional Distress by both Plaintiffs against Kirk and BDBE; and

- **Count VIII** – Civil Theft by both Plaintiffs against Kirk and BDBE.

### III.   PENDING MOTIONS

Pending before the Court are both Defendants' motion to dismiss and the parties' motions for summary judgment. "When the same arguments are raised in a pending motion to dismiss and a pending motion for summary judgment, several district courts within the Eleventh Circuit have concluded that it is appropriate to address the arguments in the context of the summary judgment motion." *Al-Rayes v. Willingham*, No. 3:15-cv-107-J-34JBT, 2017 WL 2470943, at 5 (M.D. Fla. May 17, 2017) (citing *Cableview Commc'ns of Jacksonville, Inc. v. Time Warner Cable Se., LLC*, Case No. 3:13-cv-306-J-34JRK, 2016 WL 128561, at *8 (M.D. Fla. Jan. 12, 2016); *Bryson v. Berges*, Case No. 14-62323-CIV, 2015 WL 5000850, at *3 n.4 (S.D. Fla. Aug. 24, 2015)). Because discovery has ended, and the pending Motions for Summary Judgment have been fully briefed, for purposes of judicial economy, the Court will consider the Motions for Summary Judgment and deny the Motion to Dismiss as moot.

Also pending before the Court is Plaintiffs' motion for reconsideration of the Court's Order denying Plaintiffs' motions to submit new evidence in support of their motion for summary judgment. (ECF No. 246). Plaintiffs are in the habit of filing motions for reconsideration when the outcome of their motion is not to their satisfaction. A motion for reconsideration is not a vehicle for parties to ask the Court to rethink what the Court has already thought through. *See Z.K. Marine, Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992) (internal quotations and citation omitted). Having carefully considered the motion for reconsideration, the Court finds

that it must be denied.  Nevertheless, the Court notes that even if the videos were considered as proposed by Plaintiffs, their content has no effect on this case's outcome.  The videos are wholly irrelevant to the circumstances at issue here and are not probative of Defendants' conduct as it relates to this case.  The motion for reconsideration, (ECF No. 246), is therefore denied and Plaintiffs are reminded *once again* that a motion for reconsideration *must not* be used to ask the Court to rethink what the Court has already thought through.

## IV.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court shall grant summary judgment if "the depositions, documents, electronically stored information, affidavits or declarations, stipulations…, or other materials…show [] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  Rule 56 requires entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (alterations and internal quotation marks omitted).  Once the moving party has shouldered its initial burden, the burden shifts to the non-moving party to "'set forth specific facts showing that there is a genuine issue for trial,' not just to 'rest upon the mere allegations or denials of the adverse party's pleading.'" *United States*

*v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (quoting *Resolution Trust Corp. v. Camp*, 965 F.2d 25, 29 (5th Cir. 1992)).  The party opposing summary judgment must do more than show that there is "metaphysical doubt" as to any material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  When the record taken as a whole could not lead a rational trier of fact to find for the nonmovant, there is no genuine issue.  *See id.* at 587.

At summary judgment, the Court is required to view the evidence in the light most favorable to the nonmovant.  *See Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988).  "All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant.  However, an inference based on speculation and conjecture is not reasonable." *Id.*  "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

Additionally, "cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345-46 (11th Cir. 2015).  When the parties file cross-motions for summary judgment, the standard of review "does not differ from the standard applied when one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *GEBAM, Inc. v. Inv. Realty Series I, LLC*, 15 F. Supp. 3d 1311, 1315–16 (N.D. Ga. 2013) (citing *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)); *see also United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions…will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment

as a matter of law on facts that are not genuinely disputed." (citation omitted)).

V.    **DISCUSSION**

A.  <u>**Kirk is Entitled to Summary Judgment on Count I**</u>

Plaintiffs move for summary judgment on Anyadike's claim for breach of contract against Kirk. (Pls.' Mot. Kirk ¶¶ 4–5, ECF No. 157). Kirk moves for summary judgment only as to Carey's claim for breach of contract.[4] (Defs.' Mot., ECF No. 151). For the following reasons, the Court finds that Kirk is entitled to summary judgment on Count I as to Carey.

The Court first turns to Anyadike's Motion for Summary Judgment. Plaintiffs argue that "Kirk breached their agreement by not performing on the agreement and appearing at Iguana Nighclub, as required by the agreement." (Pls.' Mot. Kirk ¶ 5). Kirk responds that Plaintiffs breached the contract first when they advised him—contrary to Anyadike's previous representations—that the payment of $20,000 called for by the Performance Agreement was for a different event in February, over Super Bowl weekend. (Defs.' Resp. at 6, ECF No. 190; *see also* Kirk Decl. ¶ 5). Kirk maintains that when he learned this information, he returned the $20,000 to Soto. (Kirk Decl. ¶ 4; Kirk Dep. at 60:15–25, ECF No. 191-1). Under Florida law, a material breach of a contract allows the non-breaching party to treat the breach as a discharge of his contractual liability." *Colucci v. Kar Kare Automotive Group., Inc.*, 918 So. 2d 431, 437 (Fla. 4th DCA 2006). Here, genuine issues of material facts exist as to whether Anyadike materially breached the agreement first, so as to discharge Kirk of his contractual obligation to appear at Café Iguana. Thus, Anyadike's Motion as to Count I is denied.

