UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case No.: 21-20408-CIV-MARINEZ**

KENNETH CAREY, *et al*.,

      Plaintiffs,

v.

JONATHAN KIRK, *et al*.,

      Defendants.

_____/

## OMNIBUS ORDER ON MOTIONS FOR SANCTIONS

**THIS CAUSE** came before the Court upon three related motions for sanctions. First, Defendants Jonathan Kirk ("Kirk") and Billion Dollar Baby Entertainment, LLC ("BDBE") filed a Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11(c) (the "First Rule 11 Sanctions Motion"), (ECF No. 222). Plaintiffs Kenneth Carey ("Carey") and Steve Anyadike ("Anyadike") (collectively, "Plaintiffs") filed an Opposition, (ECF No. 225), and Defendants Kirk and BDBE filed a Reply, (ECF No. 228). Second, Defendants Universal Music Group, Inc. ("UMGI") and Interscope Records ("Interscope")[1] filed a Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11(c) (the "Second Rule 11 Sanctions Motion"), (ECF No. 244). Plaintiffs filed an Opposition, (ECF No. 265), and Defendants UMGI and Interscope filed a Reply, (ECF No. 266). The First and Second Rule 11 Sanctions Motions seek sanctions against Plaintiffs, Plaintiffs' counsel Jonathan May, Esq. ("Mr. May"), and Mr. May's law firm The Lions' Den,

---

[1] The Second Rule 11 Sanctions Motion clarifies that "Interscope is not a legal entity. It is an unincorporated division of UMG Recordings, Inc. ('UMGR'). This motion is technically brought by UMGR on behalf of non-entity, Interscope." (ECF No. 244 at 1). The Court acknowledges this distinction but will continue to refer to "Interscope" herein for consistency with other filings.

Attorneys at Law (the "Lions' Den"), in connection with Plaintiffs' civil conspiracy claims, which were dismissed by the Court.[2] Finally, Defendant Kirk filed a Motion for Sanctions Including an Award of Attorneys' Fees Against Plaintiffs' Counsel Jonathan May and His Law Firm The Lions' Den and Renewal of Motion for Fees Pursuant to ECF No. 275, seeking sanctions under both 28 U.S.C. § 1927 and the Court's inherent authority against Mr. May and the Lions' Den for conduct leading up to and including the trial (the "1927 Sanctions Motion"), (ECF No. 341). Plaintiffs filed an Opposition, (ECF No. 344), and Defendant Kirk filed a Reply, (ECF No. 350).

Counsel for the Parties appeared before United States Magistrate Judge Jacqueline Becerra for oral argument on the First and Second Rule 11 Sanctions Motions on January 30, 2023 (the "Rule 11 Hearing"). (*See* ECF No. 356). Following the Rule 11 Hearing, without leave of Court and after expressly informing the Court that no further argument or submission was necessary, Plaintiffs filed a Notice of Supplemental Authority Pursuant to Local Rule 7.8 In Support of Plaintiffs' Response to All Defendants' Motion for Sanctions, (ECF No. 359). Defendants Kirk and BDBE filed a Motion to Strike Plaintiffs' Notice of Supplemental Authority, (ECF No. 360). Defendants UMGI and Interscope also filed a Response to Plaintiffs' Notice of Supplemental Authority, asking the Court to disregard the Notice, (ECF No. 363). Plaintiffs then filed a Second Notice of Supplemental Authority Pursuant to Local Rule 7.8 In Support of Plaintiffs' Response to All Defendants' Motion for Sanctions, (ECF No. 365). Defendants UMGI and Interscope filed a Response to Plaintiffs' Second Notice, asking the Court to disregard the Second Notice, (ECF No. 366), and Defendants Kirk and BDBE filed a Notice of Adoption of that Response, (ECF No. 367).

---

[2] Count V (civil conspiracy) was dismissed as to UMGI and Interscope, (ECF No. 272), and summary judgment was granted as to Count V for Defendants Kirk and BDBE, (ECF No. 279).

After a review of the instant Motions, the arguments of the Parties, including the Supplemental Briefing filed by both Defendant Jonathan Kirk, (ECF No. 394), and Plaintiffs, (ECF No. 395), the pertinent portions of the record, and the relevant authorities, and for the reasons stated below, it is hereby **ORDERED and ADJUDGED** that the First Rule 11 Sanctions Motion, (ECF No. 222), and the Second Rule 11 Sanctions Motion, (ECF No. 244), are **GRANTED IN PART AND DENIED IN PART**. Specifically, the Rule 11 Sanctions Motions is **GRANTED** as against Mr. May and the Lions' Den and **DENIED** as against Plaintiffs individually, as outlined below. It is **FURTHER ORDERED and ADJUDGED** that the 1927 Sanctions Motion, (ECF No. 341), is **DENIED**.

## I.    PROCEDURAL HISTORY

This case began over four years (and 395 filings) ago. At issue now is the conduct of Plaintiffs and their counsel from the time of filing the Complaint, through the trial, and up to and including the filings made after and in connection with the instant Motions. As such, the Court will review the pertinent parts of the record upon which it will rely to evaluate the conduct of Plaintiffs and their counsel.

### A.  The Parties and The Factual Background

Plaintiffs Carey and Anyadike are music event planners/promoters who are generally in the business of booking rap artists for performances. (*See* ECF No. 279 at 2). Defendant Kirk is a rap artist professionally known as "DaBaby." (*Id.*) Defendant Interscope is a record label brand that releases Kirk's music. (*See* ECF No. 244 at 2). Interscope is neither a corporation nor a legal entity, but rather is a brand that exists within the corporation UMG Recordings, Inc. (*Id.* at 1–2.) Defendant UMGI is a holding company that owns UMG Recordings, Inc. (*Id.*) Defendant BDBE is an entity solely owned by Kirk used for signing new artists discovered by Kirk. (*Id.*) Throughout the action, Plaintiffs characterized BDBE, Interscope, and UMGI as record labels to which

3

Defendant Kirk, performing as "DaBaby," is "signed"—meaning that they have an agreement to publish and/or promote his music. (*See* ECF No. 121). This characterization was disputed by Defendants throughout the proceedings. As discussed in more detail below, the case at hand stems from events surrounding a performance at Café Iguana on January 2, 2020, for which Plaintiffs alleged that Defendant Kirk failed to appear as agreed, and a physical altercation that occurred shortly before the scheduled performance. (*See id.*)

Specifically, Plaintiffs alleged that they entered into two performance agreements—one with former Defendant Khalik Caldwell ("Caldwell"), another rap artist, and one with Defendant Kirk. (ECF No. 121 at 3, 4.)[3] According to the Amended Complaint, Plaintiffs had a written agreement with Caldwell to perform at Café Iguana in Broward County, Florida on January 2, 2020 (the "Event") in exchange for a payment. (*Id.* at 3.) Plaintiffs also alleged that they had a written agreement with Kirk, to attend the Event for promotional purposes in exchange for a payment, which Plaintiffs attached to the Amended Complaint as Exhibit 7. (*See* ECF No. 121-1 at 9). The purported performance agreement with Kirk consisted of a single page and stated that it was made "between [Defendant] Jonathan Kirk p/k/a DaBaby and [Plaintiff] Steve Ayandike [sic] on this date January 2, 2019," for a performance on January 2, 2019, although the Amended Complaint stated that the Event was to occur on January 2, 2020. (*Id.*) The performance agreement further stated that "the Artist(s)," which was an undefined term, "hereby agrees to a social media post, social media drop, and venue walkthrough" at a time "TBD" in exchange for an "engagement fee [of] $20,000," which was "due by 4pm 1/2/2019" and "ALL PAYMENTS SHALL BE BY

---

[3] Because the Amended Complaint contains multiple instances of re-numbering paragraphs (*i.e.*, the "Introduction" begins with paragraph 1, the "General Allegations" begins with paragraph 1, Count VII begins with paragraph 1, and the section titled "Destruction of Evidence as Criminal Conduct" begins with paragraph 1), the undersigned will cite only to the page numbers of the relevant allegations. (*See* ECF No. 121).

CASH." (*Id.* (emphasis in original)). The document was signed by Plaintiff Anyadike and contained no date. (*Id.*) No other party, or non-party, signed the document. (*Id.*)

The Event, however, did not occur. Plaintiffs alleged that this was because Kirk "anticipatorily repudiated the agreement by attacking Plaintiffs viciously" prior to the scheduled Event. (ECF No. 121 at 3). Plaintiffs arrived at the Novotel Hotel in Miami, Florida to meet Kirk and tender payment for the Event. (*Id.* at 4) Plaintiffs alleged that they tendered $20,000.00 in cash to Kirk, and Kirk "demanded an additional $10,000.00." (*Id.*). Plaintiffs alleged that they did not have an additional $10,000.00 in cash available at the time, and Kirk "[a]pparently infuriated by being told no," proceeded to "punch[] Steve Anyadike," while "four identified co-conspirators/agents of DaBaby" attacked Carey. (*Id.* at 4–5).

**B. The Amended Complaint**

The Amended Complaint, the operative pleading in the matter, asserted eight counts against various combinations of the Defendants. (ECF No. 121.)[4] Below is a summary of those counts and the factual allegations, if any, that were offered in support of each count.

---

[4] This matter originated in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, on February 1, 2020, styled as Case No. 2020-002448-CA-01 (the "State Court Lawsuit"). (*See* ECF No. 1-3 (Complaint in the State Court Lawsuit)). Carey's complaint in the State Court Lawsuit asserted various claims sounding in contract and tort against Defendants Kirk, BDBE, UMGI, Interscope, Caldwell, and Unknown Conspirators Nos. 1–4. (*Id.*) Anyadike was not a plaintiff in the State Court Lawsuit. (*Id.*) Kirk and BDBE filed an Answer on June 1, 2020, after Carey filed three Motions for Default that were denied by the court. (*See* State Court Lawsuit, ECF Nos. 23, 31, 69.) UMGI, Interscope, and Caldwell did not respond to the Complaint. In June 2020, Kirk and BDBE served written discovery requests on Carey, to which Carey failed to respond. (*See* State Court Lawsuit, ECF Nos. 64–67.) Kirk and BDBE moved to compel responses, and the court granted the motion. (*See* State Court Lawsuit, ECF Nos. 74, 75, 79.) On October 29, 2020, Carey moved to add Anyadike as a plaintiff to the State Court Lawsuit. (ECF No. 80.) Defendants did not respond. In January 2021, Carey served written discovery requests on Kirk and UMGI. (*See* State Court Lawsuit, ECF Nos. 82–84.) On January 27, 2021, Caldwell accepted service of process through his counsel. (*See* State Court Lawsuit, ECF No. 85.) On January 29, 2021, the case was removed to this Court. (ECF No. 1.)

First, Plaintiffs asserted a claim for breach of contract against Defendant Kirk (Count I). (*Id.* at 7–8.) Plaintiffs alleged that Defendant Kirk failed to appear at Café Iguana as his performance agreement required, although Plaintiffs executed their end of the bargain by tendering payment to Kirk. (*Id.* at 8.) Plaintiffs alleged that they "spent days planning and prepping for this event in hopes and virtual guarantee of making over 100K for each Plaintiff in profit," and that they "had arranged for other celebrities to appear for the event, since DaBaby was going to be there." (*Id.*) On this count alone, Plaintiffs sought $263,750.00 in compensatory damages from their calculations of the potential profit on the Event, plus court costs and attorney's fees. (*Id.*)

Second, Plaintiffs asserted a claim for intentional assault against Defendants Kirk, BDBE, UMGI, Interscope, and "Identified Co[-]Conspirators" (Count II). (*Id.* at 9–10.) As to Plaintiff Anyadike, Plaintiffs alleged that Kirk "put Steve [Anyadike] in fear of great bodily harm, prior to punching him in the face and then chased him with the assistance of his four coconspirators." (*Id.* at 9.) As to Plaintiff Carey, Plaintiffs alleged that "[u]nknown conspirators jumped Kenneth Carey and put him in fear of extreme bodily harm and even death, while the[y] knocked him down, humiliated him, pulled his pants down, [and] poured apple juice on him." (*Id.*) Plaintiffs alleged that Defendant Kirk should be "held jointly and severally liable, pursuant to Florida case law," with Defendants BDBE, UMGI, and Interscope, because they "conspired and . . . implemented a marketing plan/scheme/show that includes attacking and hurting innocent people for the purposes of gaining ratings, news coverage and notoriety for their financial gain and they have gained incredible amounts of influence and power from their illegal, criminal scheme." (*Id.*) Plaintiffs' theory of a "scheme" runs throughout the Amended Complaint and is explained more below. On this count, Plaintiffs demanded $100,000, plus attorney's fees and court costs. (*Id.* at 10.)

6

Third, Plaintiffs asserted a claim for intentional battery against Defendants Kirk, BDBE, UMGI, Interscope, and "Identified Co-Conspirators" (Count III). (*See* ECF No. 121 at 10–13.) As to Plaintiff Anyadike, Plaintiffs alleged that "DaBaby intended to and did punch Steve Anyadike on hotel cameras and then chased him towards the hotel." (*Id.* at 11.) As to Plaintiff Carey, Plaintiffs alleged that

> DaBaby and identified Co[-]Conspirators 1[–]4 intended to cause harmful or offensive contact with Kenneth Carey by grabbing him, punching him, forcibly removing his pants as part of their signature attack and attempting to humiliate him by dragging him and pouring apple juice on him while taunting him and saying it looks like he peed himself.

(*Id.*) Plaintiffs added that Carey "is alive by the mercy of God." (*Id.*) Plaintiffs asserted the same theory of a "marketing plan/scheme" to involve Defendants BDBE, UMGI, and Interscope. (*Id.*) In doing so, Plaintiffs stated, "[w]e have evidence that it was a scheme because DaBaby's agents/coconspirators pulled Kenneth's pants down as they taunted him before knocking him unconscious as DaBaby has done before and sold merchandise bragging about it." (*Id.*) As to damages, Plaintiffs stated that "[i]t will take an extremely high award to convince these juggernauts from forgoing their fraudulent scheme/show because if they profit $100 million but it costs them $90 million, they still make $10 million." (*Id.* at 11–12.) Accordingly, on this count, Plaintiffs sought damages "[t]otaling $300,000,000," "[p]unitive damages (uncapped)," court costs, and attorney's fees. (*Id.* at 13.)

Fourth, Plaintiffs asserted a claim for promissory estoppel against Defendants Kirk and BDBE (Count IV). (*Id.* at 13–14.) Plaintiffs alleged that Kirk promised to appear at Café Iguana "in fulfillment of a contractual obligation between DaBaby and a third party and accepted $20,000.00 in payment from Kenneth Carey," but "later asserted that he was to have received $30,000.00 instead," and did not appear at the Event. (*Id.* at 14.) Plaintiffs asserted that they "relied on DaBaby's promise to fulfill his contractual obligation when they tendered the $20,000.00 cash

to" Kirk and that Kirk did not return the payment. (*Id.*) Plaintiffs sought $24,000 in damages for this count, plus court costs and attorney's fees. (*Id.*)

Fifth, and particularly relevant to the instant Motions, Plaintiffs asserted a claim of civil conspiracy against Defendants Kirk, BDBE, UMGI, Interscope, and "Identified Conspirators 1-4" (Count V). (*Id.* at 14–17.) Specifically, Plaintiffs alleged that:

> DaBaby, BDBE, Identified Co[-]co[n]spirators/Agents of BDBE, Universal [UMGI] and Interscope conspired and have implemented a Marketing Plan and Scheme/Show that includes attacking and hurting innocent people, mostly African Americans, for the purposes of gaining news coverage and notoriety for their financial gain and they have gained incredible amounts of influence and power from their illegal, criminal scheme.

(*Id.* at 15.) According to Plaintiffs, Defendant Kirk's altercation with Plaintiffs on January 2, 2020, was no more than a marketing tactic, either conceived of or encouraged by BDBE, UMGI, and Interscope. (*Id.*) Plaintiffs alleged that they

> know there was a scheme because 1. DaBaby attacked parties over a measly $10,000 dollars when he had $250,000 to $300,000 in his room, when they didn't owe the money and 2. This is a pattern and course of conduct by DaBaby and has shown over time his desperate attempts for stardom and fame at the expense of others and 3. Universal [UMGI] and Interscope have not done any actions to prevent DaBaby from this criminal conduct.