Moving on to Kirk's Motion for Summary Judgment as to Carey's claim. Kirk contends

---

[4] Kirk does not move for summary judgment on Anyadike's claim for breach of contract. (Defs.' Mot. at 7).

that summary judgment is warranted because Carey was not a party to the Performance Agreement. The Court agrees. "As a general rule, non-parties to a contract [] can neither sue or be sued for breach of contract to which they were not parties." *AICON 58-18 Corp. v. King Ocean Servs., Ltd.*, 2018 WL 6522190, at *2 (S.D. Fla. Jan. 12, 2018) (quoting *Solnes v. Wallis & Wallis, P.A.*, No. 13-621225-CIV, 2013 WL 3771341, at *4 (S.D. Fla. July 18, 2013)). Indeed, only parties to a contract or third-party beneficiaries have standing to sue for breach of contract. *Danow v. Great Am. Ins. Co.*, No. 21-80250-Civ, 2021 WL 6693759, at *2 (S.D. Fla. April 8, 2021) (citing *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.*, 647 So. 2d 1028, 1030–31 (Fla. 4th DCA 1994)). In their Amended Complaint, Plaintiffs allege that they both contracted with Kirk. Yet, it is undisputed that the only parties to the Performance Agreement are Anyadike and Kirk. (Pls.' Resp. SOMF at 2).[5] There is no dispute in this case that no other party to this action was a signatory to the Performance Agreement. Thus, as a non-signatory, Carey has no standing to bring a breach of contract claim against Kirk. *See AICON 58-18*, 2018 WL 6522190, at *2.

In response to Defendants' Motion, Carey now appears to argue, for the first time, that he was a third-party beneficiary to the Performance Agreement. (Pls.' Resp. ¶ 4, ECF No. 239) (arguing that Carey "was not an incidental beneficiary to the agreement. He was a partner with [Anyadike] and other gentlemen in carrying out the event.")). Plaintiffs cannot raise a new legal claim for the first time in response to a summary judgment and the Court will not consider it. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

Even if the Court considered this new third-party beneficiary breach of contract claim, it would still be subject to summary judgment. Carey argues that he and Anyadike were "partners"

---

[5] Because Plaintiffs failed to abide by the Local Rules in numbering their paragraphs, the Court refers to the page numbers automatically generated by the CM/ECF system, as opposed to paragraph numbers.

in carrying out the event and that they are both "seeking together to enforce the agreement, which would be the same consequentially as if just [Anyadike] is enforcing the agreement." (*Id.*). Plaintiffs' understanding of the law is misguided.  A breach of contract claim brought as a third-party beneficiary requires a plaintiff to allege the following elements: "(1) existence of a contract; (2) the *clear or manifest intent* of the contracting parties that the contract primarily and directly benefit the third party; (3) breach of the contract by a contracting party; and (4) damages to the third party resulting from the breach." *Mendez v. Hampton Ct. Nursing Ctr., LLC*, 203 So. 3d 146, 148 (Fla. 2016) (quoting *Found. Health v. Westside EKG Assocs.*, 944 So. 2d 188, 194–95 (Fla. 2006)) (emphasis added).  A party can be considered an intended beneficiary "only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party[.]" *Caretta Trucking*, 647 So. 2d at 1031.  Here, Plaintiff neither alleged nor is there any evidence of the contracting parties' clear or manifest intent that Carey primarily and directly benefit from the Performance Agreement.

Accordingly, summary judgment is granted in favor of Kirk and against Carey on Count I, and summary judgment is denied as to Anyadike's claim against Kirk for breach of contract.

### B. Counts II and III – Assault and Battery

Next, Plaintiffs and BDBE cross-move for summary judgment on Plaintiffs' claims for assault (Count II) and battery (Count III).[6]  The Court first addresses Plaintiffs' assault and battery claims against Kirk, then turns to the claims against BDBE.  For the following reasons, Anyadike is entitled to summary judgment on his claims for assault and battery, and BDBE is entitled to summary judgment on Plaintiffs' claims for assault and battery.  Summary judgment is denied as to Carey's claims for assault and battery.

---

[6] Kirk does not move for summary judgment on these claims.  (Defs.' Mot. at 7).

"An assault is any intentional, unlawful offer of corporeal injury to another by force, or force unlawfully directed toward the person of another, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." *Winn & Lovett Grocery Co. v. Archer*, 126 Fla. 308, 171 So. 214, 217 (Fla. 1936) (emphasis added); *Doe v. Evans*, 814 So. 2d 370, 379–80 (Fla. 2002). "A battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." *Paul v. Holbrook*, 696 So.2d 1311, 1312 (Fla. 5th DCA 1997); *Sullivan v Atl. Fed. Sav. & Loan Ass'n*, 454 So. 2d 54–55 (Fla. 4th DCA 1984). Florida case law makes clear that assault and battery are intentional torts and that to commit these torts, an actor must intend to cause apprehension or unwanted physical contact. *See Colony Ins. Co. v. Barnes*, 410 F. Supp. 2d 1137, 1141 (N.D. Fla. 2005) (applying Florida law). Because of this intent requirement, "not every harmful contact is a battery, and not everything that causes apprehension is an assault. *Id.* at 1142.

### 1) *Anyadike is Entitled to Summary Judgment on Counts II and III*

Applying these principles to the instant case, the Court finds that summary judgment must be granted in Anyadike's favor as to Kirk on Counts II and III. While the parties dispute whether Kirk hit Anyadike with a closed or open fist, the record is clear that Kirk did in fact hit Anyadike on January 2, 2020 and that Anyadike ran in fear to the hotel lobby. (Kirk Decl. ¶ 4; Defs.' Resp. SOMF ¶ 1(c), ECF No. 187; Anyadike Dep. at 140:10–15; Carey Dep. 234:25–235:2). Kirk summarily argues that there is a dispute of material fact as to his intent to cause contact or apprehension, and the harmfulness and offensiveness of the strike. This argument is without merit. The required intent "does not necessarily involve the subjective intent to do harm." *AIX Specialty Ins. Co. v. Ashland 2 Partners, LLC*, 383 F. Supp. 3d 1334, 1339 (M.D. Fla. 2019) (quoting

*Geovera Specialty Ins. Co. v. Hutchins*, 831 F. Supp. 2d 1306, 1312 (MD. Fla. 2011)).  Kirk attested in his declaration that he hit Anyadike after learning that he had attempted to involve Kirk in a fraud scheme and that Anyadike had lied to Kirk about the event where Kirk would be appearing. (Kirk Decl. ¶ 5). This is sufficient to show that Kirk intended to hit Anyadike and to cause apprehension, regardless of whether he intended to cause harm.  Moreover, even if Kirk's intended slap or punch to Anyadike's face in a public place did not constitute offensive conduct— which the Court finds it does—it most certainly constitutes harmful contact.  As such, summary judgment is granted in Anyadike's favor as to his claims for assault and battery against Kirk.