(*Id.* at 16.) In short, Plaintiffs claimed that because Defendants profit from Kirk's music and image, they are liable for anything that Kirk does. On this count, Plaintiffs sought "Punitive Damages (uncapped) . . . Totaling $300,000,000," plus court costs and attorney's fees. (*Id.* at 15.)

Sixth, Plaintiffs asserted a claim for defamation against Defendants Kirk, BDBE, UMGI, and Interscope (Count VI). (*Id.* at 17–19.) Plaintiffs alleged that Defendant Kirk made various false statements that harmed Plaintiffs' reputation as businessmen. (*Id.*) Specifically, Plaintiffs identified four statements as defamatory. First, Plaintiffs took issue with "[t]he Police Report stat[ing] that Kenneth [Carey], as a promoter, did not pay [Kirk] the full amount he was owed which [is] untrue." (*Id.* at 17.) Plaintiffs alleged that "these words caused others to post videos

8

threatening [Carey], stating that he was terrible at his job," and accordingly damaged Carey's reputation. (*Id.*) Next, Plaintiffs took issue with lyrics from two songs performed by Defendant Kirk as DaBaby, one of which was a remix published on another artist's album. (*Id.* at 5, 18.) Plaintiffs asserted that a song titled "Life Is Good" included the lyrics, "I can't entertain all that flodgin, . . . I got fools try to sue up the boss . . . . I got dudes trying to sue down in Florida." (*Id.* at 18.) Plaintiffs argued that the use of the word "flodgin," (which they contended means "lying") was defamatory because Plaintiffs never lied. (*Id.*) Plaintiffs also asserted that a song titled "Talk About It" included the lyrics,

> Court Days for the New Year . . . 20 on a lawyer, twenty seven thousand for a jet I never boarded . . . . A rich n**** can't rob a broke n**** and you know that, lock a n**** up in South Florida like Kodak, quarter million dollars in my [] tote bag, think I like to fight til a n**** get a toe tag.

(*Id.*) Plaintiffs alleged that these lyrics "defame Kenneth Carey by saying DaBaby and his assailants didn't rob Kenneth, yet they did not rob him to gain money, but to humiliate him, deprive him of his phone and evidence and to deprive him of the resources he had at the time, out of pure evil intentions and their own gain." (*Id.*) Plaintiffs stated that "Interscope and Universal helped sell the records and streams for the album *Blame It On Baby*," which contained one of the songs at issue, but they do not reference Defendant BDBE's role, despite adding BDBE to this count. (*Id.*) Finally, Plaintiffs alleged that Kirk posted "to DaBaby's social media" a statement that "calls Plaintiffs Janky Promoters," which Plaintiffs argued "is not an opinion but a ***comment*** on their work product as described by one of their prior important clients." (*Id.* at 18–19 (emphasis added)). On this count alone, Plaintiffs sought "$1.00 for every stream and every person that they were defamed and falsely accused by DaBaby," and calculated that total to be 500 million people. (*Id.* at 19.) Plaintiffs also alleged that they were damaged by "los[ing] employment opportunities in the form of working with artists and other promoters," and that "[i]t will take Carey and Anyadike

9

years to try to repair their reputation by doing excellent work and being excellent with their jobs and even still, some people may never hire them again." (*Id.*) In total, Plaintiffs sought $7,000,000.00 in "general damages" on this count, plus court costs and attorney's fees. (*Id.*)

Seventh, Plaintiffs asserted a claim of intentional infliction of emotional distress against Defendants Kirk, BDBE, UMGI, Interscope, and "Co[-]conspirators" (Count VII). (*Id.* at 19–21.) Plaintiffs reiterated the allegation that Defendants have all implemented a "Marketing Plan and Scheme that includes attacking and hurting innocent people, mostly African Americans, for the purposes of gaining news coverage and notoriety for their financial gain and they have gained incredible amounts of influence and power from their illegal, criminal scheme." (*Id.* at 20.) Plaintiffs then alleged that "[t]he conduct [] of Defendants was extreme and outrageous," namely "punching Steve [Anyadike] and Kenneth [Carey], grabbing Kenneth [Carey], forcibly removing his pants as part of their signature attack and attempting to humiliate him, dragging him and pouring apple juice on him while taunting him and saying it looks like he peed himself." (*Id.*) Plaintiffs alleged that "DaBaby and BDBE and Caldwell regularly release music threatening to kill people" and "Plaintiffs are exposed to these messages everywhere they go because DaBaby is on the radio, on tv, in shopping stores and all of the time, so the threat is a constant reminder to Plaintiffs." (*Id.*) Plaintiffs sought $300,000,000.00 in damages on this count, including "therapy expenses" and "mental distress," plus court costs and attorney's fees (*Id.* at 20–21.)

The final count asserted by Plaintiffs was a claim of civil theft against Defendants Kirk, BDBE, UMGI, Interscope, and "Co[-]conspirators" (Count VIII). (*Id.* at 21–23.) Plaintiffs alleged that "DaBaby, BDBE and the Co[-]conspirators stole $80, credit cards and Kenneth [Carey's] iphone 7." (*Id.* at 21.) Plaintiffs described Carey's phone as his "personal computer and lifeline to work with celebrity performers," and alleged that the value of the information in his phone totaled

"$100,000 at least." (*Id.* at 22.) Plaintiffs alleged that "[w]hen [Carey's] $80 and his $20,000 cash were taken from him, he did not have money to replace his phone and the phone was not backed up so he lost all of his information." (*Id.* at 22.)

Plaintiffs also included a section titled "Destruction of Evidence as Criminal Conduct," at the conclusion of the Amended Complaint. (*Id.* at 23.) The section was neither styled as background nor a substantive claim, and it is unclear whether it was meant to be considered alongside the civil theft claim. In this section, Plaintiffs alleged that "DaBaby and all of the other parties took the phone in order to destroy evidence," which "is analogous to a professional criminal that breaks into the home would show little forced entry whereas a person lacking experience may just through [sic] a brick through glass and leave the evidence. Da[B]aby and Defendants are professional criminals that commit crimes and then try to cover them up in anyway they can." (*Id.*)

Plaintiffs concluded their Amended Complaint with a "Summary" stating that they sought in excess of $907,487,000.00 against Defendants—the majority of which are punitive damages. (*Id.* at 24.) Plaintiffs asserted that "[w]hile nearly one billion may be a lot of money to most people, it is only about 1/50th of Universal['s] net worth," and "[t]he punishment must be financially severe to put an end to the scheme of criminal behavior as indicated herein." (*Id.*)

Plaintiffs attached thirty-seven exhibits to the Amended Complaint. (ECF No. 121-1.) These thirty-seven exhibits consisted of: ten screenshots of purported posts from the social media platform Instagram (one of which does not identify the posting account, one of which contains highlighted circles inserted by Plaintiffs over the faces of individuals, and one of which is a screenshot of a website "eurweb" showing what appears to be an Instagram post); eight screenshots of purported videos from the web platform YouTube (one of which was posted by the account "Real World Police," one of which was posted by the account "How Rich Are They?" and six of

which do not identify the posting account); one screenshot of an unknown website purporting to show the "streaming activity of Da[B]aby and other top artists" which appears to be representative of the week ending on September 3, 2020, for an unknown reason, and contains highlights inserted by Plaintiffs; one graphic of a purported quote from an unknown source; and various other screenshots without sources. (*Id.*)

### C.  The Motions To Dismiss Filed By Defendants UMGI and Interscope

Defendants UMGI and Interscope each filed a Motion to Dismiss the Amended Complaint, (ECF Nos. 123, 126.) Defendant UMGI argued that the Court lacked personal jurisdiction over it because it is a Delaware Corporation with a principal place of business in California, and has no ties to Florida, to Kirk, or to BDBE. (ECF No. 123 at 3.) UMGI noted that the Amended Complaint was devoid of any allegations to support personal jurisdiction over UMGI, and that UMGI was not even mentioned in the "Jurisdiction and Venue" section of the Amended Complaint. (*Id.* at 6.) Defendant UMGI also argued that the Amended Complaint failed to state a claim against it as the allegations were all conclusory. (*Id.* at 16.)

In response, Plaintiffs argued that the Court had personal jurisdiction over UMGI because it conducted substantial activity in Florida. (ECF No. 144 at 2.) Specifically, Plaintiffs stated UMGI "do[es] thousands of transactions of business in Florida everyday," "[t]hey pretend to the Court that they think they don't run businesses in Florida even though the same Universal Music Group says they run businesses through Florida through their labels and divisions and they have been involved in lawsuits against them in the same Southern District of Florida," and "[t]hey had an interest in DaBaby's recent shows at Rolling Loud in Miami, Florida in 2021 and West Palm Beach on Thanksgiving in 2021." (*Id.* at 2, 5.) Plaintiffs cited no support (either legal or factual) for these propositions. Instead, Plaintiffs asked, "[i]s UMGI and UMGR going to deny that

12

Floridians, which the state of Florida which has over 20 million people that none of them download music or generate profit for UMG and all of their labels?" (*Id.* at 6.) Plaintiffs further argued that UMGI, Interscope, and non-party UMG Recordings, Inc. were all the same company because they "present themselves as a unity, not different entities," by referencing one another on their respective websites, on YouTube, and on other "social media." (*Id.* at 5–6.) Additionally, Plaintiffs stated that UMGI's "agreement with Da[B]aby states that the agreement is valid throughout the Universe. Literally it says Universe. See agreement between UMGR/Interscope and DaBaby. Florida is in the Universe." (*Id.* at 5.) Finally, Plaintiffs restated that UMGI must have conspired with Kirk, because it "ha[s]n't stopped him from ***doing criminal crimes***, [it] sell[s] his gangster persona and brand," and it "contracted with him for a lot of money upon his violent actions." (*Id.* at 2–3 (emphasis added)). Plaintiffs concluded by requesting that the Court deny UMGI's Motion to Dismiss and "[i]f this Court is not so inclined," requesting "that this Court grant [Plaintiffs] leave to amend either the Complaint or another remedy to satisfy this Court[']s reasoning for granting their Motion to Dismiss." (*Id.* at 12.)

Plaintiffs attached 17 pages of "exhibits" to their Opposition to UMGI's Motion to Dismiss, although they did not reference any specific exhibits in their Opposition. (ECF No. 144-1.) The first two pages of these exhibits are screenshots of a website purporting to be www.interscope.com, viewed on an unspecified date. (*Id.* at 1–2.) The third is a screenshot of a Google search, where a search was conducted for "univeral music group"—wherein Google shows results for "*universal music group*" instead of the inputted misspelling—and retrieving a result from www.universal music.com on an unspecified date. (*Id.* at 3.) The remaining exhibits include screenshots of videos and descriptions from YouTube, an article from the publication Rolling

Stone regarding an unrelated "Vault Fire Lawsuit," and screenshots from unidentified websites. (*Id.* at 4–17.)

Defendant UMGI filed a Reply in Support of its Motion to Dismiss. (ECF No. 169.) As to personal jurisdiction, UMGI noted that Plaintiffs provided no support for their proposition that UMGI conducts any business in Florida. (*Id.* at 3.) As to the failure to state a claim, UMGI argued that "[w]hile Plaintiffs use the buzz words 'conspiracy,' 'mastermind,' 'plan,' and 'scheme,' the allegations are entirely conclusory" and rather than address their "pleading failures," Plaintiffs made new allegations regarding the conspiracy that are nowhere to be found in the Amended Complaint. (*Id.* at 4.)

Defendant Interscope also filed a separate Motion to Dismiss. (ECF No. 126.) Defendant Interscope, through UMG Recordings, Inc., argued that it is not a legal entity, and therefore, could not be sued or served with process. (*Id.* at 2.) Interscope noted that its counsel notified Plaintiffs' counsel Mr. May of this fact as early as April 2020, and Mr. May took no action to remedy the lack of service. (*Id.*)

Plaintiffs filed an Opposition to Interscope's Motion to Dismiss. (ECF No. 145.) Plaintiffs argued that "Interscope was served with Process of Service [sic]" because "Interscope holds themselves out to be located at the same address that [UMGI] is located and both were served at that location. Interscope is owned by UMGI." (*Id.* at 1.) Plaintiffs stated that this "multinational corporation" "pretend[s] to use legalities to confuse the Court, the public and avoid liability." (*Id.*) Plaintiffs then, for the first time, asked the Court to "allow them to substitute UMG Recordings Inc. (UMGR) for Interscope, or to add UMG Recordings Inc. as a Defendant." (*Id.* at 2.) Regardless of what entity they sued, however, Plaintiffs argued that "they were precise and concise with the fact that the mastermind behind the civil conspiracy was Lucian Grainge (CEO of UMG N.V.) and

John Janick of Interscope," because "Lucian Grange presents himself as the most intelligent, smart CEO of the music industry, according to his own profile," and "[w]ho is going to believe that the CEO of a multinational company was not aware of an agreement worth millions of dollars when singing [sic] Da[B]aby and that he was not be [sic] aware of the transaction or was not informed as to the transaction." (*Id.* at 3.) Finally, Plaintiffs argued that "UMG is like an octopus, [t]hey are created in Delaware to not reveal who are the owners but at the same time they are a publicly traded company in Europe, largely owned by Vivendi," and Plaintiffs "request[ed] that this court lift up the corporate veil and the legal maneuvers that the opposing counsel is trying to do to avoid the truth and liability." (*Id.* at 6.) Although Plaintiffs cited to no exhibits in their Opposition to Interscope's Motion to Dismiss, they attached the same 17 pages of exhibits that they attached to their Opposition to UMGI's Motion to Dismiss. (ECF No. 145-1.)

Defendant Interscope filed a Reply in Support of their Motion to Dismiss. (ECF No. 168.) Interscope's Reply simply stated that Plaintiffs' Opposition was not responsive to the Motion to Dismiss at all. (*Id.* at 1.) Interscope asserted that it was never served, Plaintiffs provided no evidence to the contrary, and Plaintiffs "demonstrate[d] a fundamental lack of understanding of corporate law." (*Id.* at 2–3.)

The Court granted both Motions to Dismiss on August 4, 2022. (ECF No. 272.) First, in granting UMGI's Motion to Dismiss, the Court found that "the Amended Complaint is completely devoid of *any* jurisdictional allegations as to UMGI," which "alone constitutes a failure to plead a prima facie case of personal jurisdiction and warrants dismissal of UMGI." (*Id.* at 5 (emphasis in original)). Nevertheless, the Court analyzed the Amended Complaint as to both specific personal jurisdiction over UMGI under the Florida Long-Arm Statute (Sections

48.193(1)(a)(1) and (1)(a)(2)) and general personal jurisdiction over UMGI under the Florida Long-Arm Statute (Section 48.193(2)). (*Id.* at 6–7.)

As to Section 48.193 (1)(a)(1), which provides for specific personal jurisdiction over a non-resident defendant "[o]perating, conducting, engaging in, or carrying on a business or business venture in [Florida] or having an office or agency in [Florida]," the Court found that Plaintiffs "fail to present any evidence whatsoever to substantiate these contentions and thus fail to meet their burden." (*Id.* at 7.) The Court further stated that "Plaintiffs' unsubstantiated contention that UMGI has been sued in the Southern District of Florida in 2012 and was subject to the Court's personal jurisdiction does nothing to salvage their allegations. [] Even if this could be considered a factor in the determination of specific personal jurisdiction, Plaintiffs' representations to the Court are not only misleading, but incorrect," as "the district court never ruled on whether it had personal jurisdiction over UMGI," and "Plaintiffs appear to ignore the glaring fact that UMG Recordings, Inc. is a separate and distinct legal entity." (*Id.* at 7–8.) Finally, the Court stated that "Plaintiffs' allegations in their Amended Complaint that they will demonstrate jurisdiction 'through depositions and cross examination under oath during the trial[,]' (Am. Compl. ¶ 34), are inappropriate, as they are required to substantiate their jurisdictional allegations with competent evidence at the dismissal stage, not later." (*Id.* at 7.)