### 2)  *Carey is not Entitled to Summary Judgment Against Kirk on Counts II and III*

Carey is not entitled to summary judgment on his claims for assault and battery against Kirk because genuine issues of material fact exist.  The parties dispute whether Kirk attacked Carey.  On the one hand, Carey insists that he was punched many times by Kirk and the individuals accompanying him, that Kirk poured apple juice on him, and that Kirk pulled his pants down. (Carey Dep. at 149:4–5, ECF No. 153-3; Carey Aff. ¶ 10, ECF No. 165-2).  Kirk, on the other hand, maintains he did not even know who Carey was, that he never hit Carey on January 2, 2020, or any other time, and that he never poured apple juice on Carey.  (Kirk Decl. ¶ 6).  The surveillance video of Novotel depicts several individuals hitting a man several times and then dragging him on the pavement, but it is indiscernible from the video who these individuals are.  (*See* ECF No. 179). Thus, Plaintiffs' Motion summary judgment on Carey's claims for assault and battery is denied.

### 3)  *BDBE is Entitled to Summary Judgment on Counts II and III*

BDBE is entitled to summary judgment in its favor on Plaintiffs' claims for assault and battery.  As part of Plaintiffs' claim for assault, they allege that "[a]ll of the parties are agents as part of a large chain to [sic] goes from Universal to Interscope BDBE to DaBaby to Coconspirators

[sic]."  (Am. Compl. ¶ 56, ECF No. 121).  Plaintiffs fail to mention BDBE in their battery claim, but given Plaintiffs' position throughout their briefing that Kirk acted as BDBE's employee, the Court treats these claims as ones raised under vicarious liability.

To maintain a claim for vicarious liability, a plaintiff must show that the employee committed a negligent act: "(1) within the scope of employment, or (2) during the course of employment and to further a purpose or interest of the employer." *Valeo v. East Cost Furniture Co.*, 95 So. 3d 921, 925 (Fla. 4th DCA 2012).  "Generally[,] . . . batteries by employees are held to be outside the scope of an employees employment and, therefore, insufficient to impose vicarious liability on the employer." *Id.* (citing *Nazareth v. Herndon Ambulance Serv., Inc.*, 467 So. 2d 1076, 1078 (Fla. 5th DCA 1985)).

Defendants argue that summary judgment should be granted in their favor because the evidence establishes that Kirk was not acting as owner of BDBE when the incident with Plaintiffs occurred.  Plaintiffs counter that Kirk was acting within the scope of his employment with BDBE because he was collecting payment from Plaintiffs in his role as owner of BDBE.  (Pls.' Resp. ¶ 7).  Plaintiffs contend that both Kirk and the co-conspirators who attacked Plaintiffs were employed by BDBE and were acting as BDBE's agents because they all wore a diamond "BDBE chain."  (Pls.' Resp. ¶ 25; *see* ECF No. 121-1).  According to Plaintiffs, Kirk would not give a diamond chain "to just anyone, but only to people that provide him with great support and work for him."  (Am. Compl. ¶ 10).

Plaintiffs' contentions are nothing more than mere speculation and conjecture and cannot withstand summary judgment.  *See Chapman*, 861 F.2d at 1518.  Plaintiffs' unsupported representations that "BDBE was part of the event by putting together the contract and more[,]" (Pls.' Resp. ¶ 25), are insufficient to hold BDBE liable for Kirk's intentional torts.  Simply because

14

Kirk is BDBE's sole owner and "[e]verything he does impacts BDBE[,]" (*id.*), does not mean that Kirk was acting on BDBE's behalf the day he struck Anyadike.  If this were true, any company owned by Kirk could be held liable for his acts.  While it is true that BDBE's then-president assisted Kirk in drafting the Performance Agreement, BDBE does not appear as a named party in the Performance Agreement, and there is no other evidence on the record suggesting that Kirk was acting on BDBE's behalf or for BDBE's benefit, as opposed to his own.  (*See* Performance Agreement, ECF No. 152-1).

Further, Plaintiffs provide no proof that Kirk and the alleged co-conspirators were even wearing a diamond chain associated with BDBE at the time of the incident.  There is no proof that the photos Plaintiffs attach to their complaints of individuals with a diamond chain were taken on the day of the Incident.  (*See* ECF No. 121-1 at 8).  Nor is there evidence that this particular chain is a "BDBE chain," as Plaintiffs posit.

For these reasons, summary judgment is granted in Anyadike's favor and against Kirk as to Counts II and III; summary judgment is denied as to Carey's claims against Kirk under Counts II and III; and summary judgment is granted in favor of BDBE and against Plaintiffs as to Counts II and III.  This case shall proceed to trial on Carey's assault and battery claims against Kirk, and for a determination of damages as to Anyadike's assault and battery claims against Kirk.

C. **Kirk is Entitled to Summary Judgment on Count IV**

The Court now turns to Plaintiffs' claim for promissory estoppel (Count IV).  Plaintiffs only move for summary judgment on this claim as to Kirk. (Pls.' Mot. ¶ 7).  Defendants move for summary judgment on all claims under Count IV for different reasons.  In this section, the Court addresses the claims against Kirk only.[7]  As stated herein, summary judgment is granted as to

---

[7] Based on what the Court can determine from Plaintiffs' filings, Plaintiffs appear to be raising a

Count IV in Kirk's favor.