As to Section 48.193 (1)(a)(2), which, as relevant herein, provides for specific personal jurisdiction over a non-resident defendant conspirator, the Court noted that "Plaintiffs once again fail to meet their burden of establishing personal jurisdiction based on conspiracy because they have alleged nothing that clearly connects UMGI to a conspiracy made or carried out in Florida," and "[t]he Amended Complaint is simply devoid of any allegations connecting UMGI to the physical altercation between Kirk and Carey." (*Id.* at 8, 10.) Accordingly, the Court found that

"Plaintiffs' speculative conspiracy allegations leap much too far and cannot form the basis for personal jurisdiction." (*Id.*)

The Court also found that UMGI was not subject to general personal jurisdiction under Section (2) of the Florida Long-Arm Statute and stated that "Plaintiffs provide no evidence— affidavits or other competent proof—apart from their conclusory arguments in their response to UMGI's Motion to rebut" the sworn declaration of Sheryl Gold, an officer of UMGI, which was attached to UMGI's Motion to Dismiss. (*Id.* at 12.) Additionally, the Court denied Plaintiffs' request to further amend the Amended Complaint, stating,

> [a]t the very least, Plaintiffs have known of the deficiencies in their complaint since September 2021, when UMGI raised the same arguments it now raises in the instant Motion [to Dismiss]. (*See* ECF No. 87). Instead of curing these deficiencies, Plaintiffs chose to sit idle and wait months after the deadline to amend the complaint had passed to request permission to amend the complaint again. The Court will not condone this conduct."

(*Id.* at 13.)

In granting Interscope's Motion to Dismiss, the Court stated, "since the inception of this case, UMGR/Interscope has maintained its position that Interscope Records is a non-juridical entity which has not been properly served pursuant to the Federal Rules of Civil Procedure . . . yet Plaintiffs have turned a blind eye." (*Id.* at 14.) The Court added that "Plaintiffs' undue delay and repeated failures to cure deficiencies in this action will no longer be tolerated," and denied Plaintiffs' request to further amend the Amended Complaint. (*Id.*)

### D. The Motions to Dismiss and for Summary Judgment Filed By Defendants Kirk and BDBE

Kirk and BDBE also filed a joint Motion to Dismiss the Amended Complaint, (ECF No. 127), and a joint Motion for Summary Judgment, (ECF No. 151). In their Motion to Dismiss, Kirk and BDBE argued that the Amended Complaint was a "shotgun pleading" that failed to state a claim against them. (ECF No. 127 at 5–11.) Kirk and BDBE specifically took issue with Plaintiffs'

17

recurrent use of "Plaintiffs" and "Defendants," attributing all conduct to all Defendants. (*Id.* at 7–8.) As to each count, Kirk and BDBE argued: (1) Count IV for promissory estoppel must fail as to Plaintiff Anyadike because there was undisputedly a written agreement between Anyadike and Kirk; (2) Count V for civil conspiracy must fail as a matter of law because the intra-corporate conspiracy doctrine bars a conspiracy claim against a corporation and its own agents or employees; (3) Count VIII for civil theft must fail as to Anyadike because he did not serve a statutory pre-suit demand as required; and (4) seven of the eight counts improperly sought attorneys' fees with no contractual or statutory basis. (*Id.* at 8–11.)

Plaintiffs filed an Opposition to Kirk and BDBE's Motion to Dismiss. (ECF No. 146.) Therein, Plaintiffs argued that the Amended Complaint was not a shotgun pleading because "Plaintiff uses the term Plaintiffs to refer to both Plaintiffs and would specify an individual Plaintiff when necessary," and "Defendants plural could mean all of the Defendants or a portion of the Defendants and requires the context of the description to determine and distinguish between the two." (*Id.* at 1.) As to promissory estoppel, Plaintiffs asserted that the claim "includes both Anyadike and Kirk because the two men were partners with regards to this deal and both parties relied upon the promises and representations made by [BDBE's] agent Kinsza Virgil." (*Id.* at 1–2.) Plaintiffs then "request[ed] from this Court to add Defendant Universal Music Group Recordings, as Plaintiffs would like to involve all potentially liable Defendants with this suit." (*Id.* at 2.) In response to the intra-corporate conspiracy doctrine argument, Plaintiffs stated that they "disagree and argue that they do not allege an int[r]acorporate conspiracy," because "[w]hile Jonathan Kirk owns [BDBE], he had Kinsza Virgil running the company as president." (*Id.*) Plaintiffs cited no authority as to why that would not constitute an intra-corporate conspiracy. As to civil theft, Plaintiffs stated that "Anyadike was not beaten down and had his phone, cards and

money taken like Kenneth Carey, yet Steve Anyadike did tender payment to DaBaby for services and did not receive his tender for payment back from Jonathan Kirk." (*Id.* at 2–3.) Plaintiffs admitted that Anyadike "did not tender a letter separate from Kenneth Carey" and did not cite any authority to support why that statutory requirement should be excused. (*Id.* at 3.) Plaintiffs stated that they "don't dispute that attorneys['] fees are not available for Counts 1[–]7," and requested the "ability to amend the complaint to comply with this Court[']s findings" if the Motion to Dismiss was granted. (*Id.*)

Kirk and BDBE filed a Reply in Support of their Motion to Dismiss, noting that "Plaintiffs' three-page Response fails to address most of the BDBE Defendants' arguments, fails to cite *any* case law, and makes no attempt to explain why the case law cited by the BDBE Defendants does not control." (ECF No. 170 at 1 (emphasis in original)). Kirk and BDBE further argued that Plaintiffs "should not be permitted to benefit from their shotgun pleading simply because this case is in its late stages and set for trial," because "Plaintiffs caused this predicament—they filed the Amended Complaint on November 19, 2021—the last day their amendment was allowed, as extended by the Court," and "Plaintiffs' repeated failure to comply with the Federal Rules of Civil Procedure and Local Rules caused Plaintiffs' delay getting their Amended Complaint on file." (*Id.* at 4–5.)

Before the Motion to Dismiss was fully briefed, Kirk and BDBE filed a joint Motion for Summary Judgment. (ECF No. 151.) BDBE moved for summary judgment against both Plaintiffs on all seven counts of the Amended Complaint against it, and Kirk moved for summary judgment against both Plaintiffs on all counts except Count I (breach of contract by Anyadike only), Count II (assault), and Count III (battery). (*Id.*) Kirk and BDBE filed a Statement of Material Facts in support of their Motion for Summary Judgment, containing citations to the record and exhibits

attached thereto. (ECF No. 152.) Kirk and BDBE also filed additional Exhibits in Support of their

Motion for Summary Judgment, including declarations and deposition transcripts. (ECF No. 153.)

Plaintiffs filed an Opposition to Kirk and BDBE's Motion for Summary Judgment. (ECF

No. 174.) Throughout the Opposition, Plaintiffs stated that they "dispute" statements, but provided

no support for their arguments. (*Id.* at 1, 4.) For example, as to the conspiracy, Plaintiffs stated that

"[t]he evidence is not uncontroverted that a conspiracy didn't exist," but "[r]ather, there is about

every possible circumstantial evidence available other than a recording of them agreeing or them

agreeing on paper," yet Plaintiffs pointed to no such evidence in the record. (*Id.* at 3.) Plaintiffs

did, however, point vaguely to "TMZ and many of [sic] media sources" as evidence that Kirk had

committed unrelated violent acts before and after the events at issue. (*Id.* at 3.) Plaintiffs analogized

their situation to "[a] grocery store that is robbed[, which] does not know that the robber and the

getaway driver agreed to what happened before, but their actions and the consequences show their

conspiracy," and to "a racism/discrimination case," where "[p]eople know it is wrong so they don't

admit to it[,] [y]et the courts allow recovery based on disparate impact, essentially, the

consequences and facts of the situation show whether they were bad actors or not." (*Id.* at 2–4.)

Plaintiffs then characterized the altercation as Kirk "pulling [Carey's] pants and underwear down

in front of potentially hundreds of millions of people, ***sexually battered*** him and could have killed

him in ***attempted murder*** that wasn't successful," and claimed that they were entitled to damages

for intentional infliction of emotional distress, with no citations to the record or case law. (*Id.* at 6

(emphasis added)). Plaintiffs then changed the narrative of their civil theft claim, stating that

"Carey doesn't asse[r]t that Defendants took his credit cards but asserts that they did deprive him

of his credit cards when they took the cards out of his pockets without his permission." (*Id.* at 7.)

Plaintiffs concluded with a three-page long quotation from a case regarding vicarious liability, and

a "request" that "all of Defendants Motions for Summary Judgment are denied," although this Opposition was directed only at Kirk and BDBE's Motion for Summary Judgment. (*Id.* at 8–10.)

Plaintiffs also filed an Opposition to Kirk and BDBE's Statement of Material Facts. (ECF No. 176.) While Plaintiffs stated that facts were "disputed" throughout (*e.g.,* "9 – Disputed"), they provided no citations to the record. (*Id.*) Most notably, Plaintiffs responded to one statement regarding the conspiracy with, "[t]here is an admission of Cam Caldwell that the parties conspired. There is proof that DaBaby made shirts about the Cam Caldwell incident glorifying himself. There is an admission from Jonathan Kirk that violence helps sales when speaking about signing with Interscope. There is proof that the parties make money together . . ." (*Id.* at 3.) Again, Plaintiff provided no citation for the "proof."

Kirk and BDBE moved to strike Plaintiffs' Opposition to their Statement of Material Facts, arguing that it failed to comply with the Local Rules because it contained no record citations. (ECF No. 184.) Plaintiffs responded to the Motion to Strike by "provid[ing] their best citations herein with the hopes that this Court will consider the same," and stated that they "have attempted to gain compliance with the local rules as best they can, being as specific as they can." (ECF No. 208 at 1.) The Court struck both Plaintiffs' Opposition to Kirk and BDBE's Motion for Summary Judgment and Plaintiffs' Opposition to Kirk and BDBE's Statement of Material Facts for failure to follow the Local Rules. (ECF No. 232.) In doing so, the Court found that

> [t]his is not the first time Plaintiffs fail to comply with the Rules and the Court has repeatedly warned them that their actions will no longer be tolerated. (*See, e.g.,* ECF No. 96, 143). The Court warns Plaintiffs, as it has previously done on many occasions, that continued violations of the Federal Rules of Civil Procedure and the Local Rules will result in appropriate sanctions.

(*Id.* at 1.) The Court allowed Plaintiffs to file revised Oppositions within a week, and Plaintiffs complied. (*See* ECF No. 239.)

While Kirk and BDBE's Motion for Summary Judgment was pending, Plaintiffs filed their own Motion for Summary Judgment against Kirk, and another against BDBE. (ECF Nos. 157, 159.) First, Plaintiffs moved for summary judgment on all eight counts against Kirk. (ECF No. 157.) Throughout the Motion, Plaintiffs cited "Undisputed Facts" as authority, with no references to the docket or any other document. (*Id.*) Plaintiffs also repeatedly cited to the Amended Complaint as "undisputed evidence" of multiple propositions. (*Id.*)

On Count I (breach of contract), Plaintiffs cited the Amended Complaint as existence of the contract and argued, "Jonathan Kirk admits to not appearing for the event as he had agreed to do so. See Undisputed Facts by Defendant." (*Id.* at 2–3.) On Counts II and III (assault and battery), Plaintiffs argued that Kirk committed assault and battery when he "struck Steve Anyadike intentionally," citing only Anyadike's own affidavit, and when he "poured apple juice on Kenneth Carey while telling him that it looked like he peed on himself," and "struck Kenneth Carey on the ground," citing only Carey's own affidavit. (*Id.* at 4.) Plaintiffs further accused Kirk of "commit[ing] perjury in proceedings when he responded to his interrogatories that he didn't know any of the men identified on instagram," who Plaintiffs allege are co-conspirators. (*Id.* at 5.) On Count IV (promissory estoppel), Plaintiffs argued that "the parties had an agreement via an offer, acceptance and consideration. See Undisputed Facts," and "[y]et, if this Court does not accept that there was an agreement/contract then Plaintiffs seek together and/or separately a remedy with promissory estoppel." (*Id.* at 6–7.) On Count V (civil conspiracy), Plaintiffs made several unsupported statements including "Kirk conspired with his friends that attacked Kenneth Carey," "Kirk [c]onspired as well with Billion Dollar Baby Entertainment LLC, Interscope/UMGR and UMGI to make money from violent acts by receiving boosts in the media which would boost his brand awareness, social media following and sales," and "[t]here is a video of an artist that got in

22

a violent fight with DaBaby named Cam Coldheart. See evidentiary video and transcript." (*Id.* at 7–8.) On Count VI (defamation), Plaintiffs stated, "Plaintiffs both believes [sic] these lyrics are about them and are a great threat against my [sic] life," and cited the "Music Recording of Talk About It on the album Blame It On Baby" for evidence of the song lyrics at issue. (*Id.* at 13.) On Count VII (intentional infliction of emotional distress), Plaintiffs argued that "[t]he conduct [] of Defendants was extreme and outrageous," referring to the altercation with Kirk; cited to Carey's affidavit for details of the altercation; stated "[a]dditionally, Kirk admits to striking Steve. Undisputed Fact"; and cited one line of Kirk's deposition wherein Kirk states that he thought his thumb was broken but that he had also broken it the year prior. (*Id.* at 14–15.) On Count VIII (civil theft), Plaintiffs cited "TMZ Video and testimony of Kenneth Carey" and the Amended Complaint for support that Kirk committed civil theft by removing "cash/dollars, credit cards and phone out of Kenneth Carey[']s pockets," but not actually taking anything from him. (*Id.* at 15.)

Plaintiffs also moved for summary judgment on all seven counts against BDBE. (ECF No. 159.) Plaintiffs began by stating "Billion Dollar Baby Entertainment LLC (BDBE) is involved as a co[-]conspirator based on the following evidence." (*Id.* at 2.) Plaintiffs then quoted large portions of Kinsza Virgil's deposition (a former employee of BDBE), without any argument therein, and concluded, "[t]hus, BDBE was run by a President who assisted him with Kirk's plans [to] attack Kenneth Carey and Steve Anyadike." (*Id.* at 2–3.) Plaintiffs additionally included multiple unsupported statements that each Plaintiff "attest[ed] to," followed by a request that the Court "[c]onsider the following in conjunction with each other," and another list of unsupported statements (with only two citations: "See Video of Court Proceeding" and "Prospectus"). (*Id.* at 4–7.) On each count, Plaintiffs largely reiterated their arguments from the Motion for Summary Judgment against Kirk verbatim and added few statements relating to BDBE. (*Id.* at 7–16.) For

instance, Plaintiffs argued that "BDBE is a corporate legal maneuver that DaBaby uses to pay conspirators because all of them use necklaces/chains with BDBE and BDBE would arrange for their travel and other benefits for the conspirators," citing the deposition of Kinsza Virgil, which did not say anything to that effect. (*Id.* at 14.) Additionally, Plaintiffs stated, with no support, "BDBE assisted in setting up the show for DaBaby by writing the half page agreement to lure in promoters Anyadike and Carey." (*Id.* at 15.)

Plaintiffs filed one Statement of Material Facts to support his two Motions for Summary Judgment against Kirk and BDBE.[5] (ECF No. 160.) Plaintiffs stated, "Steve Anyadike testified to the following," with statements that were neither quoted nor cited, and "Kenneth Carey testified to the following," with statements that were neither quoted nor cited. (*Id.* at 1–4.) Plaintiffs cited to "[t]he transcript of the video [] attached as Exhibit 2," to support non-party Cam Coldheart's purported statements about an unrelated altercation, although there is no Exhibit 2 to the Statement of Material Facts. (*Id.* at 4–6.) Plaintiffs also cited to "Video of Interview and Transcript on Page 24, Line 5," filed in an unspecified location, as support for statements attributed to Kirk on a "Breakfast Club radio show" regarding an unrelated altercation. (*Id.* at 6.) The remainder of Plaintiffs' Statement of Material Facts vaguely cited deposition testimony, restated arguments that cannot be considered facts, and again accused Kirk of "commit[ing] perjury in proceedings when he responded to his interrogatories that he didn't know any of the men identified on instagram". (*Id.* at 9.) Plaintiffs then filed a separate "Notice of Filing Exhibits," (ECF No. 161), with no case caption or explanation of what the exhibits related to—which was promptly stricken by order of the Clerk for failure to follow the Local Rules. (ECF No. 164.)