Turning first to Anyadike's promissory estoppel claim against Kirk. Kirk argues that summary judgment is appropriate as to Anyadike's claim for promissory estoppel against him because there is a written agreement between them. Plaintiffs argue, once again for the first time in their Motion, that this claim is being pled in the alternative and should therefore survive. Under Florida law, a complaint cannot allege an express agreement in a claim for promissory estoppel. *Baptist Hosp. of Miami, Inc. v. Medica healthcare Plans, Inc.*, 385 F. Supp. 3d 1289, 1293 (S.D. Fla. 2010). Plaintiffs can, however, plead their promissory estoppel claim in the alternative, but a claim for promissory estoppel, even in the alternative, cannot survive upon a showing that an express contract exists. *See id.* ("Under Florida law, [i]t is only upon a showing that an express contract exists that the . . . promissory estoppel count fails.") (internal quotations and citations omitted). Here, there is no dispute that a contract between Anyadike and Kirk exists wherein Kirk "promised to appear at Café Iguana" in exchange for $20,000. (Am. Compl. ¶ 82; Defs.' SOMF ¶¶ 10–11; Pls' Resp. SOMF at 2). Thus, because an express contract has been proven to exist, Anyadike's claim against Kirk for promissory estoppel fails.

Moving on to Carey's claim for promissory estoppel against Kirk. Kirk moves for summary judgment on this claim arguing that there is no evidence that he made any promises to

---

claim for promissory estoppel against BDBE only under a vicarious liability theory. The Court therefore grants summary judgment in favor of BDBE on this claim for the reasons stated in Section V(H). But even if Plaintiffs were raising a direct liability claim against BDBE, nothing in the record shows that BDBE made any promises either to Carey or Anyadike. (*See* Am. Compl. ¶¶ 79–86; Pls.' Mot. BDBE ¶¶ 16–22, ECF No. 159; Pls.' Resp. ¶ 8). Plaintiffs only discuss the promises Kirk made to Plaintiffs. Moreover, Plaintiff failed to address in their response Defendants' argument that BDBE did not make any promises to Kirk. (Pls.' Resp. ¶ 8). Generally, "[w]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such an argument or claim abandoned." *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014). Accordingly, the Court must conclude that BDBE did not make any direct promises to Carey and summary judgment in BDBE's favor is appropriate even under a direct liability theory.

Carey. Plaintiffs argue that "DaBaby promised [Carey], 'I am going come [sic] to the event and I am going to help you promote the event. I'll help you all sell it out.'" (Pls.' Resp. ¶ 8). Yet, Plaintiffs fail to provide a record citation supporting this contention, and the Court's thorough review of the record did not reveal the source of Kirk's purported statement. Plaintiffs' response to the motion for summary judgment is not evidence, and Plaintiffs have failed to cite to particular parts of materials on the record to support their contentions, even after being given a second chance to do so.[8] *See Smith v. Athens Gastroenterology Ass'n, P.C.*, No. 3:16-CV0122, 2017 WL 5196393, at *2 (M.D. Ga. Nov. 9, 2017). Accordingly, because there is no evidence that Kirk made any promises to Carey, Carey's claim for promissory estoppel against Kirk cannot survive.

As such, summary judgment is granted in Kirk's favor on Plaintiffs' claims for promissory estoppel.

### D. Defendants are Entitled to Summary Judgment on Count V

Turning now to Plaintiffs' claims for civil conspiracy (Count V) against Kirk and BDBE. The parties cross-move for summary judgment on Count V. The Court grants summary judgment in Defendants' favor on this claim.

Plaintiffs allege that Kirk, BDBE, and their co-conspirators "conspired and have implemented a Marketing Plan and Scheme[] that includes attacking and hurting innocent people, mostly African American, for the purposes of gaining news coverage and notoriety for their financial gain and they have gained incredible amounts of influence and power from their illegal, criminal scheme." (Am. Compl. ¶ 90). Defendants move for summary judgment under two bases.

---

[8] Upon Defendants' Motion, the Court struck Plaintiffs' response to Defendants' Motion and response to Defendants' Statement of Material Facts for failure to provide record citations and supporting documentation in their filings in violation of Local Rule 56.1 of the Local Rules of the Southern District of Florida. (ECF No. 232). Plaintiffs' amended filings suffers from the same deficiencies.

First, Defendants advance that, other than Plaintiffs' opinions and speculation, the record is devoid of any evidence that there was an agreement between Kirk and BDBE to conspire to commit a tort. Second, Defendants argue that summary judgment is appropriate as a matter of law under the intra-corporate conspiracy doctrine. Because the Court finds that summary judgment is appropriate in Defendants' favor under the first basis, it need not address the intra-corporate conspiracy doctrine.

A civil conspiracy requires "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Mazer*, 556 F.3d at 1271 (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. 3d DCA 2008)). "Each coconspirator need not act to further a conspiracy; each need only know of the scheme and assist in it some way to be held responsible for all of the acts of his coconspirators." *Regions Bank v. NBV Loan Acquisition Member LLC*, No. 21-cv-23578, 2022 U.S. Dist. LEXIS 86588, at *27 (S.D. Fla. May 11, 2022) (citation omitted).