---

[5] Plaintiffs' Statement of Material Facts was also directed at Plaintiffs' Motion for Summary Judgment against Defendant UMGI, (ECF No. 158), which was denied as moot when UMGI was dismissed from the action.

Defendants Kirk and BDBE filed a joint Opposition to Plaintiffs' Motions for Summary Judgment against them, stating that "[b]ecause both motions raise substantially the same arguments, the BDBE Defendants are filing this single memorandum in opposition, for efficiency's sake." (ECF No. 190 at 1.) Kirk and BDBE first noted that "Plaintiffs' Motion[s] fail[] to comply with Local Rule 56.1," because "Plaintiffs' Statement of Material Facts (ECF No. 160) fails in many instances to cite to any record evidence or to specific pages." (*Id.* at 2.) Kirk and BDBE then discussed each count in depth and outlined the outstanding disputes of material fact therein, arguing that summary judgment was not proper on any count and Plaintiffs' Motions should be denied. (*Id.* at 2–23.)

Plaintiffs filed one Reply in support of both of their Motions for Summary Judgment against Kirk and BDBE. (ECF No. 202.) Therein, Plaintiffs re-stated their original arguments, with little to no support from the record or other authorities. (*Id.*) Notably, Plaintiffs posed questions and promptly answered the same, including, "What if the co[-]conspirators were to tell him no when he asks them to do something? He can withdraw their benefits of traveling with him and being with him," and "Did they want to attack Kenneth Carey? They had no business or knowledge of Kenneth Carey. They risked their safety, criminal record and more just to appease and make DaBaby happy when he wanted to attack and embarrass Kenneth Carey." (*Id.* at 6.) Finally, Plaintiffs stated, "Plaintiffs tried to submit the videos to this Court earlier[,] but their Notice of Filing was denied and they had to submit the Motion instead of the Notice and then deliver it." (*Id.*)

The Court issued an Omnibus Order on September 2, 2022, ruling on the three Motions for Summary Judgment and denying Kirk and BDBE's Motion to Dismiss as moot. (ECF No. 279.) The Court granted summary judgment for BDBE on all seven counts against it; granted summary

judgment for Defendant Kirk on Count I (breach of contract by Carey), Count IV (promissory estoppel), Count V (civil conspiracy), Count VI (defamation), Count VII (intentional infliction of emotional distress), and Count VIII (civil theft); and granted summary judgment for Plaintiff Anyadike on Counts II and III (assault and battery) only. (*Id.*)

As to Count I (breach of contract) by Carey, the Court held that summary judgment was proper because Carey was not a party to the performance agreement. (*Id.* at 9–11.) The Court noted that because "Plaintiffs cannot raise a new legal claim for the first time in response to a summary judgment," it would not consider the argument that Carey was a third-party beneficiary to the agreement. (*Id.* at 10.) As to Count IV (promissory estoppel), the Court held that the claim failed as to Anyadike because there was an express contract and failed as to Carey because "there [was] no evidence that Kirk made any promises to Carey." (*Id.* at 16–17.) The Court again noted that "Plaintiffs argue, once again for the first time in their Motion, that this claim is being pled in the alternative and should therefore survive," but did not consider that argument. (*Id.* at 16.) The Court further noted that "Plaintiffs' response to the motion for summary judgment is not evidence, and Plaintiffs have failed to cite to particular parts of materials on the record to support their contentions, even after being given a second chance to do so." (*Id.* at 17.) As to Count V (civil conspiracy), the Court held that the claim failed and noted that "Plaintiffs point[ed] to *no other evidence* on the record," to show that "Defendants had an agreement between them to commit an unlawful act," apart from a YouTube video that the Court declined to consider. (*Id.* at 19 (emphasis added)). As to Count VI (defamation), the Court found that "Plaintiffs' position [] implies that extrinsic facts are necessary to establish that the statements made in the Instagram post are defamatory," and thus could not constitute defamation *per se*. (*Id.* at 22.) The Court also found that "[b]ecause Plaintiffs have failed to present evidence of actual, out of pocket losses they

incurred as a result of the allegedly defamatory statements made against them," their claims for defamation *per quod* must also fail. (*Id.* at 24.) As to Count VII (intentional infliction of emotional distress), the Court "agree[d] with Kirk that Plaintiffs' claims 'boil down to garden variety battery claims, with no serious injuries even alleged,'" and thus did not constitute intentional infliction of emotional distress. (*Id.* at 25.) Finally, as to Count VIII (civil theft), the Court found that "Carey's claim for civil theft also fails because there is simply no evidence of Carey's damages," and "[b]ecause Plaintiffs' positions rest upon mere allegations and speculation, [] there is no genuine issue of material fact." (*Id.* at 27–28.)

In the Omnibus Order, the District Court also denied Plaintiffs' Motion for Reconsideration of the Court's Order denying Plaintiffs' motions to submit new evidence in support of their motion for summary judgment, (ECF No. 246), reminding Plaintiffs "*once again* that a motion for reconsideration *must not* be used to ask the Court to rethink what the Court has already thought through." (*Id.* at 7 (emphasis in original)). The Court also noted that Plaintiffs' Opposition to Kirk and BDBE's Motion for Summary Judgment had been stricken for failure to comply with the Local Rules. (*Id.* at 18–19 n.1.)

> When the Court struck Plaintiffs' original response, it was to provide Plaintiffs with an opportunity to *correct* their filings and provide specific citations to record material, nothing more. This Order did not give Plaintiffs carte blanche to reformulate their arguments after having the benefit of Defendants' reply, and of additional filings on the docket. This conduct, along with Plaintiffs' pattern of violations of this Court's orders and the Rules, has not gone unnoticed.

> (*Id.*)

In short, the only claims that remained for trial consisted of: Plaintiff Anyadike's breach of contract claim against Defendant Kirk (Count I), and because the Court granted summary judgment for Plaintiff Anyadike on his assault and battery claims against Defendant Kirk (Counts II and III), a determination of damages on those two claims; Plaintiff Carey's assault and battery

claims against Defendant Kirk (Counts II and III); and Defendant Kirk's two counterclaims against Plaintiffs for common law invasion of privacy and unauthorized use of name or likeness, which were not at issue in the Motions for Summary Judgment. (*See id.*)

### E.   Other Pre-Trial Conduct

Mr. May's conduct with respect to several pre-trial issues merits discussion in the context of the instant Motions. First, Plaintiffs moved for an extension of the discovery and dispositive motion deadlines, notably only three days before the deadlines which had already once been extended, without any reasonable explanation for doing so. (ECF No. 125.) Instead, Plaintiffs argued that an extension was proper because they "struggled to find appropriate experts," including therapists who "weren't available, were on sabbatical or only saw women in distress" and that "[t]he first attempted therapist Mr. Carey worked with, turned out to not be a licensed therapist when they were sought to be verified by Defendant[s'] counsel." (*Id.* at 2.) Plaintiffs then argued that Defendants did not cooperate with the discovery process, essentially framing the remainder of the motion as a motion to compel generalized discovery without any reference to a specific discovery matter or request. (*Id.* at 3–9.) Plaintiffs argued that "documents avoided show proof of premeditation. If it was not premeditated, then why did the attackers cover their head with hoods?" (*Id.* at 5.) The Court granted a brief extension of the deadlines "only for the purposes of taking the previously scheduled depositions." (ECF No. 136.) Despite their representations with respect to Defendants' discovery responses, Plaintiffs never sought to compel any discovery from Defendants, although the Court explicitly directed them to do so. (*See* ECF No. 100 ("Plaintiff shall notice its Motion for hearing on the Court's next available discovery calendar, pursuant to the undersigned's Discovery Procedures, available at https://www.flsd.uscourts.gov/content/judge-jacqueline-becerra.")).

Second, following the Court's brief extension of the discovery and dispositive motion deadlines, Plaintiffs filed a Motion for Reconsideration, under seal, without leave of Court to do so. (ECF No. 140.) Therein, Plaintiffs argued that they discovered "new evidence," consisting of two YouTube videos of a non-party, who Plaintiffs represented had died approximately eight months earlier, speaking about an unrelated altercation. (*Id.* at 3.) The Court struck the filing for violation of the Local Rules, warning that "Plaintiffs' continued noncompliance with this Court's orders and the Rules **will result in appropriate sanctions**." (ECF No. 143 at 1 (emphasis in original)). Filing motions for reconsideration when Plaintiffs received an unfavorable result was somewhat commonplace, as Plaintiffs filed *four* motions for reconsideration of the Court's Orders, and each was denied or stricken. (*See* ECF Nos. 140, 163, 246, 277.)

Third, although Plaintiffs moved for extensions of time throughout the action, they opposed Defendants' Verified Joint Motion for Brief Continuance of Trial, (ECF No. 224). (ECF No. 226.) Plaintiffs' Opposition stated, "[w]e oppose to [*sic*] any dilatory extension that is trying to freeze the case and we believe the delays are due to recent violent incidents performed by the Defendants." (*Id.* at 1.) Plaintiffs further argued:

> [I]mposing the rule of law cannot depend upon external necessities of family that has nothing to do with the attacks that DaBaby performed against Plaintiffs . . . What if, for extending the trial, DaBaby kills another person and goes to jail. He won't be able to take responsibility for these Court proceedings. Or what if DaBaby, according to his last posting, decides to shoot again but shoots himself . . . [T]hey are trying to freeze the case and avoid trial because the Academy recently banned Will Smith for 10 years for smacking Chris Rock in the face and the public opinion of America has a revival. So their strategy is to avoid court. [] If something happens with the war in Europe or any future event happens that can mitigate an action in which the Defendant punch kick or assault or jump or knock to the ground or almost killed [*sic*] based on their entertainment counseling wishes and desires. [] The opposing counsel, that wants to travel, should teach their families that the rule of law and the Court rulings are above individual necessity because they have been set up to protect justice and to serve a higher purpose, which is equal treatment under the law.

(*Id.* at 1–3.) Notably, Plaintiffs moved for continuance of the Rule 11 Hearing for personal reasons after they filed this Opposition. (ECF No. 345.)

Fourth, the Court repeatedly struck and denied Plaintiffs' motions and accompanying "notices" for failure to follow the Local Rules and Court Orders, giving repeated and clear admonitions that the conduct would not be condoned. For instance, the Court denied Plaintiff Carey's Motion to Add Plaintiff Steve Anyadike, (ECF No. 45), because "[t]he Motion fails to comply with the Local Rules," and "Plaintiff fails to provide any authority, or even sufficient facts for the Court to assess the merits of his request." (ECF No. 63 at 1.) The Court denied Plaintiff's Motion to Add Punitive Damages, (ECF No. 70), for failure to comply with the Local Rules requiring that "fonts for typewritten filings must not be smaller than 12-point." (ECF No. 71.) Plaintiff Carey filed a Response to that Order, arguing that there are no restrictions on the font style, and that his font was 13-point. (ECF No. 75.) The Court entered a second Order, "advis[ing] the parties that all filings must be in **Times New Roman, 12-point font and shall strictly comply with the Local Rules**." (ECF No. 77 (emphasis in original)). The Court struck Plaintiff Carey's Rule 26(a) Disclosures and Witness List, (ECF Nos. 72, 73), "for failure to comply with the Local Rules of the Southern District of Florida and this Court's Scheduling Order," adding "[t]he Court admonishes the parties of their responsibility to comply with the Local Rules of the Southern District of Florida . . . Going forward, the parties must strictly follow the local rules." (ECF No. 74.)

The Court denied three of Plaintiff Carey's motions—Plaintiff's Motion for Leave to Amend Complaint Filed Jointly but Separately in Conjunction with a Motion to Add Punitive Damages, (ECF No. 68), Plaintiff's Second Motion to Add Plaintiff Steve Anyadike, (ECF No. 69), and Plaintiff's Motion to Add Punitive Damages, (ECF No. 80)—and stated that

> [t]he Court is troubled by Plaintiff's continued attempts to circumvent the Local
> Rules . . . Plaintiff is well aware that these three motions should only be filed as
> *one* motion. Plaintiff is either trying to bypass the page limitation set forth in the
> Local Rules, or he is engaging in piecemeal litigation. Neither are acceptable in this
> Court. The Court has repeatedly admonished Plaintiff for failing to comply with
> the rules and this Court's orders, and further violations or attempts to circumvent
> the rules will not be tolerated.

(ECF No. 81 at 1–2.) The Court struck Plaintiff Carey's Reply In Support of his Motion to Amend

the Complaint, (ECF No. 93), and stated:

> Once again, the Court finds itself admonishing Plaintiff for his failure to comply
> with the Federal Rules of Civil Procedure and the Local Rules of the Southern
> District of Florida . . . Plaintiff filed his reply without seeking an extension from
> this Court or explaining why his filing was delayed. (ECF No. 95). Plaintiff has
> continuously failed to comply with the rules of this Court since the inception of this
> case. Both the undersigned and Magistrate Judge Becerra have reminded Plaintiff
> that he must strictly comply with the Court's Orders, the Federal Rules of Civil
> Procedure[], the Local Rules of the Southern District of Florida, and Judge
> Becerra's Discovery Procedure. (*See, e.g.,* ECF Nos. 49, 50, 71, 74, 81). Plaintiff,
> however, has shown a pattern of disregard for the rules despite the Court's
> warnings. The only reasonable conclusion at this point is that Plaintiff is
> deliberately disregarding the rules. While the Court hesitates to penalize the
> plaintiff for the transgressions of his lawyer, it finds no other alternative than to
> strike the reply . . . Plaintiff is forewarned that further violations of the Court's
> Orders and the Rules will no longer be tolerated and may result in dismissal of this
> action. The Court has given Plaintiff numerous warnings, yet Plaintiff—or his
> counsel, or both—continue to deliberately ignore them.

(ECF No. 96 at 1–2.) The Court struck two of Plaintiffs' Oppositions to Motions for Summary

Judgment and two of Plaintiffs' Oppositions to Defendants' Statements of Material Facts, (ECF

Nos. 173–76), and stated,

> Plaintiffs' statements of material facts are wholly devoid of any record citations
> and supporting documentation . . . This is not the first time Plaintiffs fail to comply
> with the Rules and the Court has repeatedly warned them that their actions will no
> longer be tolerated. (*See, e.g.,* ECF Nos. 96, 143). The Court warns Plaintiffs, as it
> has previously done on many occasions, that continued violations of the Federal
> Rules of Civil Procedure and the Local Rules will result in appropriate sanctions.

(ECF No. 232 at 1.)