Plaintiffs' claims fail at the first element. Plaintiffs admit that Carey had no knowledge of an agreement between Defendants to engage in the purported scheme. (Pls.' Resp. ¶ 9; *see also* Carey Dep. at 213:16–21, ECF No. 153-3 (stating that it is his opinion that Kirk conspired with BDBE for "clout")). Similarly, Anyadike's testimony reflects that his only basis for alleging that there was a scheme is BDBE's purported failure to censor or take down Kirk's music and BDBE's purported profiting from said music. (Anyadike Dep. at 179:6–18, ECF No. 153-4). Plaintiffs contend that despite this lack of knowledge, there is other evidence that proves Defendants' conspiracy. In particular, Plaintiffs point to a YouTube video by Cam Coldheart, who appears to be a rapper unrelated to the underlying Incident in this case.[9] (*See* Pls.' Resp. ¶ 10). Plaintiffs cite

---

[9] Plaintiffs' amended response is the equivalent of a sur-reply. The response presents new

a link to a YouTube video and the purported transcript of the video, which describes a "hoax" orchestrated by Coldheart and Kirk to gain notoriety for Coldheart. (ECF No. 163-1). The Court will not consider this evidence. The cited materials were attached to Plaintiffs' motion for reconsideration of the Court's Order denying Plaintiffs' motion to extend the discovery deadline. (ECF No. 163). The Court has denied Plaintiffs' motion for reconsideration, (ECF No. 171), so Plaintiffs cannot use these documents as evidence in support of their Motion for summary judgment or their response to Defendants' Motion.[10] Plaintiffs point to no other evidence on the record showing that Defendants had an agreement between them to commit an unlawful act. Summary judgment on Count V is thus granted in Defendants' favor.

### E. Kirk is Entitled to Summary Judgment on Count VI

The parties cross-move for summary judgment on the defamation claims (Count VI).[11] For the following reasons, the Court grants Kirk's motion for summary judgment on this claim.[12]

---

arguments that were not included in their original response and cites to exhibits attached to Plaintiffs' motion in limine, (ECF No. 198)—a motion that was filed after the original response. (*Compare* ECF No. 174 *with* ECF No. 239). When the Court struck Plaintiffs' original response, it was to provide Plaintiffs with an opportunity to *correct* their filings and provide specific citations to record material, nothing more. This Order did not give Plaintiffs carte blanche to reformulate their arguments after having the benefit of Defendants' reply, and of additional filings on the docket. This conduct, along with Plaintiffs' pattern of violations of this Court's orders and the Rules, has not gone unnoticed.

[10] Even if the Court considered the YouTube video, it does not salvage Plaintiffs' claims for conspiracy. At most, the video shows that Kirk had an agreement with Coldheart to help Coldheart gain more followers, not that Kirk had an agreement with BDBE to attack African Americans in order to gain notoriety and publicity for himself. Because the evidence advanced by Plaintiffs is "merely colorable" and "not significantly probative," summary judgment in Defendants' favor is appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

[11] It is unclear whether Plaintiffs are moving for summary judgment on their defamation claim against BDBE. (*See generally* Pls.' Mot. Kirk ¶ 9; Pls.' Mot. BDBE ¶¶ 24–31).

[12] Summary judgment on the defamation claim against BDBE is also granted for the reasons stated in Section V(H).

A common law claim for defamation in Florida requires the following elements: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (citing Restatement (Second) of Torts §§ 558B, 580A-580B). A "defamatory" communication is one that "tends to harm the reputation of another as to lower him or her in estimation of community or deter third persons from associating or dealing with the defamed party." *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 803 (Fla. 1st DCA 1997).

Plaintiffs bring both a *per se* and *per quod* defamation action. Defamation *per se* must be "actionable on its face" and does not "require[] additional explanation of the words used to show that they have a defamatory meaning and that the person defamed is the plaintiff." *Thompson v. Orange Lake Country Club, Inc.*, 224 F. Supp. 2d 1368, 1377 (M.D. Fla. 2002) (citing *Hoch v. Rissman*, 742 So. 2d 451 (Fla. 5th DCA 1999)). Defamation *per quod*, on the other hand, "requires additional explanation of, or an interpretation of innuendo suggested by the words used to demonstrate the defamatory meaning or that the plaintiff is the subject of the statement." *Mac Isaac*, 557 F. Supp. 3d at 1259 (quoting *Scobie v. Taylor*, No. 13-60457-CIV, 2013 WL 3776270, at *3 (S.D. Fla. July 17, 2013). The critical distinction between the two is that in *per se* cases, the Court may only consider the "'four corners' of the publication and 'the injurious nature of the statement' must be apparent from the words of the publication itself." *Id.*

"[T]here is no strict requirement in Florida that an allegedly defamed person be named in a publication for the statement to be actionable." *Mas Isaac v. Twitter, Inc*, 557 F. Supp. 3d 1251, 1258 (S.D. Fla. 2021) (citing *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973)). But it has long been held that if a person alleging defamation is not named in the defamatory publication,

"the communication as a whole [must] contain[] sufficient facts or references from which the injured person may be determined by the persons receiving the communication." *Id.* The Court must determine "whether 'the average person upon reading [the] statements could reasonably have concluded that the plaintiff[s] [were] implicated[.]" *Id.* (quoting *Miami Herald Pub. Co. v. Ane*, 423 So. 2d 376, 389 (Fla. 3d DCA 1982)).

Plaintiffs allege three areas of alleged defamation. First, they contend they were defamed by a Miami-Dade County Police report which stated that "[Carey] as a promoter, did not pay [Kirk] the full amount he was owed[.]" (Am. Compl. ¶ 104). Second, Plaintiffs maintain they were defamed by the lyrics in the following songs by Kirk:

- <u>Talk About It</u>: "Court Days for the New Year . . . 20 on a lawyer, twenty seven thousand for a jet I never boarded . . ." (Pls' Mot. Kirk ¶ 9(b); Am. Compl. ¶ 111);

- <u>Talk About It</u>: "A rich nigga can't rob a broke nigga and you know that, lock a nigga up in South Florida like Kodak, quarter million dollars in my motha fucking tote bag, think I like to fight til a nigga get a toe tag[,]" (Pls.' Mot. Kirk ¶ 9(c); Am. Compl. ¶111);

- <u>Life Is Good</u>: "I can't entertain all that flodgin, . . . I got fools try to sue up the boss . . . I got dudes trying to sue down in Florida[,]" (Pls.' Mot. Kirk ¶ 9(e); Am. Compl. ¶ 108);

Third, Plaintiffs claim they were defamed by Kirk's Instagram post calling them "janky promotors." (Am. Compl. ¶ 115–116). The post reads: "Don't allow yourself to be mislead [sic] by janky promoters and lazy ass grown men itching for the opportunity to file a lawsuit that they won't win." (ECF No. 121-1 at 25).