Finally, Plaintiffs submitted *fourteen* filings past their respective deadlines, often due to vague "CM/ECF errors" or with no explanation at all. *See* ECF Nos. [23] (Certificate of Interested Parties filed 5 days after the deadline); [24] (Opposition to Defendant Caldwell's Motion to Compel Arbitration filed 6 days after deadline, asserting that "[c]ounsel for Plaintiff was sick and faced CM ECF technical account errors," though he did not move for an extension); [36] (Second Certificate of Interested Parties filed 39 days after the deadline); [38] (Third Certificate of Interested Parties filed 41 days after the deadline); [52] (Performance Agreement filed one day after the deadline, after the Court issued an Order to Show Cause, to which Plaintiff Carey replied, "Plaintiff's counsel was in Mexico" and "Plaintiff's counsel tried to submit the document to the Federal Filing System CM/ECF, however, because of the design of the system, Plaintiff could not access the system," though he did not move for an extension); [92] (Reply in Support of Motion to Amend filed 7 days after deadline); [198] (Motion in Limine filed one day after the deadline); [218] (Motion to Submit Unconventional Filing of Evidentiary Videos to the Clerk for Support of Plaintiffs' Motions for Summary Judgment and Other Court Considerations filed 30 days after the deadline for motions in limine); [225] (Opposition to the First Rule 11 Sanctions Motion, one of the ***instant Motions***, filed 19 days after the deadline); [229] (Third Motion to Submit to this Court Terrifying, Newly Discovered Video, Articles and Photo Evidence filed 104 days after the deadline for motions in limine); [233] (Fourth Motion to Add New Evidence filed 122 days after the deadline for motions in limine); [251] (Proposed Voir Dire Questions filed 5 days after the deadline); [257] (Notice of Filing Joint Verdict Form for All Parties, which was not actually agreed to by the Defendants as Plaintiffs represented, filed 6 days after the deadline); [276] (Opposition to Defendants' Motion to Preclude Kenneth Carey from Seeking Emotional Damages at Trial filed *6 months* after the deadline, after the Court issued an Order to Show Cause, to which Plaintiff

Carey replied, "Plaintiff misread this notice and thought that Defendants were required to refile their Motion rather than not refile. Furthermore, Plaintiffs intended to respond to the Motion when refiled and thought that they had responded to the Motion").

### F. Compliance With the Scheduling Order

The Court's Scheduling Order set clear directives and deadlines for the Parties to follow in their pre-trial proceedings. (ECF No. 13.) For example, the Court ordered the Parties to submit "a **SINGLE JOINT** set of proposed jury instructions and a joint proposed verdict form in accordance with the deadlines set forth below," which were subsequently extended due to the continuance of trial. (ECF No. 13 at 2 (emphasis in original)). Defendants, however, filed a unilateral set of proposed jury instructions, noting that "Defendants' counsel is mindful that the Court's Order requires all parties to file one joint submission. However, Plaintiffs' counsel, Jonathan May, Esq., has not yet sent Defendants' counsel any comments to Defendants' proposed instructions, which Defendants sent" five days prior. (ECF No. 248 at 1–2.) Thereafter, Mr. May filed a "Notice of Filing Joint Verdict Form for All Parties" with the representation that Plaintiffs' email submission to the Court represented a joint verdict form, agreed to by all Parties (including, at the time, Defendants BDBE, UMGI, Interscope, and Kirk). (ECF No. 257.) Defendants jointly moved to strike Plaintiffs' Notice and email submission, stating that the form "was never agreed to by Defendants' counsel." (ECF No. 267.) The Court granted the Motion to Strike, noting that "it is apparent to the Court that Plaintiffs' counsel exhibited an incredible lack of diligence and professionalism" and that "[t]he Court is concerned about Plaintiffs' and their counsel's continued unwillingness to abide by the rules and this Court['s] orders." (ECF No. 275 at 1.) The Court deferred ruling on Defendants' request for attorneys' fees incurred in connection with the motion to strike, a request that Defendant Kirk has now renewed within the instant 1927 Sanctions Motion. (ECF No. 341.)

Plaintiffs, through Mr. May, also submitted two nearly identical sets of proposed *voir dire* questions to the Court. (*See* ECF Nos. 251, 311.) Among the questions submitted, Plaintiffs proposed the following questions which were clearly inappropriate:

> 7. Do you play fortnight? [sic]
> 8. Do you like UFC fighting?
> 9. Do you like boxing matches?
> 10. Do you like Mike Tyson?
> 11. Do you like Mohammed Ali[?]
> [. . .]
> 29. Do you believe that people can be racist against other? [sic]
> [. . .]
> 31. Have you been involved with any movements involving racism like Black Lives Matter?
> 32. Are you affiliated with any political party?
> [. . .]
> 37. Did you grow up in a violent neighborhood?
> 38. Do you care about value and principals? [sic]
> 39. Have you been involved in the Me Too movement?
> 40. Are you pro choice?
> 41. Do you believe in God?

(ECF No. 311 at 1–3.) The Court did not allow any of Plaintiffs' proposed questions to reach the jury during *voir dire*.

## G.  The Trial

Before the jury heard opening statements, the Court addressed a number of outstanding issues with counsel. (ECF No. 368 at 3–38.) During that time the Court admonished Mr. May for "playing fast and loose with the rules of evidence" and attempting to admit multiple hearsay statements with no applicable exceptions. (*See id.* at 29:11–15.) Ultimately, the Court bifurcated the trial as to liability and damages. (*Id.* at 38:6–7.)

Plaintiffs presented their case as to liability on the first day of trial. (*See* ECF Nos. 368, 369.) Plaintiffs called three witnesses—Plaintiff Carey, Plaintiff Anyadike, and Defendant Kirk. (*Id.*) On that first day, the jury was asked to return to the jury room a total of five times, notably three of those times within the first hour of trial, to resolve objections to Mr. May's attempts to

admit evidence which had either been previously excluded by the Court or had not been authenticated. (*See* ECF Nos. 368 at 40, 77, 81; 369 at 17, 98.)

Following the direct examination of Defendant Kirk, Mr. May attempted to call Loretta Carey as a witness via Zoom videoconference, however, the Court denied the request as the testimony concerned damages and not liability. (*See* ECF No. 369 at 98–99.) Mr. May then stated that he would like to call Kinsza Virgil as a witness, and asked Defendant Kirk's counsel whether she was present. (*Id.* at 99.) The Court asked whether Mr. May had subpoenaed Ms. Virgil as a witness and Mr. May replied that he had not. (*Id.*) Mr. May then moved on and asked Defendant's counsel whether "Mr. Soto" or "Arnold Taylor" were available and present in Court, and Defendant's counsel replied that they were not present, as they were also not subpoenaed by Plaintiffs' counsel. (*Id.*) Mr. May then promptly rested for Plaintiffs as to liability. (*Id.* at 100.)

The second day of trial began with Mr. May's request that "the stipulated facts" be read to the jury, despite the fact that Plaintiffs had already rested their case—which Mr. May said was a "mistake" on his part. (ECF No. 370 at 4–5.) The Court denied the request, noting that Plaintiffs' counsel had shown "an incredible lack of preparation." (*Id.* at 7–10.) Defendant Kirk's counsel called two witnesses—Antonio Soto and Kinsza Virgil—and additionally played two video depositions of witnesses who were unavailable, then rested as to liability at the conclusion of the day. (*See id.*)

The third day of trial began with Mr. May's closing statement. (ECF No. 372 at 8–34.) Defendant Kirk's counsel objected to Mr. May's closing statement a total of eight times because counsel was discussing evidence that had not been introduced at trial. (*Id.*) The Court sustained multiple objections, instructing Mr. May to "restrict [him]self to the evidence that [he] remember[s] happening in this courtroom." (*Id.* at 13.) At the conclusion of Mr. May's closing

statement, the Court advised that Mr. May had "pretty much used up [his] time" as he left only 20 seconds for rebuttal. (*Id.* at 34.)

After Defense counsel's closing statement, however, Mr. May's co-counsel Mr. Morales began a rebuttal closing statement. (*Id.* at 57.) At the expiration of his brief 20 seconds, Mr. Morales continued on despite the Court's repeated warnings that time had expired. (*Id.* at 57–58.) Mr. Morales was held in direct contempt of Court and issued a fine of $500.00. (*Id.* at 58; ECF No. 375 at 7; ECF No. 328.)

Within four hours, the jury issued a verdict on liability. (ECF No. 373 at 5–6.) Defendant Kirk was found not liable to Plaintiff Anyadike on Count I, which was the only claim presented to the jury for a liability determination. (*Id.*) Defendant Kirk was found not liable to Plaintiff Carey on any count raised in the Amended Complaint. (*Id.*) Further, both Plaintiffs were found liable to Kirk on Counterclaim I one for common law invasion of privacy, and Counterclaim II for unauthorized use of name or likeness. (*Id.*)

On the fourth and final day, the Parties litigated the second phase of the trial: damages. (ECF No. 374.) Mr. May began with a direct examination of his first witness, Defendant Kirk. (*Id.* at 6.) Within the first five minutes of questioning, the Court called a sidebar conference to determine whether Mr. May was in fact referring to a statement found within a deposition transcript, as he represented. (*Id.* at 8–9.) Mr. May could not identify anything in the transcript to support his attempted impeachment, and the Court sustained Defense counsel's objection. (*Id.* at 10.) Less than five minutes after the sidebar, the Court had to excuse the jury to instruct Mr. May to stop publishing documents to the jury that were not properly in evidence, noting that Mr. May had "totally ignored the rules of evidence, totally ignored the decorum of the courtroom, [and] totally ignored prior rulings by [the Court]." (*Id.* at 12–15.) The Court then required Mr. May to

36

proffer his remaining questions to Defendant Kirk outside the presence of the jury, an exercise which lasted approximately one hour, to determine what would be admissible. (*Id.* at 15–47.) During Mr. May's second direct examination of Plaintiff Anyadike, the Court had to again excuse the jury to admonish Mr. May about a line of questioning regarding unrelated alleged assaults by Defendant Kirk. (*Id.* at 64.)

Defense counsel notified the Court at that time that Defendant Kirk would be moving for sanctions, for "putting up with [Mr. May's] incompetence for two and a half years." (*Id.* at 65.) The Court responded that "[i]f this was not incompetence, it was absolute derogation of [Mr. May's] duty as an officer of the court," and notified Mr. May that the Court would be "turn[ing] this case over to the peer review committee of the Federal District Court." (*Id.*)

The jury returned a verdict in less than two hours, awarding a total of $100.00 to Plaintiff Anyadike on his assault and battery claims against Defendant Kirk, and a total of $100.00 to Defendant Kirk on his counterclaims for common law invasion of privacy and unauthorized use of name or likeness against both Plaintiffs. (ECF No. 375 at 4–5.) At the conclusion of the day, Counsel for Defendant Kirk asked if there would be an attorneys' fees and sanctions hearing, and the Court advised counsel to move for that relief. (*Id.* at 7.)

## II.     THE INSTANT MOTIONS

At issue now are two motions for sanctions pursuant to Federal Rule of Civil Procedure 11 (the First and Second Rule 11 Sanctions Motions, ECF Nos. 222 and 244), and one motion for sanctions pursuant to both 28 U.S.C. § 1927 and this Court's inherent authority (the 1927 Sanctions Motion, ECF No. 341). The Motions are now ripe for review.

### A.   The First Rule 11 Sanctions Motion

Defendants Kirk and BDBE filed the First Rule 11 Sanctions Motion, seeking Rule 11 sanctions against Plaintiffs, Mr. May, and the Lions' Den, for the civil conspiracy allegations

found in Count V of the Amended Complaint, and the filings flowing therefrom. (ECF No. 222.) Kirk and BDBE argue that without the "conspiracy allegations and claims," "the case is dwindled down to garden variety claims of breach of contract for minimal, if any, damages, and alleged assaults and battery." (*Id.* at 9.) The conspiracy claims, Kirk and BDBE argue, were no more than "purported leverage in this case, which gave rise to wild damage demands – totaling more than $907 million – in the Amended Complaint." (*Id.* at 9.) Thus, Kirk and BDBE seek attorneys' fees and costs for their defense of the conspiracy claims and related filings. (*Id.* at 2.) The improper filings at issue include: Plaintiffs' Motions for Summary Judgment (ECF Nos. 157, 159), Plaintiffs' Statement of Material Facts (ECF No. 160), Plaintiffs' Opposition to Kirk and BDBE's Motion for Summary Judgment (ECF No. 174), and Plaintiffs' Opposition Statement of Facts (ECF No. 176), as well as portions of the Amended Complaint, (ECF No. 121), asserting claims against BDBE for Count II (assault), Count III (battery), Count IV (defamation), Count VII (intentional infliction of emotional distress), and Count VIII (civil theft), which Kirk and BDBE contend are premised exclusively upon the civil conspiracy claims of Count V. (*Id.* at 1–2.)

Kirk and BDBE posit two grounds for Rule 11 sanctions. First, under Rule 11(b)(2), Kirk and BDBE argue that Plaintiffs' conspiracy claims were not "warranted by applicable law." (*Id.* at 4.) Specifically, Kirk and BDBE argue that they could not possibly conspire with each other, because BDBE is Kirk's company and under the intra-corporate conspiracy doctrine, Kirk cannot conspire with himself. (*Id.* at 7.) Kirk and BDBE note that sanctions are not available as against Plaintiffs themselves under Rule 11(b)(2), and that accordingly sanctions on this ground are sought only against Mr. May and the Lions' Den. (*Id.* at 10.) Second, under Rule 11(b)(3), Kirk and BDBE argue that Plaintiffs' conspiracy claims contained factual contentions that "did not have 'evidentiary support' and were unlikely to have evidentiary support 'after a reasonable opportunity

for further investigation or discovery.'" (*Id.* at 4.) As to the Rule 11(b)(3) argument, Kirk and BDBE seek sanctions against Plaintiffs, Mr. May, and the Lions' Den. (*Id.* at 10.) On this basis, Kirk and BDBE cite to the deposition transcripts of both Carey and Anyadike, wherein each stated that it was only their "opinion" that the Defendants were part of a conspiracy, and that they based that opinion largely on posts from the Internet. (*Id.* at 5–6.)

Plaintiffs filed an Opposition to the First Rule 11 Sanctions Motion. (ECF No. 225.) Plaintiffs respond that they should not be sanctioned because they "have [] strong evidentiary and factual bases for their conspiracy count," and "the interest of justice would find in favor of Plaintiffs even if the law would not." (*Id.* at 2.) Plaintiffs' Opposition aims to "further explain[] the logic of the conspiracy herein" and "giv[e] examples of analogous cases to the case herein." (*Id.* at 1.)

As to their legal basis for the conspiracy claim, Plaintiffs cite to two wholly irrelevant "cases." The first is *United States v. Lehder-Rivas*, 955 F.2d 1510 (11th Cir. 1992)—a criminal case wherein multiple defendants were convicted of criminal conspiracy to import cocaine—as an "illustration" for the Court to "understand a conspiracy." (ECF No. 225 at 2, 5.) Plaintiffs also rely on the so-called "case" of actor Will Smith slapping comedian Chris Rock at the Academy Awards, as a juxtaposition to this conspiracy claim, to show what a conspiracy is not. (*Id.* at 4–5; ECF No. 225-1 at 6 (attaching a photograph from an unknown source of the incident at the Academy Awards)). Plaintiffs assert that the Academy of Motion Picture Arts and Sciences "punished" actor Will Smith after he "slapped Chris Rock on camera," whereas in this case Defendant Kirk was not "punished" for his allegedly violent actions, and the inaction of BDBE, UMGI, and Interscope shows a conspiracy. (ECF No. 225 at 4–5.)

As to their factual basis for the conspiracy claim, Plaintiffs argue that:

> [T]here is evidence in the contract the Defendants have together and with third party
> companies that advance their interests, there is evidence in the investment UMG
> makes on behalf of DaBaby, there is evidence that UMG is proud of and attracts
> investors in their public prospectus using Da[B]aby's name, there is evidence in the
> media coverage and buzz created on the subject, there is evidence in the influence
> UMG has and [its] agreements with social media powers like [T]witter, [F]acebook,
> [T]iktok and others and most importantly, there is evidence in the profits
> Defendants made together, specifically payments from UMG to DaBaby and from
> DaBaby to UMG. UMG entities knowingly contracted with DaBaby knowing his
> background of criminal behavior and attacks, all evidenced in news articles and
> videos online.

(*Id.* at 3 (emphasis in original).) Plaintiffs provide no citations to any of this "evidence" in their

Opposition. (*Id.*) Plaintiffs also assert that UMGI and Kirk have an agreement "to make money

together"; "that anything Kirk does as DaBaby will result in shared profits for UMG and Interscope

and its entities"; that "UMG and its holdings [] will advise Kirk (marketing, sales, strategy and

more)"; and "that UMG entities advise DaBaby [Kirk] with regards to every aspect of his career."

(*Id.*) Again, Plaintiffs provide no citation to this purported agreement or any such clauses therein.