As an initial matter, the Court grants summary judgment as to the statements made in the police report. Unlike Plaintiffs' allegations in the Amended Complaint, the allegedly defamatory statements made in the police report were attributed to Carey, not Kirk. (*See id.* at 37 (attributing statements to "Victim 1")). Interestingly, Plaintiffs maintain in their Response to Defendants'

Motion that they are "unaware as to whether the police report was made based on their claims or the claims of DaBaby." (Pls.' Resp. ¶ 22). The police report clearly states that the statements were made by Victim 1, who was the person complaining of being attacked and doused with apple juice. (*See* ECF No. 121-1 at 38). Here, it is Carey who complains that he was attacked by Kirk and doused with apple juice.  (*See* Carey Dep. at 149:4–5).  Summary judgment is thus granted in Defendant's favor as to the statements on the police report.

The Court now turns to the remaining statements and begins with defamation *per se*.  Kirk argues that Plaintiffs' claims fail under this theory.  In response to Defendants' Motion, Plaintiffs merely argue that Kirk admitted that the lyrics in his song Talk About It related to Plaintiffs.  But Plaintiffs miss the mark.  The relevant inquiry is whether, based on the four corners of the publication, i.e., the song, the average person could reasonably have concluded that Plaintiffs were implicated.  *See Mas Isaac*, 557 F. Supp. 3d at 1258.  This question must be answered in the negative.  Without additional explanation of the words in the songs, the injurious nature of Kirk's lyrics, if any, is not apparent.  As a person in the public eye, Kirk could have been referencing any other lawsuit he was involved in and could have been talking about other individuals trying to sue him.  Based on the face of the statements in Kirk's songs, it is not apparent that the words of the publication relate to Plaintiffs.

As to Kirk's Instagram publication, Plaintiffs' own arguments rebut a finding of *per se* defamation.  Plaintiffs maintain that the timing of the Instagram post was near the time the Incident occurred and that this, coupled with the words in the post, is sufficient to associate the post with Plaintiffs. (Pls.' Resp. ¶ 20).  Plaintiffs' position therefore implies that extrinsic facts are necessary to establish that the statements made in the Instagram post are defamatory.  Accordingly, Plaintiffs' claim for defamation *per se* fails and Kirk is granted summary judgment on this claim.

Moving on to defamation *per quod*. Kirk argues that there is no evidence that "any of Kirk's social media posts or songs would be recognized by readers as referencing Plaintiffs indirectly." (Defs.' Mot. at 15). Even if Plaintiffs could point to a published statement that constituted defamation, Defendants contend, Plaintiffs' claims fail because they cannot prove special damages. Special damages are "actual, out of pocket losses; that is, realized or liquidated loss." *Grayson v. No Labels, Inc.*, No. 20-cv-1824, 2022 WL 1316227, *3 (M.D. Fla. April 28, 2022). To succeed on their defamation *per quod* action, Plaintiffs must prove "actual economic damage." *Paulson v. Cosmetic Dermatology, Inc.*, 2017 WL 2484197, at *2 (S.D. Fla. June 8, 2017) (citing *Leavitt, D.O. v. Cole*, 291 F. Supp. 2d 1338, 1342 (M.D. Fla. 2003)); *Daniels v. HSN, Inc.*, No. 8:18-cv-3088-T-24, 2020 WL 533927, at *4 (M.D. Fla. Feb. 3, 2020) ("[A] plaintiff must prove special damages when asserting a claim for defamation *per quod*[.]") (citations omitted).

Here, there is no evidence that Plaintiffs suffered actual, economic damages as a result of the purported defamation. Carey stated at his deposition that the only change to his business relationship with artists after the Incident is that the artists will now ask for full payment in advance, not that they would not enter into business with him at all. (*See* Carey Dep. at 213:3–13). Importantly, Plaintiffs were unable to point to any events that were canceled as a result of the purportedly defamatory statements in the songs, rather than the Incident itself. While Carey points to a Cardi-B show that was planned to take place after the January 2, 2020 event, he concedes this show was canceled because he could no longer afford to pay for it since he was counting on the money from the January 2, 2020 event. (*Id.* at 214:13–23, 217:2–10). Plaintiffs also admit that soon after the Incident, the COVID-19 pandemic hit the country and put a halt on entertainment shows. (*See* Anyadike Dep. at 45:9–20; Carey Dep. at 192:3–28; 202:13–20). The canceled Cardi-B show thus were not a result of the purportedly defamatory statements in Kirk's songs.

Moreover, as result of the pandemic, Anyadike pivoted into a different career—he now owns a "successful studio in Baltimore, Maryland[.]" (Anyadike Dep. at 42:9–18, 45:9–46:3). Therefore, Anyadike is essentially seeking damages for a job he is no longer interested in pursuing. *See Grayson*, 2022 WL 1316227, \*3. Finally, the record is devoid of any evidence that Plaintiffs have spent any money to rehabilitate their reputation as promoters.

Because Plaintiffs have failed to present evidence of actual, out of pocket losses they incurred as a result of the allegedly defamatory statements made against them, summary judgment is granted in Kirk's favor as to Plaintiffs' claims for defamation *per quod*.

**F.   <u>Kirk is Entitled to Summary Judgment on Count VII</u>**

The parties also cross-move for summary judgment on Plaintiffs' claims for intentional infliction of emotional distress (Count VII). For the following reasons, Defendant's motion for summary judgment is granted as to Count VII.