(*Id.*) Plaintiffs further argue that they need not show a written agreement evidencing the

conspiracy, because "criminals" would not put their conspiracies in writing, including "Noriega

[who] didn't create written documents with his co-conspirators to sell cocaine in the U.S." (*Id.* at

5 (no citation provided as to the reference to "Noriega")).

Defendants Kirk and BDBE filed a Reply in support of the First Rule 11 Sanctions Motion.

(ECF No. 228.) Kirk and BDBE state that they continue to rely on the authorities cited in the First

Rule 11 Sanctions Motions and additionally address two short points. (*Id.*) First, Kirk and BDBE

argue that the Court should strike Plaintiffs' Opposition for failure to comply with the Local Rules

of the Court, because it was filed approximately 19 days after the deadline. (*Id.* at 1.) Second, Kirk

and BDBE note that Plaintiffs' Opposition is devoid of any record citations and relies entirely on

unrelated incidents that post-dated summary judgment in the action. (*Id.* at 1–2.)

### B.  The Second Rule 11 Sanctions Motion

Defendants UMGI and Interscope filed the Second Rule 11 Sanctions Motion, also seeking Rule 11 sanctions against Plaintiffs, Plaintiffs' Counsel Mr. May, and the Lions' Den, for involving UMGI and Interscope in this litigation with no factual or legal basis to do so. (ECF No. 244.) UMGI and Interscope contend that they were "named only because they have other business dealings with [Kirk] which are completely unrelated to the claims in this case," and that they have repeatedly urged Plaintiffs' counsel to withdraw their conspiracy claims to no avail. (*Id.* at 2.) UMGI and Interscope argue that Plaintiffs' and Mr. May's actions "have unnecessarily and unreasonably multiplied the litigation—which ultimately is a simple assault and battery case against Kirk—resulting in a waste of resources by all parties involved, including the Court." (*Id.* at 18.) Thus, UMGI and Interscope seek attorneys' fees and costs for their time spent defending this action from the moment that Plaintiffs filed the Amended Complaint onward. (*Id.* at 6.)

UMGI and Interscope posit two grounds for Rule 11 sanctions. First, under Rule 11(b)(2), UMGI and Interscope argue that Plaintiffs' conspiracy claims are "legally frivolous." (ECF No. 244 at 11.) Specifically, UMGI and Interscope argue that (1) Interscope is not a legal entity, and it therefore cannot be sued; (2) even if Interscope could be sued, the intra-corporate conspiracy doctrine bars Plaintiffs' theory of civil conspiracy as the agents of a corporation cannot conspire amongst themselves; and (3) even if Interscope could somehow be sued and held liable for Kirk's conduct, Plaintiffs have established no tie to UMGI as a matter of law and cannot assert personal jurisdiction over UMGI. (*Id.* at 11–13.) UMGI and Interscope note that sanctions are not available as against Plaintiffs themselves under Rule 11(b)(2), and that accordingly sanctions on this ground are sought only against Mr. May and the Lions' Den. (*Id.* at 19.) Second, under Rule 11(b)(3), UMGI and Interscope argue that Plaintiffs' conspiracy claims are "factually frivolous." (*Id.* at 13.)

41

Specifically, UMGI and Interscope note that Plaintiffs testified that they based their claims on their own "opinions" and "what they have read online and social media," and that they have provided no evidence, even when themselves moving for summary judgment, to support their theory of civil conspiracy. (*Id.* at 13–15.) Further, UMGI and Interscope assert that Mr. May should have been aware that Plaintiffs' claims were both legally and factually frivolous, not only from basic research and due diligence, but also from explicit explanations provided to Mr. May by counsel for both UMGI and Interscope. (*Id.* at 16–18.)

Plaintiffs filed an Opposition to the Second Rule 11 Sanctions Motion. (ECF No. 265.) Plaintiffs argue that sanctions are not warranted herein, because their conspiracy claims are legally sound and have "undeniable, overwhelming evidence in the Plaintiffs' favor." (ECF No. 265 at 2.) Plaintiffs assert two new legal arguments herein. First, Plaintiffs rely on *Hyman v. Borack & Assocs., P.A.*, No. 8:12-cv-1088-T-23TGW, 2012 WL 6778491, at *1 (M.D. Fla. Dec. 17, 2012), *report and recommendation adopted*, No. 8:12-cv-1088-T-23TGW, 2013 WL 68534, at *1 (M.D. Fla. Jan. 4, 2023), for the proposition that "merely weak" arguments and evidence are insufficient to render Rule 11 sanctions appropriate. (*Id.* at 3.) Notwithstanding that argument, Plaintiffs contend that their "claims in this Case are not weak nor insufficient [and they] believe they will prevail in a Jury trial based on the evidence submitted and presented, the Agreement between the parties and the reasons stated herein." (*Id.*)

Second, Plaintiffs cite *Walters v. Blankenship*, 931 So. 2d 137, 141 (Fla. 5th DCA 2006) for the proposition that "***an alternative basis for a civil conspiracy claim exists where the plaintiff can show some 'peculiar power of coercion' possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess***." (ECF No. 265 at 16 (citing *Walters*, 931 So. 2d at 140) (emphasis in original)). Plaintiffs maintain that there was an underlying

"tort or wrong" but seem to also argue that even without an underlying tort or wrong, UMGI and Interscope's purported conspiracy with Kirk and BDBE can be shown exclusively through their "peculiar power of coercion," because "DaBaby alone does not possess the resources, the power or the influence to do such a marketing scheme alone," and "[h]e needs the support of BDBE, himself, his attackers and UMG[I]/Interscope." (*Id.* at 17.)

As to factual evidence supporting Plaintiffs' conspiracy allegations, Plaintiffs cite to multiple documents that they fail to locate in the record: (1) "UMG[I]'s Public Prospectus," which does not appear at any of the docket entries cited by Plaintiffs, (*see* ECF No. 265 at 5 (citing ECF Nos. 206 at 9 (which does not contain a "chart of UMG[I]'s Public Prospectus" as indicated); and 206 at 1 (which does not contain the "second paragraph of UMG[I]'s Public Prospectus" as indicated)); (2) the "Entertainment Income Agreement," which is purportedly an agreement between Kirk and "Interscope/UMG[I]," which also does not appear at any of the docket entries cited by Plaintiffs, (*see* ECF No. 265 at 6 (citing ECF Nos. 230 at 5–6 (which does not exist, as ECF No. 230 is a one paragraph long Paperless Order); and 230 at 1 (same))); (3) a transcript of statements purportedly made by Kirk in an interview on "the Breakfast Club radio show/media outlet," which also does not appear at the docket entry cited by Plaintiffs, (*see* ECF No. 265 at 7 (citing ECF No. 163 at 25 (which does not exist, as ECF No. 163 is an 8-page long motion for reconsideration))); and (4) UMGI and/or Interscope's "Code of Conduct," (with no citation to any such document) which Plaintiffs note "may not be used as evidence, as determined by this Court," yet which is quoted (allegedly, as the Court cannot confirm the same without reference to the document) by Plaintiffs herein as evidence that a conspiracy existed. (*Id.* at 8.) Plaintiffs assert that the lack of further documentation is because "[e]very action by DaBaby and UMG[I]/Interscope is to conceal their conspiracy with their best efforts, yet, Plaintiffs continue to dismantle it with

every document, every publishing and more." (ECF No. 265 at 18.) Plaintiffs accuse UMGI and Interscope of discovery violations, including refusal to produce "a single document" and "not answer[ing] any interrogatories in defiance of law and to avoid the truth." (*Id.* at 11.) Finally, Plaintiffs argue that the best way to identify a conspiracy is to "[f]ollow the money," yet Plaintiffs cite to no financial, or any other, documents to support that assertion. (*Id.* at 13.)

UMGI and Interscope filed a Reply in Support of the Second Rule 11 Sanctions Motion. (ECF No. 266.) In support of their argument that Plaintiffs' claims were factually frivolous, UMGI and Interscope assert that Plaintiffs' Opposition is devoid of accurate record citations. (*Id.* at 2.) In response to Plaintiffs' allegation that UMGI and Interscope committed discovery violations to conceal evidence, UMGI and Interscope argue that they lodged only proper objections to discovery, and in any event, Plaintiffs failed to comply with the Court's discovery procedures to remedy any purported discovery violations. (*Id.* at 9–10.) UMGI and Interscope note that Plaintiffs' Opposition is devoid of any reference to Defendants' arguments that the claims are legally frivolous, including the arguments that the Court lacks personal jurisdiction over UMGI and that Interscope is a non-juridical entity that was not served and cannot be sued. (*Id.* at 5.) Further, UMGI and Interscope argue that Plaintiffs conflate the theories of vicarious liability (which was not alleged in Plaintiffs' Amended Complaint) and civil conspiracy (which was alleged, albeit insufficiently). (*Id.* at 6.) Finally, UMGI and Interscope distinguish Plaintiffs' case law as both factually distinct and legally irrelevant. (*Id.* at 7–9.)

## C. The 1927 Sanctions Motion

At the conclusion of the trial, Defendant Kirk filed the 1927 Sanctions Motion, directed only at Mr. May and the Lions' Den. (ECF No. 341.) Defendant Kirk argues that sanctions are proper under both 28 U.S.C. § 1927 and the Court's inherent authority, because Mr. May's conduct

immediately prior to and at trial exhibited a "repeated, constant, and flagrant disregard for the rules of evidence and this Court's order[s]," which was done in bad faith and unreasonably multiplied the proceedings. (*Id.* at 2–3.) Defendant Kirk cites to multiple instances of allegedly bad faith conduct by Mr. May before trial, including: the delayed and unreasonable proposed edits to jury instructions (inserting his entire theory of facts into each instruction), which required Defendant Kirk to file unilateral jury instructions in violation of the Court's Order; the repeated attempt to include a new therapist, who was already excluded; the litany of unauthenticated screenshots of social media posts and websites included in Plaintiffs' exhibit list; and the improper designation of nearly all of a deposition, when less than one page was used at trial. (*Id.* at 5–8.) Additionally, Kirk cites to multiple instances of allegedly bad faith conduct by Mr. May at trial, including: the proposal of "improper and inflammatory proposed [voir dire] questions" (*e.g.,* "Do you care about value[s] and principals [sic]?" and "Are you pro[-]choice?"); the repeated attempts to admit exhibits that the Court had already ruled were inadmissible; and the repeated attempts to "back door" evidence into the trial that was unable to be authenticated. (*Id.* at 8–10.) Defendant Kirk argues that this conduct multiplied the proceedings, causing the trial to last four days when it should have been no more than two—and that attorneys' fees are proper for the time spent defending against Mr. May's unreasonable actions. (*Id.* at 10.)

Mr. May filed an Opposition to the 1927 Sanctions Motion. (ECF No. 344.) Mr. May argues that "Plaintiff[s'] counsel arranged his whole life around complying with this Court['']s rules, Local Rules, Orders, Requirements and more" and characterizes his many missteps as "mistakes" rather than bad faith actions. (*Id.* at 4–6.) Mr. May attempts to justify each of the actions identified by Defendant Kirk, including, for example the inclusion of the *voir dire* question "Do you believe in God?" stating that "[n]ot allowing the question, is arguable discrimination based on

religion against the Plaintiffs. For example, if someone is a satanist, they may approve of and appreciate violence against others." (*Id.* at 14.) Mr. May then goes on to accuse Kirk's counsel of acting in bad faith, including the allegations that Kirk's counsel, Drew Findling, Esq., "stated in deposition that if he were Kirk, he would have attacked me [Mr. May]," and "yell[ed] in Court before the jury verdict 'you are a disgrace' many times and lung[ed] towards Plaintiffs['] attorney to the point of him being restrained by Court personnel and Police attended the hearing behind Plaintiffs['] counsel after that incident." (*Id.* at 16.) Mr. May concludes by stating that the Court has already determined that the whole "lawsuit was not in bad faith" and "would not prejudice the opposing party," and draws the comparison to "the Jury Verdict on defamation against Alex Jones awarding over 1 billion in fees for a social media post." (*Id.* at 18–19.)

Defendant Kirk filed a Reply in Support of the 1927 Sanctions Motion. (ECF No. 350.) Therein, Defendant Kirk responds with further explanation as to each of Mr. May's actions and how those actions multiplied the proceedings against Defendant Kirk. (*See id.*) Defendant Kirk takes particular issue with the accusations against his own counsel, stating "Attorney Drew Findling never stated he would attack Plaintiffs' counsel in the deposition" and "[l]aw enforcement sat behind Plaintiffs' counsel's table near the end of trial because Plaintiff Carey was sitting in a federal courtroom with an active felony warrant and was taken into custody immediately after the jury began deliberations," rather than to protect Mr. May from Kirk's counsel, as Mr. May alleged in his Opposition. (*Id.* at 6.) Kirk argues that "Plaintiffs' counsel flouted the Court's evidentiary ruling, plain and simple," time and time again, resulting in Kirk accruing unnecessarily high attorneys' fees, the payment of which he contends is a proper sanction against Mr. May and the Lions' Den. (*Id.* at 4, 9.)

### D. Supplemental Briefing

Following the Rule 11 Hearing, without leave of Court, and after expressly informing the undersigned that no further argument or submission was necessary, Plaintiffs filed a Notice of Supplemental Authority Pursuant to Local Rule 7.8 In Support of Plaintiffs' Response to All Defendants' Motion for Sanctions (the "First Supplement"), (ECF No. 359.) Defendants Kirk and BDBE filed a Motion to Strike the First Supplement, (ECF No. 360), which the Court granted (ECF No. 393). Kirk and BDBE argue that "[r]ather than being supplemental authority, Plaintiffs' filing attempts to re-argue points that he made at the Rule 11 hearing on January 30, 2023," and that the arguments are "baseless, wholly irrelevant to the subject matter of the Rule 11 motions, and far outside the scope of a Notice of Supplemental Authority under Local Rule 7.8." (ECF No. 360 at 1–2.) Kirk and BDBE request that the Court strike the First Supplement. (*Id.* at 3.)

Defendants UMGI and Interscope filed a response asking the Court to disregard the First Supplement, (ECF No. 363). UMGI and Interscope similarly argue that the First Supplement fails to comply with Local Rule 7.8, "simply restates prior arguments and submissions to the Court," and "ignores the 200-word limitation found in Local Rule 7.8." (*Id.* at 1.) UMGI and Interscope also state, "[p]utting aside the Notice['s] procedural deficiencies, the Notice raises no pertinent or significant authorities," and "even if the Court were to consider the Notice, it does not alter the conclusion that Plaintiffs and their counsel are subject to Rule 11 Sanctions." (*Id.* at 2.)

Only days later, Plaintiffs filed yet another supplement, the Second Notice of Supplemental Authority Pursuant to Local Rule 7.8 In Support of Plaintiffs' Response to All Defendants' Motions for Sanctions (the "Second Supplement"), (ECF No. 365). Therein, Plaintiffs state that "[b]ad faith requires showing that no reasonable attorney in the same position would do the same actions," and then proceeds to list four improperly cited cases, seemingly for the proposition that

if other attorneys have filed "similar" cases, it cannot be unreasonable to do so in this action. (*Id.* at 1–2.) The Court is not able to identify the exact cases from Plaintiffs' vague descriptions and will not endeavor to do so herein. (*See, e.g., id.* at 1 ("Case 2:2023cv00862: Plaintiff sued Brian Warner AKA Marilyn Manson, Record Label Interscope Music Publishing Inc and Nothing Records concerning child molestation in California" listing no caption, date, or court)).

Defendants UMGI and Interscope filed a Response to the Second Supplement. (ECF No. 366.) They argue that "[n]one of the citations" provided by Plaintiffs "are to actual **authorities**. Rather, they are complaints that have been filed with no substantive rulings rendered." (*Id.* at 1.) UMGI and Interscope add that "even if the allegations were successful, they are not analogous to Plaintiffs' allegations," and distinguish each citation provided. (*Id.* at 1–2.) UMGI and Interscope assert that in three out of four cases there is no conspiracy alleged, and in the fourth case there is a *criminal* conspiracy alleged to harm a victim rather than "a generic conspiracy to financially gain from publicity, like Plaintiffs allege here." (*Id.*) Defendants Kirk and BDBE filed a Notice of Adoption of UMGI and Interscope's Response to the Second Supplement. (ECF No. 367.)