To succeed on a claim for intentional infliction of emotional distress under Florida law, a plaintiff must prove: "(1) deliberate or reckless infliction of mental suffering; (2) by outrageous conduct; (3) which conduct must have caused the suffering; and (4) the suffering must have been severe." *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990) (citing *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278 (Fla. 1985)). "The viability of a claim for intentional infliction of emotional distress is highly fact-dependent and turns on the sum of the allegations in the specific case at bar." *Johnson v. Thigpen*, 788 So. 2d 410, 413 (Fla. 1st DCA 2001). The second element— the requirement of "outrageous" conduct—"is measured by an objective test." *Hamon v. Casa Casuarina, LLC*, No. 10-20457, 2010 WL 11442754, at \*2 (S.D. Fla. June 18, 2010) (citing *Vernon v. Med. Mgmt. Assoc. of Margate, Inc.*, 912 F. Supp. 1549, 1557 (S.D. Fla. 1996)). Additionally, "the question of what constitutes outrageous conduct is a question of law to be

resolved by the court, not a question of fact for a jury." *Id.*

To constitute as "outrageous" conduct, it is not "enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice[.]" *Metro. Life Ins.*, 467 So. 2d at 278. To meet the objective outrageousness standard, the conduct in question must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 278–79 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). "While there is no exhaustive or concrete list of what constitutes outrageous conduct, Florida common law has evolved an extremely high standard." *Garcia v. Carnival Corp.*, 838 F. Supp. 2d 1334, 1339 (S.D. Fla. 2012) (internal quotation marks omitted).

Kirk argues that, even in the light most favorable to Plaintiffs, the alleged conduct does not rise to the level of outrageousness required to succeed on a claim for intentional infliction of emotional distress. The Court agrees with Kirk that Plaintiffs' claims "boil down to garden variety battery claims, with no serious injuries even alleged." (Defs.' Mot. at 18). Here, the only complained of conduct was one punch (or slap) to Anyadike's face, hitting Carey, pulling Carey's pants down, and pouring apple juice on him. If true, Kirk's conduct is reprehensible and offensive, but it does not meet the extremely high standard imposed by Florida courts. Thus, Kirk is entitled to summary judgment on this claim.[13]

### G.  **Kirk is Entitled to Summary Judgment on Count VIII**

The Court now turns to Plaintiffs' claim for civil theft against Kirk (Count VIII).  All

---

[13] Plaintiffs' claim for intentional infliction of emotional distress against BDBE fails for the reasons stated *infra* in Section V(H).

parties move for summary judgment on this claim.  The Court finds that this claim fails as to both Plaintiffs, and summary judgment is granted in favor of Kirk.[14]

To maintain a cause of action under the civil theft statute, Plaintiffs must show by "clear and convincing evidence" that Kirk (1) knowingly (2) obtained or used, or endeavored to obtain or use, Plaintiffs' property with (3) felonious intent (4) to either temporarily or permanently (a) deprive Plaintiffs of [their] right to or a benefit from the property or (b) appropriate the property to Kirk's own use or to using any person not entitled to the property. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009) (citing Fla. Stat. § 812.014(1); Fla. Stat. § 772.11).  Beyond proving these elements, Florida law also requires that to bring a claim for civil theft, the plaintiff "must make a written demand for . . . the treble damage amount of the person liable for damages." Fla. Stat. § 772.11(1); *Korman v. Iglesias*, 736 F. Supp. 261, 267 (S.D. Fla. 1990) ("[B]efore an action for civil theft is filed the plaintiff must make written demand for payment upon the defendant, and allow 30 days for payment."). If the recipient complies "within 30 days after receipt of the demand, that person shall be given a written release from further civil liability for the specific act of theft . . . by the person making the written demand." *Id.*

Plaintiffs bring a civil theft claim against Defendants alleging that, on the day of the Incident, Kirk stole Carey's iPhone 6,[15] $80, his credit cards, and the $20,000 he had been paid that day.  (Am. Compl. ¶¶ 4, 7–8).  Plaintiffs advance that because Carey's iPhone contained his "personal computer, work produce [sic], work lifeline[,] and intellectual property[,]" the value of

---

[14] Plaintiffs' claim for civil theft against BDBE fails for the reasons stated *infra* in Section V(H).

[15] Although Plaintiffs Amended Complaint alleges the stolen iPhone was an iPhone 7, (Am. Compl. ¶ 4), Carey testified that it was an iPhone 6, (Carey. Dep. at 149:25–150:6), and Plaintiffs' Response to Defendants' Motion states the same, (Pls.' Resp. ¶ 31).

the iPhone is $100,000.  (*Id.* ¶ 9).  Plaintiffs seek treble damages of that amount.  (*Id.*).

Kirk moves for summary judgment on Anyadike's claim for civil theft against him arguing that Anyadike failed to serve him with a written demand before filing suit.  Neither Plaintiffs' response to Defendants' Motion nor Plaintiffs' Motion fails to address this argument, the Court therefore deems this argument admitted.  *Jones*, 564 F. App'x at 434.  Regardless, the record fails to show that Anyadike ever sent a demand letter to Kirk as required by the statute, and Anyadike does not even attempt to explain or cure this deficiency.  The only demand letter Plaintiffs reference in their pleadings is Carey's letter dated January 7, 2020.  (ECF No. 121-1 at 42–48; (Pls.' Mot. Kirk ¶ 12; Pls.' Mot. BDBE ¶ 35).  Because Anyadike failed to serve Kirk with a written demand letter thirty days before filing his amended complaint, his claim for civil theft fails.