### III.   ANALYSIS

#### A.   All Defendants Are Entitled to Rule 11 Sanctions Against Mr. May and the Lions' Den in Connection with Plaintiffs' Conspiracy Claims.

The First Rule 11 Sanctions Motion, (ECF No. 222), and the Second Rule 11 Sanctions Motion, (ECF No. 244), seek sanctions against Plaintiffs, Mr. May, and the Lions' Den pursuant to Federal Rule of Civil Procedure 11. Rule 11 provides, in relevant part:

> **(b) Representations to the Court.** By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

.

(2) the claims, defenses, and other legal contentions are warranted by existing law
or by a nonfrivolous argument for extending, modifying, or reversing existing law
or for establishing new law;
(3) the factual contentions have evidentiary support or, if specifically so identified,
will likely have evidentiary support after a reasonable opportunity for further
investigation or discovery; and
(4) the denials of factual contentions are warranted on the evidence or, if
specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). Additionally, Rule 11(c)(1) provides that after the procedural notice

requirements are met, an issue not in dispute here, "the court may impose an appropriate sanction

on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed.

R. Civ. P. 11(c)(1).

Although Rule 11 plainly empowers a court to sanction parties or counsel, it is an

"extraordinary remedy, one to be exercised with extreme caution." *Menendez v. Signature*

*Consultants, LLC*, No. 11-cv-61534, 2011 WL 6179727, at *1 (S.D. Fla. Dec. 13, 2011). Indeed,

"Rule 11 is intended to deter claims with *no* factual or legal basis at all; creative claims, coupled

even with ambiguous or inconsequential facts, may merit dismissal, but not punishment." *Davis v.*

*Carl*, 906 F.2d 533, 538 (11th Cir. 1990) (emphasis in original); *see also Malgeri v. Vitamins*

*Because LLC*, No. 19-cv-22702, 2022 WL 17593133, at *1 (S.D. Fla. Sept. 30, 2022) (quoting

*Davis*, 906 F.2d at 538). "Rule 11 sanctions are proper when a party files a pleading: (1) for an

improper purpose; (2) based on a legal theory that has no reasonable chance of success; or (3) that

has no reasonable factual basis." *Matthiesen v. Matthiesen*, No. 16-cv-20360, 2018 WL 1121538,

at *2 (S.D. Fla. Mar. 1, 2018) (citing *Lee v. Mid-State Land & Timber Co.*, 285 F. App'x 601, 608

(11th Cir. 2008)); *see also Gulisano v. Burlington, Inc.*, 34 F.4th 935, 942 (11th Cir. 2022) (same);

*Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996) (same). "The objective

standard for testing conduct under Rule 11 is reasonableness under the circumstances and what

was reasonable to believe at the time the pleading was submitted." *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998) (internal citation and quotation omitted).

"When deciding whether to impose sanctions under Rule 11, a district court must conduct a two-step inquiry, determining '(1) whether the party's claims are objectively frivolous; and (2) whether the person who signed the pleadings should have been aware that they were frivolous.'" *Gulisano*, 34 F.4th at 942 (citing *Alderman*, 158 F.3d at 524). In determining whether to award Rule 11 sanctions against counsel, as opposed to the party, the Court should consider whether counsel "had to rely on a client for information as to the [relevant] facts." *Donaldson v. Clark*, 819 F.2d 1551, 1556 (11th Cir. 1987) (reversing award of sanctions) (quoting Fed. R. Civ. P. 11, Advisory Note (1983 amend.)).

"Sanctions are warranted when a party exhibits a 'deliberate indifference to obvious facts,' but not when the party's evidence to support a claim is 'merely weak.'" *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1294 (11th Cir. 2002) (quoting *Alderman*, 158 F.3d at 524); *see also Bathazi v. U.S. Dep't of Homeland Sec.*, 667 F. Supp. 2d 1375, 1378 (S.D. Fla. 2009) (holding that plaintiff's counsel's persistence in continuing to challenge the adjudication process in light of repeated jurisdictional dismissals constituted "deliberate indifference"). "A factual claim is frivolous if no reasonably competent attorney could conclude that it has a reasonable evidentiary basis." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 665 (11th Cir. 2010) (citing *Davis*, 906 F.2d at 535–37). Where no evidence or only "patently frivolous" evidence is offered to support factual contentions, sanctions can be imposed. *See Davis*, 906 F.2d at 537. If, however, the evidence supporting the claim is reasonable, but simply "weak" or "self-serving," sanctions cannot be imposed. *Id.* at 536. Additionally, "[i]f the attorney failed to make a reasonable inquiry, then

'the court must impose sanctions despite the attorney's good faith belief that the claims were sound.'" *Gulisano*, 34 F.4th at 942 (quoting *Worldwide Primates, Inc.*, 87 F.3d at 1254).

Further, continuing to relitigate and reargue unfavorable rulings may constitute sanctionable conduct. *See Langermann v. Dubbin*, No. 14-cv-22531, 2014 WL 11429282, at *1 (S.D. Fla. Oct. 16, 2014) (finding that a plaintiff's continuous filing of lawsuits and motions "that require the investment of court time and resources in [an] attempt to relitigate and reargue rulings that have been decided against him" constituted sanctionable conduct under Rule 11).

Given that the civil conspiracy counts, and the claims related to it, were objectively frivolous and that counsel should have been aware that they were frivolous when the action was filed, Rule 11 sanctions against Mr. May and the Lions' Den are warranted. Specifically, Defendants UMGI and Interscope are entitled to Rule 11 sanctions in connection with all six claims against them because all claims are based on Plaintiffs' theory of civil conspiracy—a theory that lacked any factual or legal basis. Defendant BDBE is entitled to Rule 11 sanctions in connection with all seven claims against it for the same reason. Additionally, Defendant Kirk is entitled to Rule 11 sanctions in connection with his defense of the civil conspiracy claim only.

### i.    Plaintiffs' Conspiracy Claims Were Frivolous.

Rule 11(b)(3) provides that in presenting a filing to the Court, an attorney attests that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). Rule 11(c) provides that sanctions are appropriate for a violation of this requirement, namely, "when a party files a pleading that has no reasonable factual basis." *Worldwide Primates, Inc.*, 87 F.3d at 1254 (quoting *Jones v. Int'l Riding Helmets, Ltd.*, 49 F.3d 692, 694 (11th Cir. 1995)). As this Court has found, Plaintiffs' civil conspiracy and related claims were frivolous because there was no factual support for the claims. Specifically, there was no

testimony or other evidence to support the claims. Indeed, even the facts as *alleged* were insufficient. Instead, Plaintiffs' action proceeded on the unfounded theory that because Defendants profit in some way from Kirk's music, anything Kirk does (presumably good or bad) is part of a conspiracy involving all Defendants. The Court first turns to an analysis of the facts, if any, to support the theory that Defendants were conspiring with each other.

First, Plaintiffs admitted in their depositions that it was only their "opinion" that a civil conspiracy existed. For example, at his deposition, Carey testified:

> **Q.** [. . .] Is it your allegation that Jonathan Kirk conspired with Billion Dollar Baby Entertainment?
> **A.** Yeah. I mean, **that's my opinion**. I mean, I think DaBaby does things for clout. I mean, I give you—I mean, I been doing this a long time, so, I mean, DaBaby is signed to Interscope. 50 Cent was signed to Interscope. DaBaby is like the new 50 Cent. Controversy sells.

(ECF No. 156-2 at 213:17–25 (emphasis added)).

> **Q.** What evidence do you have that Universal Music had anything to do with putting together that strategy as you testify?
> **A.** I mean, I mean, I have it to me. That's what I think is going on. I mean I don't think –
> **Q.** It's your opinion?
> **A. That's my opinion**. That's what I feel.

(ECF No. 156-2 at 235:20–236:1 (emphasis added)). Similarly, at his deposition, Anyadike testified:

> **Q.** How do you know that there's this marketing strategy that you allege?
> **A.** How do I know? Because the – because the – they are still up, you know. Songs are still up – songs are still up, videos are still up, visuals are still up. Like I said, it's the lack of anything being done.
> **Q.** Is that – is that the lack of action?
> **A.** Lack of action.
> **Q.** Is that the extent – is that the extent of your firsthand knowledge of this marketing scheme that you allege?
> **A.** Yes. Because what you allow is part of what you market; you understand? And if it's being publicized in the media, then you – then it's part of – it's part of your marketing strategy, you know? It's a strategy used to make money from this.

**Q.** So it's your opinion that there's this marketing strategy based on the inactions that you described; correct?
**A.** Yes.

(ECF No. 156-4 at 294:4–25.) In response to the instant Motions, Plaintiffs offered no other testimony to support their theory.

Second, there was no other evidence presented to support Plaintiffs' conspiracy claims. Plaintiffs attached thirty-seven exhibits to the Amended Complaint, consisting only of a performance agreement between Anyadike and Kirk that did not mention UMGI, Interscope, BDBE, or any allusion to a conspiracy, and screenshots of unrelated content that did not substantiate a conspiracy. (*See* ECF No. 121-1 (containing ten screenshots from Instagram, seven screenshots from YouTube, and the remaining screenshots from unidentified websites on unidentified dates)).

Moreover, neither Carey nor Anyadike alluded to any evidence at their depositions to support their conspiracy claims. For instance, Carey testified:

**Q.** [. . .] You allege that DaBaby, Universal Music in conjunction with their plotted of attack. So that's an incorrect statement according to your testimony today?
**A.** I mean, I do think they plot attacks because even after my event, what, he had five other attacks where he attacked five other people.
**Q.** And what evidence do you have that Universal Music plotted to attack you?
**A.** He keeps doing the same thing. Keeps attacking people.
**Q.** Uh-huh. But you have no evidence that anybody at Universal Music said, you know, this guy, Kenneth Carey, he'd be a good mark. Let's beat him up and pour apple juice on him, right?
**A.** No.
**Q.** You don't have any evidence to support that claim, correct?
**A.** No, but he's did it before.
**Q.** Excuse me. You don't have any evidence to support that claim, correct?
**A.** Correct.

(ECF No. 156-2 at 240:10–241:5.) Anyadike also testified:

**Q.** Okay. All right. If you would turn to page 4, paragraph 26. Tell me about any documentation that you have reviewed that shows that there is a marketing strategy between Universal, Interscope, and Jonathan Kirk.

**Mr. May:** Object to form.
**A.** You are asking me for the marketing strategy of another company?
**Q.** Yeah.
**A.** I don't have the marketing strategy of another company. I do know that companies people work for are responsible for their employees. And if their employees – if a company is making money off of somebody, they are responsible for how that person is being marketed, because that directly reflects that company. So if the marketing scheme that you are asking for is the negligence of not doing anything when these – when videos, songs, that portray violence is put on the web for everyone to see and has not been taken down, has not been censored or anything like that. **So no, I have not seen their documents. I have not seen their marketing scheme**, but I have seen their ability to not do anything about it.

(ECF No. 156-4 at 171:11–172:14 (emphasis added)).

Additionally, in various orders, the Court found that the underlying claims were patently insufficient. For example, in dismissing the claims against Defendants UMGI and Interscope for lack of personal jurisdiction and insufficient service, respectively, the Court found that "[t]he Amended Complaint [was] simply devoid of any allegations connecting UMGI to the physical altercation between Kirk and Carey," and that "Plaintiffs' speculative conspiracy allegations leap much too far and cannot form the basis for personal jurisdiction." (ECF No. 272 at 8, 10.)

In granting summary judgment on all claims against Defendant BDBE, including the civil conspiracy count against Defendant Kirk, the Court found that

> Plaintiffs' [conspiracy] claims fail at the first element. Plaintiffs admit that Carey had no knowledge of an agreement between Defendants to engage in the purported scheme . . . Similarly, Anyadike's testimony reflects that his only basis for alleging that there was a scheme is BDBE's purported failure to censor or take down Kirk's music and BDBE's purported profiting from said music . . . Plaintiffs point to no other evidence on the record showing that Defendants had an agreement between them to commit an unlawful act. Summary judgment on Count V is thus granted in Defendants' favor.

(ECF No. 279 at 18–19.) As to Counts II and III (assault and battery) against Defendant BDBE, the Court noted that "Plaintiffs fail to mention BDBE in their battery claim" and found that even under a theory of vicarious liability, "Plaintiffs' contentions are nothing more than mere

speculation and conjecture and cannot withstand summary judgment." (*Id.* at 14.) Additionally, the Court found,

> Plaintiffs' unsupported representations that "BDBE was part of the event by putting together the contract and more[,]" (Pls.' Resp. ¶ 25), are insufficient to hold BDBE liable for Kirk's intentional torts . . . Further, Plaintiffs provide no proof that Kirk and the alleged co-conspirators were even wearing a diamond chain associated with BDBE at the time of the incident. There is no proof that the photos Plaintiffs attach to their complaints of individuals with a diamond chain were taken on the day of the Incident. (*See* ECF No. 121-1 at 8). Nor is there evidence that this particular chain is a "BDBE chain," as Plaintiffs posit.

(*Id.* at 14–15.)

As to the remaining counts against Defendant BDBE, the Court held that "[b]ecause the Court has found that Kirk is not liable as to Counts IV, VI, VII, and VIII, BDBE cannot be liable under a theory of vicarious liability." (*Id.* at 29.) In the Court's reasoning as to summary judgment for Kirk on Count IV (promissory estoppel), the Court found that "there is no evidence that Kirk made any promises to Carey," and "Plaintiffs' response to the motion for summary judgment is not evidence, and Plaintiffs have failed to cite to particular parts of materials on the record to support their contentions, even after being given a second chance to do so." (*Id.* at 16–17.) On Count VI (defamation), the Court found: (1) as to the statements in the Police Report, "[u]nlike Plaintiffs' allegations in the Amended Complaint, the allegedly defamatory statements made in the police report were attributed to Carey, not Kirk . . . Summary judgment is thus granted in Defendant's favor as to the statements on the police report"; (2) as to the argument of defamation *per se*, "[b]ased on the face of the statements in Kirk's songs, it is not apparent that the words of the publication relate to Plaintiffs"; and (3) as to the argument of defamation *per quod*, "Plaintiffs have failed to present evidence of actual, out of pocket losses they incurred as a result of the allegedly defamatory statements made against them." (*Id.* at 21–24.) On Count VII (intentional infliction of emotional distress), the Court stated that it "agrees with Kirk that Plaintiffs' claims

'boil down to garden variety battery claims, with no serious injuries even alleged.'" (*Id.* at 25.) Finally, on Count VIII, the Court found, "Carey's claim for civil theft also fails because there is simply no evidence of Carey's damages," and "[b]ecause Plaintiffs' positions rest upon mere allegations and speculation, the Court finds that there is no genuine issue of material fact." (*Id.* at 27–28.)

Rule 11 sanctions are proper herein because there was no factual support for the conspiracy claims. As to Mr. May and the Lions' Den, it is a well-known principle that "an attorney must make a reasonable inquiry into both the legal and factual basis of a claim prior to filing suit." *Worldwide Primates, Inc.*, 87 F.3d at 1255. Where an attorney "does not argue that he lacked the time to investigate the facts, that he was forced to rely solely on [a client] for information, or that he had to depend on forwarding counsel or another attorney," or similar "extenuating circumstances, an attorney cannot simply rely on the conclusory representations of a client[.]" *Id.* Mr. May has presented no extenuating circumstances that would absolve him of his responsibility to inquire about a factual basis prior to asserting a claim such as civil conspiracy. Rather, he has maintained that there were "facts" and "evidence" even up to the time of the Rule 11 Hearing. Further, although the Court has discretion in deciding whether to order Rule 11 sanctions against Plaintiffs individually on this ground, it declines to do so. There is no evidence that Plaintiffs lied or fabricated facts, and indeed their deposition testimony shows that they did not have an understanding of the claims they were asserting. Nevertheless, counsel persisted in the frivolous action. As such, Rule 11 sanctions properly lie with Mr. May and the Lions' Den, rather than with Plaintiffs individually.