Carey's claim for civil theft also fails because there is simply no evidence of Carey's damages.  "As the plaintiff seeking damages, [Carey] ha[s] the burden to present evidence to prove each of the elements of his statutory civil theft claim[.]"  *Winters v. Mulholland*, 33 So. 3d 54, 59 (Fla. 2d DCA 2010).  Based on the record before the Court, it would be impossible for a reasonable jury to award damages related to this claim because Carey has failed to provide a value as to the alleged stolen items.  Indeed, Carey testified at his deposition that his iPhone has "no amount of value on it" because his phone had the numbers of all the celebrities he deals with.  (Carey Dep. at 149:20–24). Further, although Plaintiffs allege that Kirk stole $80 from Carey, there is no evidence on the record aside from Carey's own statement to the police to support this allegation. *See Amparo v. Classica Cruise Operator Ltd.*, No. 20-CV-60896, 2021 WL 4989915, at *5 (S.D. Fla. Oct. 26, 2021) (citing *Winters v. Mulholland*, 33 So. 3d 54, 59 (Fla. 2d DCA 2010)) (granting summary judgment on civil theft claim because there was "no evidence outside of Plaintiffs' testimony . . .  presented to validate that the[] items were stolen, appraised at such values, or that

they even existed).  When asked at his deposition, Carey could not even say how much money was taken from him by Kirk; rather, he stated that Kirk took "[t]he little bit of money" Carey had on him that day.  (Carey Dep. at 149:18–19).  Similarly, there is no record evidence as to the value of his credit cards, or that they were ever even used by Kirk.

Finally, as to the $20,000, Plaintiffs have failed "set forth specific facts showing that there is a genuine issue for trial[.]"  *See Lawrence*, 276 F.3d at 197.  Kirk, as the moving party, provided the Court with evidence that he gave the money back to Soto, whom the money belonged to.  (Kirk Decl. ¶ 4; *see also* Kirk Dep. at 54:10–23).  Plaintiffs flatly deny that the money was returned, but their testimony reflects that they in fact have no personal knowledge of this.  Carey surmises that Kirk did not give Soto the money back because he did not see it happen the day of the Incident.  (*See* Carey Dep. at 153:21–154:14).  There is no evidence that he ever confirmed with Soto whether Soto was given the money back.  Similarly, Anyadike claims he does not remember whether Kirk handed the money back to Soto.  (Anyadike Dep. at 141:20–142:3).  Because Plaintiffs' positions rest upon mere allegations and speculation, the Court finds that there is no genuine issue of material fact.  Accordingly, Carey's claim for civil theft against Kirk also fails.

### H.  **BDBE is Entitled to Summary Judgment on Counts IV, VI, VII, and VIII**

Because the Court has found that Plaintiffs' claims in Counts IV, VI, VII, and VIII fail as to Kirk, their claims against BDBE under the theory of vicarious liability must also fail.  Plaintiffs contend that BDBE should be responsible for Kirk's actions because Kirk is an agent of BDBE, and he was acting in his role as owner of BDBE.  They admit that their claims against BDBE are brought under the theory of vicarious liability.  (Pls.' Resp. ¶ 32; Pls.' Mot. ¶ 1(c)–(i)).[16]  As

---

[16] Plaintiffs also appear to argue that BDBE is liable under the theory of negligent hiring.  (*See* Pls.' Mot. ¶ 1(h)–(i)).  As mentioned, Plaintiffs cannot raise a new claim for the first time in response to a summary judgment and the Court will not consider it.  *Gilmour*, 382 F.3d at 1315.

Plaintiffs correctly note in their Motion, however, it is well-established in Florida that if the "employee is not liable, the employer is not liable." *Mallory v. O'Neil*, 69 So. 2d 313, 315 (Fla. 1954); (*see also* (Pls.' Mot. ¶ 1(d) ("Derivative liability is similar to vicarious liability in that [] there is no cause of action unless the directly liable tortfeasor commits a tort[.]")).  Because the Court has found that Kirk is not liable as to Counts IV, VI, VII, and VIII, BDBE cannot be liable under a theory of vicarious liability.[17]

## VI.    CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that:

1.      Kirk and BDBE's Motion for Summary Judgment, (ECF No. 151), is **GRANTED in part**, as stated herein.

2.      The Clerk is **DIRECTED** to terminate Billion Dollar Baby Entertainment, LLC as a defendant in this action.

3.      Plaintiffs' Motion for Summary Judgment as to Kirk, (ECF No. 157), is **GRANTED in part and DENIED in part**.

4.      Plaintiffs' Motion for Summary Judgment as to BDBE, (ECF No. 159), is

---

[17] BDBE moved for summary judgment on all of Plaintiffs' claims against it except Count V, arguing that Plaintiffs failed to plead vicarious liability as a separate cause of action.  The Court cannot grant summary judgment on this basis.  While BDBE is correct that Florida law requires a claimant to specifically plead vicarious liability as a separate cause of action, *Goldschmidt v. Holman*, 571 So. 2d 422, 423 (Fla. 1990), the Eleventh Circuit has held that Florida's heightened pleading standard for vicarious liability does not apply in cases like this one where a federal court is sitting in diversity.  *Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1260 (11th Cir. 2015) (citing *Caster v. Hennessey*, 781 F.2d 1569, 1570 (11th Cir. 1986)).  The Court acknowledges that many courts in this District have followed Florida law on this respect, and agrees with them that comingling these two separate claims causes much confusion—as it has done in this case—but the Court is constrained by binding Eleventh Circuit case law.

**DENIED**.

     5.    This case shall proceed to trial on Count I as to Anyadike against Kirk; Count II as to Carey against Kirk; Count III as to Carey against Kirk; and for a determination of Anyadike's damages under Counts II and III against Kirk.

     6.    Kirk and BDBE's Motion to Dismiss, (ECF No. 127), is **DENIED as moot**.

     7.    Plaintiffs' Motion for Reconsideration, (ECF No. 246), is **DENIED**.

     8.    Plaintiffs' Motion to Seal, (ECF No. 165), is **GRANTED**.

DONE AND ORDERED in Chambers at Miami, Florida, this 2 day of September, 2022.

_____

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Becerra
All Counsel of Record