In addition to there being no facts to support the allegations that Defendants UMGI, Interscope, and BDBE participated in any kind of conspiracy with Defendant Kirk, the legal theory

itself is also clearly untenable. Indeed, Plaintiffs' approach to liability is completely unsupported by law. Rule 11(b)(2) provides that in presenting a filing to the Court, an attorney attests that "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). Rule 11(c) provides that sanctions are appropriate for a violation of this requirement, namely, when a filing "is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law." *Gulisano*, 34 F.4th at 942 (quoting *Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1314 (11th Cir. 2021)).

Plaintiffs' civil conspiracy and related claims were legally frivolous because they are clearly barred by the intra-corporate conspiracy doctrine. All Defendants argue that the intra-corporate conspiracy doctrine bars Plaintiffs' theory of civil conspiracy because a corporation and its agents/employees cannot legally conspire with each other. (ECF Nos. 222 at 7; 244 at 17.) Plaintiffs do not address this argument in their Opposition briefs. (ECF Nos. 225; 265.)

The intra-corporate conspiracy doctrine provides that "acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001) (quoting *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc)). "Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire amongst themselves." *Id.*

Plaintiffs posited shifting theories of the relationship between the Defendants—but in all instances Plaintiffs alleged that Kirk was either an agent or employee of Defendants UMGI, Interscope, and BDBE. In the Amended Complaint, Plaintiffs alleged that "DaBaby [Kirk] is

signed by and owns solely Billion Dollar Baby Entertainment [BDBE]." (ECF No. 121 at 2.) Plaintiffs alleged that "[a]ll of the parties are *agents* as part of a large chain to [sic] goes from Universal to Interscope to BDBE to DaBaby to Co[-]conspirators." (*Id.* at 9 (emphasis added)). Additionally, Plaintiffs alleged that "[t]he Co[-]conspirators are agents and work for DaBaby and BDBE." (*Id.* at 22.) Then, at his deposition, Carey testified:

> **Q.** So it's your testimony that the people that committed the assault are employees of Billion Dollar Baby Entertainment?
> **A.** Yes.
> **Q.** So you believe – is it your testimony that they're employees of Billion Dollar Baby Entertainment and Universal Music?
> **A. They are employees of Billion Dollar Baby Entertainment, which is signed to Universal Music Group**, so, yes, they are employees of both of them.
> **Q.** And what if Billion Dollar Baby Entertainment was a completely separate entity, would that change your testimony?
> **A.** I mean, I don't think they are a separate entity, but that would, yes.
> **Q.** And if they were employees simply of Billion Dollar Baby Entertainment and not Universal Music, then you would agree with me that nobody from Universal Music was present at the assault, correct?
> **A.** Besides Mr. Kirk, yes.
> **Q.** And Mr. Kirk didn't represent himself to you in any way as dealing on behalf of Universal Music, right?
> **A.** No, **but that's his employer**, so he's in the commission of his employment, what he does. He's an artist.

(ECF No. 156-2 at 230:1–231:1 (emphasis added)).

> **Q.** And in those documents that have been introduced so far and in the text messages, there's no reference to any marketing strategy that involves Universal or Interscope; is that fair to say?
> **A.** Billion Dollar Baby Entertainment is a part of Universal.
> **Q.** There's no reference to Interscope or Universal in any of those documents, am I correct?
> **A.** No, besides Billion Dollar Baby Entertainment.

(*Id.* at 130:2–11.) Additionally, Anyadike testified:

> **Q.** [. . .] [W]ell, first of all, who's an employee of – I missed that – of Universal or Interscope that's involved here?
> **A.** I believe DaBaby is – his record label or his deal is by Interscope. And under that, Interscope is UMG.

(ECF No. 156-4 at 173:24–174:4.)

Under any of the theories posited, Plaintiffs' civil conspiracy claim is based on the premise that Kirk is conspiring with BDBE (a company he solely owns), UMGI, and Interscope, yet simultaneously acting as an employee or agent of BDBE, UMGI, and Interscope. Plaintiffs' theory was clearly barred under the intra-corporate conspiracy doctrine. *See Hogan*, 817 F. App'x at 723 (affirming dismissal of a civil conspiracy claim as barred by the intra-corporate conspiracy doctrine). Not only did Mr. May fail to consider the intra-corporate conspiracy doctrine in formulating his claims, but he also failed to address it *at all* in his Oppositions to the First and Second Rule 11 Sanctions Motions when all Defendants asserted the argument. (*See* ECF Nos. 225; 265.) Further, Mr. May posited no argument to overcome or change the intra-corporate conspiracy doctrine, much less a reasonable one.

Indeed, the case law ultimately cited by Mr. May to support Plaintiffs' theory of civil conspiracy serves as evidence that Mr. May's claims were legally frivolous. In Plaintiffs' Opposition to the First Rule 11 Sanctions Motion, Mr. May primarily relied on *United States v. Lehder-Rivas*, 955 F.2d 1510 (11th Cir. 1992)—a high-profile criminal case wherein multiple defendants were convicted of criminal conspiracy to import cocaine—which he referred to throughout the Opposition as "Noriega and Escobar" as an analogy to the instant action. (ECF No. 225 (referring to "Escobar" twelve times, "Noriega" nine times, and "Ledher" five times in a 10-page brief)). Mr. May attempts to draw comparisons between the cases throughout the Opposition, including, "[a]s an illustration, Noriega was the President of Panama and he appeared to be legit to many. It is the same with Universal, which is the biggest music company in the world," and "[a]s an illustration, Noriega trafficked drugs, using many different people, through Miami into the United States. The drugs he trafficked hurt our country and its citizen[s]. Kirk and Universal/Interscope have hurt many American citizens like the Plaintiffs." (*Id.* at 5.) In the same

Opposition, Mr. May also cited to the "case" of actor Will Smith slapping Chris Rock at the Academy Awards as a comparison to the instant case. (ECF No. 225 at 1, 4–5.) Mr. May cited this as a "non-conspiracy case," for comparison, although it is not even a legal action. (*Id.*)

At the Rule 11 Hearing, when asked to provide legal authority to support Plaintiffs' civil conspiracy claim, Mr. May again referenced "Escobar" and "Noriega" as a comparison to the instant action and for the proposition that the Court must look to the "motive, intent, and opportunity" of each coconspirator to understand the conspiracy. (*See* ECF No. 356.) Mr. May also provided citations to case law for the general proposition that vicarious liability—an entirely distinct legal theory—exists in Florida. (*Id.*) At the conclusion of the hearing, Mr. May even attempted to analogize the instant case to the tragic school shooting at Sandy Hook, an argument the Court did not entertain given its preposterous nature. (*Id.*) In short, as of the Rule 11 Hearing, the best that Mr. May could do was attempt to draw analogies to criminal conspiracies with no connection to anything that could even be said to resemble the case at hand. Citing what the elements of a conspiracy are, and then using extremely high-profile criminal cases as comparators, is not evidence nor does it support a theory that a conspiracy existed under these alleged facts.

After the Rule 11 Hearing (at which Mr. May noted that no further submissions were needed), Mr. May submitted ***two*** supplements, styled as "Notices of Authority." (ECF Nos. 359, 365.) Putting aside the fact that neither filing was permitted by the Court or the Local Rules, the First Supplement contains only cherry-picked quotations from cases that have no factual similarities to the instant action. Indeed, Mr. May did not even attempt to draw any meaningful comparisons. *See, e.g., Cty. of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 569 (11th Cir. 1998) (antitrust conspiracy claim wherein the Court stated that an antitrust conspiracy can be inferred by barriers to entry and other market conditions); *United States v. Anderson*, 747 F.3d 51

(2d Cir. 2014) (criminal case stemming from the Northern District of New York where the defendant was convicted of conspiracy and attempt to possess and distribute controlled substances including ecstasy); *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157 (Fla. 3d DCA 2008) (homeowner alleged civil conspiracy claim against alleged foreclosure assistance company, title company, and mortgage broker, claiming she was defrauded out of the equity in her home). The Second Supplement contains a list of four cases that were *filed* in other courts but that have not yet been adjudicated. (ECF No. 365.) Even so, the cases lack proper citations such that it is unclear which filings, if any, Mr. May intends to reference as a comparator. (*Id.*) The case descriptions include: (1) "Plaintiff sued Brian Warner AKA Marilyn Manson, Record Label Interscope Music Publishing Inc and Nothing Records concerning child molestation in California"; (2) "Plaintiff sued Tremaine Neverson AKA Trey Songz, record label Atlantic Records Group LLC, and the manager case for a rape accusation in California. The Plaintiff alleges that Atlantic Records Group, LLC turned a blind eye despite the years of growing allegations against the singer"; (3) "The State of Nevada v Alvin Kamara for conspiracy to commit assault and battery in Clark County, Nevada where four men attacked one man and all were charged with conspiracy to commit assault and battery"; and (4) "Julia Misley V Defendant Doe 1 (Steven Tyler) and Defendant Doe 2-50 (music industry publishers and other) for sexual battery, sexual assault and IIED alleging that music industry labels and publishers are liable jointly and severally for acts of an artist." (*Id.* at 1–2.) Mr. May does not provide the court, date, or status of any filing within the supplemental cases provided. (*Id.*)

      In sum, the civil conspiracy claim, and the counts related thereto, had no factual or legal basis and do not present a reasonable argument to extend or change the law as it stands. *See, e.g., Gulisano*, 34 F. 4th at 943–44 (affirming the District Court's award of Rule 11 sanctions against

an attorney where the argument "that 'Burlington, Inc.' was the fictitious name of BSI and BCFWC [. . .] was frivolous because there were no facts to support it," and the attorney, "should have known that the motion . . . was frivolous because 'even the most minimal investigation would have alerted' him that there was no such entity as 'Burlington, Inc.'").

Thus, the First and Second Sanctions Motions are **GRANTED** as against Mr. May and the Lions' Den only. Mr. May and the Lions' Den will be assessed reasonable attorneys' fees and costs accrued in connection with each Defendant's defense of the civil conspiracy claim and the claims stemming therefrom (namely, Count V for civil conspiracy against Kirk, and all counts against BDBE, UMGI, and Interscope). The amount of attorneys' fees will be determined by separate Order.

### B. Sanctions Are Not Warranted Under 28 U.S.C. § 1927, or Under the Inherent Power of the Court.

Title 28, United States Code, Section 1927 provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably or vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Under Section 1927, which must be "strictly construed," sanctions may only be awarded when the following three factors are present: "(1) unreasonable and vexatious conduct; (2) such that the proceedings are multiplied; and (3) a dollar amount of sanctions that bears a financial nexus to the excess proceedings." *Macort v. Prem, Inc.*, 208 F. App'x 781, 785–86 (11th Cir. 2006). Moreover, negligence is insufficient to warrant sanctions under Section 1927; rather, bad faith is required, such as "where an attorney knowingly or recklessly pursues a frivolous claim or engages in litigation tactics that needlessly obstruct the litigation of non-frivolous claims." *Id.* If the Court finds that counsel's actions in the case at bar did not multiply the proceedings, the Court need not consider the first component noted above, namely, whether counsel's actions were

"unreasonable and vexatious." *See Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997) (noting that the court need not decide whether counsel's actions were unreasonable and vexatious because counsel had not multiplied proceedings and, thus, Section 1927 sanctions were not warranted). To warrant Section 1927 sanctions, "something more than a lack of merit is required." *Hudson v. Int'l Comput. Negots., Inc.*, 499 F.3d 1252, 1262 (11th Cir. 2007) (citation omitted).

To be sure, and as found above, Plaintiffs in this matter pursued frivolous claims. At least two of their claims, however, were not frivolous, and the issue of damages on those claims went to trial. On those two claims, the jury awarded $100.00 to Plaintiff Anyadike. Damages sustained from Plaintiffs' pursuit of the frivolous claims have been redressed by the Rule 11 Motions.

The issue now before the Court is whether Plaintiffs' counsel multiplied the proceedings, and only if so, whether counsel's actions were unreasonable and vexatious. The 1927 Sanctions Motion is limited, however, to trial conduct and certain "pretrial filings" including jury instructions, a motion to strike Plaintiffs' Notice of Filing Joint Verdict Form, Plaintiffs' witness list, Plaintiffs' exhibit list, Plaintiffs' deposition designations, and Plaintiffs' proposed *voir dire* questions. (*See* ECF No. 341.) While much of Mr. May's conduct throughout the proceedings, as outlined above, was clearly improper—the Court is not persuaded that the conduct *at issue* multiplied the proceedings in any meaningful way. As to trial conduct, while Defendant Kirk notes that Mr. May was admonished during the trial for improper questioning, he fails to show that absent such questioning the trial would have lasted only two days, as opposed to four. Further, the Court does not find that an additional day or two of trial would even be sufficient to make any further findings as to bad faith. Similarly, as to pretrial conduct, while Defendant Kirk correctly notes that Plaintiffs' *voir dire* questions were inappropriate, for example, he does not show how

the filing of those questions multiplied any proceedings, as the Court did not allow Mr. May to ask any of the questions at issue. Additionally, while Mr. May improperly filed a Notice of Filing Joint Verdict Form for all Parties, Defendant Kirk was only one of four Defendants who jointly moved to strike the Notice through a brief Motion to Strike. As a whole, the Court finds that the pretrial and trial conduct identified did not unreasonably and vexatious multiply the proceedings such that sanctions are warranted under 28 U.S.C. § 1927.

Likewise, although the Court has an "inherent power to sanction attorneys or parties to a case," the Court finds that further monetary sanctions are not warranted. *Kleiman v. Wright*, No. 18-cv-80176, 2020 WL 3451682, at *17 (S.D. Fla. June 24, 2020). Indeed, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).

Plaintiffs' counsel, Mr. May, displayed a flagrant disregard for the rules that govern litigation in our District. The repeated failures to abide by the Local Rules, the Federal Rules of Civil Procedure, and the Federal Rules of Evidence, were noted by the Court on several occasions. In addition, counsel has little to no appreciation for the concept that claims must be supported by evidence, and that legal arguments must be supported by existing law or by good faith arguments to extend existing law. There is clearly a disconnect between what counsel deems to be proper arguments before the Court and what actually are proper arguments before the Court. Counsel's proposed *voir dire* questions alone left the Court wondering whether he was seriously intending to have jurors answer questions related to their religious and political beliefs, as if those questions could have any relevance to the damages for assault and battery claims. Sanctioning counsel any further, however, would serve little purpose.

Rather, counsel's conduct causes the Court to seriously question whether Mr. May should be appearing before any Court in our District or State. As such, the Court will refer Mr. May to the District's Grievance committee to determine whether he should be permitted to practice in our District. Further, given the nature and frequency of Mr. May's actions, the Court will refer Mr. May to the Florida Bar to assess any remaining issues of competency to practice law in Florida.

**IV.    CONCLUSION**

Based on the foregoing, it is hereby **ORDERD and ADJUDGED** that:

1.  The First Rule 11 Sanctions Motion, (ECF No. 222) is **GRANTED** as against Mr. May and the Lions' Den and **DENIED** as against Plaintiffs individually.

2.  The Second Rule 11 Sanctions Motion, (ECF No. 244), is **GRANTED** as against Mr. May and the Lions' Den and **DENIED** as against Plaintiffs individually.

3.  Attorneys' fees shall be awarded against Mr. May and the Lions' Den, to Defendants UMGI, Interscope, BDBE, and Kirk, as outlined above.

4.  However, before the Court can award attorneys' fees, it needs additional information. Accordingly, Defendants **SHALL** file an affidavit detailing the number of hours expended as a result of Plaintiffs' counsel's sanctioned conduct. The affidavit should include Defendants' counsel's hourly rate. Defendants **SHALL** file the affidavit **on or before March 10, 2025.**

5.  The 1927 Sanctions Motion, (ECF No. 341), is **DENIED**, as outlined above.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 13 day of February 2025.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
All Counsel of Record